IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE DISTRICT OF CONNECTICUT

2013 MAY 22 P 1: 12

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | |
|---|---|
| JUNE SHEW; RABBI MITCHELL ROCKLIN; STEPHANIE CYPHER; PETER OWENS; BRIAN McCLAIN; STEPHEN HOLLY; HILLER SPORTS, LLC; MD SHOOTING SPORTS, LLC; THE CONNECTICUT CITIZENS' DEFENSE LEAGUE; and the COALITION OF CONNECTICUT SPORTSMEN, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| -against- | ) ) |
| DANNEL P. MALLOY, in his official capacity as Governor of the State of Connecticut; KEVIN T. KANE, in his official capacity as Chief State's Attorney of the State of Connecticut; REUBEN F. BRADFORD, in his official capacity as Commissioner of the Connecticut Department of Emergency Services and Public Protection; DAVID I. COHEN, in his official capacity as State's Attorney for the Stamford/ Norwalk Judicial District, Geographic Areas Nos. 1 and 20; JOHN C. SMRIGA, in his official capacity as State's Attorney for the Fairfield Judicial District, Geographical Area No. 2; STEPHEN J. SEDENSKY III, in his official capacity as State's Attorney for the Danbury Judicial District, Geographical Area No. 3; MAUREEN PLATT, in her official capacity as State's Attorney for the Waterbury Judicial District, Geographical Area No. 4; KEVIN D. LAWLOR, in his official capacity as State's Attorney for the Ansonia/Milford Judicial District, Geographical Areas Nos. 5 and 22; MICHAEL DEARINGTON, in his official capacity as State's Attorney for the New Haven Judicial District, Geographical Area Nos. 7 and 23; PETER A. MCSHANE, in his official capacity as State's Attorney for the Middlesex Judicial District, Geographical Area No. 9; MICHAEL L. REGAN, in his official capacity as State's Attorney for the New London Judicial District, Geographical Area Nos. 10 and 21; PATRICIA M. FROEHLICH, in her official | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT**

May 22, 2013

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

1

capacity as State's Attorney for the Windham )
Judicial District, Geographical Area No. 11; )
GAIL P. HARDY, in her official capacity as )
State's Attorney for the Hartford Judicial District, )
Geographical Areas Nos. 12, 13, and 14; )
BRIAN PRELESKI, in his official capacity as )
State's Attorney for the New Britain Judicial )
District, Geographic Area Nos. 15 and 17; )
DAVID SHEPACK, in his official capacity as )
State's Attorney for the Litchfield Judicial District, )
Geographical Area No. 18; and )
MATTHEW C. GEDANSKY, in his official )
capacity as State's Attorney for the Tolland )
Judicial District, Geographic Area No. 19, )
　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　Defendants. )
　　　　　　　　　　　　　　　　　　　　　　　　)

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs JUNE SHEW; RABBI MITCHELL ROCKLIN; STEPHANIE CYPHER; PETER

OWENS; BRIAN McCLAIN; STEPHEN HOLLY; HILLER SPORTS, LLC; MD SHOOTING

SPORTS, LLC; THE CONNECTICUT CITIZENS' DEFENSE LEAGUE; and THE COALITION

OF CONNECTICUT SPORTSMEN, by and through their attorneys, for their complaint against

defendants DANNEL P. MALLOY; KEVIN T. KANE; REUBEN F. BRADFORD; DAVID I.

COHEN; JOHN C. SMRIGA; STEPHEN J. SEDENSKY III; MAUREEN PLATT; KEVIN D.

LAWLOR; MICHAEL DEARINGTON; PETER A. MCSHANE; MICHAEL L. REGAN;

PATRICIA M. FROEHLICH; GAIL P. HARDY; BRIAN PRELESKI; DAVID SHEPACK; and

MATTHEW C. GEDANSKY, state as follows:

### INTRODUCTION

1.　　　This is an action to vindicate the right of the people of the State of Connecticut to

keep and bear arms under the Second Amendment to the United States Constitution, which prohibits

infringement of the right of law-abiding citizens to keep commonly-possessed firearms in the home

for defense of self and family and for other lawful purposes. In a hasty response to the tragic mass shootings in Newtown, Connecticut, the Connecticut General Assembly passed An Act Concerning Gun Violence Prevention and Children's Safety (Connecticut General Assembly Bill No. 1160) ("the Act") on April 4, 2013. The Act was rushed through the legislature without thorough debate or meaningful public examination. The Act irrationally bans pistols, rifles, shotguns, and magazines that are commonly used for lawful purposes by countless law-abiding citizens in Connecticut and throughout the United States. The Act violates plaintiffs' fundamental rights under the Second Amendment and is unconstitutional.

## PARTIES

2.     Plaintiff **JUNE SHEW** ("SHEW", "individual plaintiff") is resident of Hartland (Hartford County), Connecticut, and a citizen of the United States. Ms. SHEW holds a Permit To Carry Pistols and Revolvers issued by the State of Connecticut. This permit has never been suspended or revoked. She is 80 years old, is widowed, and lives alone.

3.     Plaintiff **RABBI MITCHELL ROCKLIN** ("ROCKLIN", "individual plaintiff") is resident of Fairfield (Fairfield County), Connecticut, and a citizen of the United States. Rabbi ROCKLIN holds a Permit To Carry Pistols and Revolvers issued by the State of Connecticut. This permit has never been suspended or revoked. Rabbi ROCKLIN ministers to the faithful at Congregation Ahavath Achim in Fairfield. He also serves our country as a Captain in the U.S. Army Reserves.

4.     Plaintiff **STEPHANIE CYPHER** ("CYPHER", "individual plaintiff") is resident of Plymouth (Litchfield County), Connecticut, and a citizen of the United States. Ms. CYPHER holds a Permit To Carry Pistols and Revolvers issued by the State of Connecticut. This permit has never

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

been suspended or revoked. Ms. CYPHER is disabled: at the age of 12 she lost her right arm to cancer.

5.    Plaintiff **PETER OWENS** ("OWENS", "individual plaintiff") is resident of Enfield (Hartford County), Connecticut, and a citizen of the United States. Mr. OWENS holds a Permit To Carry Pistols and Revolvers issued by the State of Connecticut. This permit has never been suspended or revoked. Mr. OWENS is disabled: when he was four years old he suffered a stroke and lost the functional use of the left side of his body. As a result, he cannot use most of his left hand or arm.

6.    Plaintiff **STEPHEN HOLLY** ("HOLLY", "individual plaintiff") is resident of Ansonia (New Haven County), Connecticut, and a citizen of the United States. Mr. HOLLY holds a Permit To Carry Pistols and Revolvers issued by the State of Connecticut. This permit has never been suspended or revoked. Mr. HOLLY is a former Navy Seal and is disabled: he has multiple sclerosis and, as a result, he has limited functional use of his left hand.

7.    Plaintiff **BRIAN McCLAIN** ("MCCLAIN", "individual plaintiff") is resident of Monroe (Fairfield County), Connecticut, and a citizen of the United States. Mr. MCCLAIN holds a Permit To Carry Pistols and Revolvers issued by the State of Connecticut. This permit has never been suspended or revoked. He is 73 years old, is a widower, and lives with his son, daughter-in-law, and granddaughter.

8.    Plaintiff **HILLER SPORTS, LLC** ("HILLER", "business plaintiff") is a Connecticut Limited Liability Company with a principal place of business in Norwalk (Fairfield County), Connecticut. HILLER holds a Federal Firearms License ("FFL") that permits it to buy, sell, import and manufacture firearms and ammunition both within and without the State of Connecticut. Pursuant to this license, HILLER buys, sells, receives, and transfers firearms within

and without Connecticut. HILLER sells ammunition, as well as magazines that hold ammunition. The firearms sold by HILLER include rifles, pistols and shotguns. Prior to the enactment of the Act, HILLER sold firearms now classified by the Act as "assault weapons" and standard magazines now classified by the Act as "large capacity magazines." Several models sold by HILLER to the public prior to the Act were AR-15 type modern sporting rifles. Many of the semi-automatic rifles sold by HILLER prior to the Act had characteristics such as pistol grips, forward grips, and thumbhole stocks.

9.     Plaintiff **MD SHOOTING SPORTS, LLC** ("MD", "business plaintiff") is a Connecticut Limited Liability Company with a principal place of business in Monroe (Fairfield County), Connecticut. MD holds a Federal Firearms License ("FFL") that permits it to buy, sell, import and manufacture firearms and ammunition both within and without the State of Connecticut. Pursuant to this license, MD buys, sells, receives, and transfers firearms within and without Connecticut. MD sells ammunition, as well as magazines that hold ammunition. The firearms sold by MD include rifles, pistols and shotguns. Several models of these firearms are semi-automatic, and are capable of accepting detachable magazines. Prior to the enactment of the Act, MD sold firearms now classified by the Act as "assault weapons" and standard magazines now classified by the Act as "large capacity magazines." Several models sold by MD to the public prior to the Act were AR-15 type modern sporting rifles. Many of the semi-automatic rifles sold by MD prior to the Act had characteristics such as pistol grips, forward grips, and thumbhole stocks.

10.     Plaintiff **THE CONNECTICUT CITIZENS' DEFENSE LEAGUE** ("CCDL", "association plaintiff") is a domestic non-stock business entity with a principal place of business in Stratford, CT. The CCDL is a non-partisan, grassroots organization with approximately seven thousand six hundred (7,600) members. The CCDL is devoted to advocating rights affirmed by the

Constitutions of the United States of America and the State of Connecticut. The CCDL is especially dedicated to protecting the unalienable right of all citizens to keep and bear arms, for the defense of both self and State, through public enlightenment and legislative action. The CCDL welcomes anyone who believes that the defense of constitutional rights is critical to the longevity of freedom and to the success of this nation, and in particular that the rights to self-defense and to keep and bear the arms to actualize that defense are fundamental and undeniable. The CCDL brings this suit on its own behalf and on behalf of its members.

11.    Plaintiff **THE COALITION OF CONNECTICUT SPORTSMEN** ("CCS", "association plaintiff") is a domestic non-stock business entity with a principal place of business in Hartford, CT.  The CCS is non-partisan organization with approximately thirty-five thousand (35,000) members.  The CCS is devoted to advocating rights affirmed by the Constitutions of the United States of America and the State of Connecticut. The CCS is dedicated to protecting, promoting and preserving all sportsmen's rights and activities through legislative action and providing information to the membership base. The CCS brings this suit on its own behalf and on behalf of its members.

12.    The individual plaintiffs, business plaintiffs, and members of plaintiffs CCDL and CCS are eligible under the laws of the United States and of the State of Connecticut to receive and possess firearms, including handguns, rifles, and shotguns.

13.    Defendant **DANNEL P. MALLOY** is the Governor of Connecticut, whose principal place of business is in Hartford (Hartford County), Connecticut.  As Governor, MALLOY is required to "take care that the laws be faithfully executed."  Conn. Cont., Article IV, § 12.

14.    On April 4, 2013, Governor Malloy signed into law An Act Concerning Gun Violence Prevention and Children's Safety (Connecticut General Assembly Bill No. 1160) ("the

Act"). Among other things, the Act creates new offenses with severe criminal penalties for previously lawful activities involving the acquisition and possession of widely-used rifles, handguns, and shotguns, and standard ammunition magazines that are in common use. As such, the Act severely and adversely affects Plaintiffs and other law-abiding citizens in Connecticut.

15.     Defendant **KEVIN T. KANE** is the Chief State's Attorney for the State of Connecticut, whose principal place of business is in Rocky Hill (Hartford County), Connecticut.

16.     As Chief State State's Attorney for the State of Connecticut, defendant KEVIN T. KANE is the "chief of the division of criminal justice." CONN. GEN. STAT. § 51-275. The division is responsible for "prosecut[ing] all crimes and offenses against the laws of the state." CONN. GEN. STAT. § 51-277(b). The Chief State's Attorney may "sign any warrants, informations, [and] applications for grand jury investigations"; may in certain circumstances "appear in court to represent the state" or "represent the state in lieu of a state's attorney for a judicial district"; and "shall participate on behalf of the state in all appellate, post-trial and post-conviction proceedings arising out of the initiation of any criminal action." CONN. GEN. STAT. §§ 51-277(c), (d). These prosecutorial activities include commencement of criminal actions against those individuals and/or entities accused of violating the Act.

17.     Defendant **REUBEN F. BRADFORD** is the Commissioner of the Connecticut Department of Emergency Services and Public Protection whose principal place of business is in Middletown (Middlesex County), Connecticut.

18.     As Commissioner of the Connecticut Department of Emergency Services and Public Protection (DESPP), defendant REUBEN F. BRADFORD serves as "administrative head and commanding officer of the Division of State Police." CONN. GEN. STAT. § 29-1b. "The Division of State Police … shall, whenever practical, assist in or assume the investigation, detection and

prosecution of any criminal matter or alleged violation of law." CONN. GEN. STAT. § 29-7.

Moreover, DESPP is tasked with administration of significant portions of the Act challenged here.

Act § 24 (DESPP administers and may adopt regulations regarding declarations of possession of

"large capacity magazines"); CONN. GEN. STAT. § 53-202d (DESPP administers and shall adopt

regulations regarding declarations of possession of "assault weapons").

19.     Defendant **DAVID I. COHEN** is the State's Attorney for the Stamford/Norwalk

Judicial District, Geographical Area Nos. 1 and 20, whose principal place of business is in Stamford

(Fairfield County), Connecticut.

20.     Defendant **JOHN C. SMRIGA** is the State's Attorney for the Fairfield Judicial

District, Geographical Area No. 2, whose principal place of business is in Bridgeport (Fairfield

County), Connecticut.

21.     Defendant **STEPHEN J. SEDENSKY III** is the State's Attorney for the Danbury

Judicial District, Geographical Area No. 3, whose principal place of business is in Danbury

(Fairfield County), Connecticut.

22.     Defendant **MAUREEN PLATT** is the State's Attorney for the Waterbury Judicial

District, Geographical Area No. 4, whose principal place of business is in Waterbury (New Haven

County), Connecticut.

23.     Defendant **KEVIN D. LAWLOR** is the State's Attorney for the Ansonia/Milford

Judicial District, Geographical Area Nos. 5 and 22, whose principal place of business is in Milford

(Fairfield County), Connecticut.

24.     Defendant **MICHAEL DEARINGTON** is the State's Attorney for the New Haven

Judicial District, Geographical Area Nos. 7 and 23, whose principal place of business is in New

Haven (New Haven County), Connecticut.

25.     Defendant **PETER A. MCSHANE** is the State's Attorney for the Middlesex Judicial District, Geographical Area No. 9, whose principal place of business is in Middletown (Middlesex County), Connecticut.

26.     Defendant **MICHAEL L. REGAN** is the State's Attorney for the New London Judicial District, Geographical Area Nos. 10 and 21, whose principal place of business is in New London (New London County), Connecticut.

27.     Defendant **PATRICIA M. FROEHLICH** is the State's Attorney for the Windham Judicial District, Geographical Area No. 11, whose principal place of business is in Danielson (Windham County), Connecticut.

28.     Defendant **GAIL P. HARDY** is the State's Attorney for the Hartford Judicial District, Geographical Area Nos. 12, 13, and 14, whose principal place of business is in Hartford (Hartford County), Connecticut.

29.     Defendant **BRIAN PRELESKI** is the State's Attorney for the New Britain Judicial District, Geographical Area Nos. 15 and 17, whose principal place of business is in New Britain (Hartford County), Connecticut.

30.     Defendant **DAVID SHEPACK** is the State's Attorney for the Litchfield Judicial District, Geographical Area No. 18, whose principal place of business is in Litchfield (Litchfield County), Connecticut.

31.     Defendant **MATTHEW C. GEDANSKY** is the State's Attorney for the Tolland Judicial District, Geographical Area No. 19, whose principal place of business is in Rockville (Tolland County), Connecticut.

32.     Each of the State's Attorney defendants are required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal

matters within the jurisdiction of the court or in which the court may proceed." CONN. GEN. STAT. § 51-286(a). These prosecutorial activities include commencement of criminal actions against those individuals accused of violating the Act.

33.     All Defendants herein are being sued in their official capacities.

## JURISDICTION

34.     Jurisdiction is founded on 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under the color of the laws, statutes, ordinances, regulations, customs and usages of the State of Connecticut, of rights, privileges or immunities secured by the United States Constitution.

35.     This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983.

36.     Venue lies in this district pursuant to 28 U.S.C. § 1391.

### Prohibitions on Standard Magazines

37.     Subject to limited exceptions, the Act bans standard magazines that are in common use by classifying them as "large capacity magazines." These so-called "large capacity magazines" are generally defined by the Act to include devices "that ha[ve] the capacity of, or can be readily restored or converted to accept, more than 10 rounds of ammunition." CONN. GEN. STAT. § 53-202p(a)(1).

38.     Effective on April 4, 2013, the purchase, transfer, distribution, keeping for sale, offering or exposing for sale, or importation into the State of a newly-defined "large capacity magazine" is a Class D felony. CONN. GEN. STAT. § 53-202p(b).

39.     Starting January 1, 2014, possession of any standard magazine that is now defined by the Act as a "large capacity magazine" is a Class D felony. If a standard magazine banned by the

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

Act was obtained before the Act's passage, a first offense for possessing it is an infraction subject to a fine; any subsequent offense is a Class D felony. CONN. GEN. STAT. § 53-202p(c).

40.     Notwithstanding the Act, members or employees of the Department of Emergency Services and Public Protection, police departments, the Department of Correction or the military or naval forces of Connecticut or of the United States may possess, purchase, or import the otherwise banned "large capacity magazines" regardless of whether such possession, purchase, or importation is for use in discharging their official duties or for personal use when off duty. CONN. GEN. STAT. § 53-202p(d)(1).

41.     In addition, a person who prior to January 1, 2014 lawfully possessed a standard magazine that has now been re-defined and banned by the Act as a "large capacity magazine," and who by that date applies to declare possession of the magazine to the Department of Emergency Services and Public Protection may continue to possess the newly banned "large capacity magazine," subject to certain conditions. CONN. GEN. STAT. § 53-202p(e)(3). These conditions restrict possession of such magazines to certain narrowly-defined places where, in some instances, they may contain "not more than ten bullets." CONN. GEN. STAT. § 53-202q(f)-(g).

42.     A non-military person who moves into Connecticut in lawful possession of a newly-defined and newly-banned "large capacity magazine" must, within ninety days, either render it permanently inoperable, sell it to a licensed gun dealer, or remove it from the State. A military person who moves into the State, by contrast, may declare possession of such magazine and keep it. CONN. GEN. STAT. § 53-202p(d).

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

## Prohibitions on Commonly Used Rifles, Handguns, and Shotguns

43.    The Act now defines as "assault weapons" commonly possessed rifles, handguns, and shotguns that are semiautomatic, meaning that they fire only a single round with each pull of the trigger, just like firearms that are not banned by the Act. CONN. GEN. STAT. § 53-202a. The firearms classified by the Act as "assault weapons" are not "machine guns." Machine guns are fully automatic and continue to fire without the need for subsequent pulls of the trigger and for as long as the trigger remains depressed and the machine gun has ammunition.

44.    The Act radically broadens the definition of firearms banned by the Act as "assault weapons" by generally replacing the "two-features" generic test found in prior law with a "one-feature" test. CONN. GEN. STAT. § 53-202a(1)(E)(i). It also adds scores of "specific" semiautomatic firearms named by manufacturer and/or model to the previous list of "specific" firearms categorized as "assault weapons." CONN. GEN. STAT. § 53-202a(1)(A)(i), (B), (C), and (D).

45.    Effective on April 4, 2013, a person who "distributes, transports or imports into the state, keeps for sale, or offers or exposes for sale, or who gives any assault weapon," with certain exceptions, commits a class C felony, and "shall be sentenced to a term of imprisonment of which two years may not be suspended or reduced by the court." CONN. GEN. STAT. § 53-202b(a)(1).

46.    Possession of a firearm defined by the Act as an "assault weapon" generally is a Class D felony. CONN. GEN. STAT. § 53-202c(a).

47.    For possession of a firearm defined by the Act as an "assault weapon" to be grandfathered, the owner, among other things, must have lawfully possessed the firearm on April 3, 2013 and must submit an application to the Department of Emergency Services and Public Protection for a certificate of possession of the firearm by January 1, 2014. CONN. GEN. STAT. § 53-202d(a)(2), (f).

48.     A person who obtains a certificate of possession for a firearm newly banned by the Act as an "assault weapon" may continue to possess the firearm, limited to narrowly-defined places or purposes. CONN. GEN. STAT. § 53-202d(f)-(g).

49.     A non-military person who moves into Connecticut in lawful possession of a firearm newly banned by the Act as an "assault weapon" must, within ninety days, either render it permanently inoperable, sell it to a licensed gun dealer, or remove it from the State. A military person who moves into the State, by contrast, may declare possession of such firearm and keep it. CONN. GEN. STAT. § 53-202d(d).

50.     As amended by the Act, CONN. GEN. STAT. § 53-202a(1)(E) defines an "assault weapon" to include:

*Rifles*

i.      A semiautomatic, centerfire rifle that has an ability to accept a detachable magazine and has at least one of the following:

    I.      A folding or telescoping stock;

    II.     Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

    III.    A forward pistol grip;

    IV.     A flash suppressor;

    V.      A grenade launcher or flare launcher;

ii.     A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds of ammunition; or

iii.    A semiautomatic, centerfire rifle that has an overall length of less than thirty inches....

*Pistols*

iv.   A semiautomatic pistol that has the ability to accept a detachable magazine and has at least one of the following:

    I.   An ability to accept a detachable magazine that attaches at some location outside the pistol grip;

    II.   A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer;

    III.   A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or

    IV.   A second hand grip; or

v.   A semiautomatic pistol with a fixed magazine that has the ability to accept more than ten rounds.

*Shotguns*

vi.   A semiautomatic shotgun that has both of the following:

    I.   A folding or telescoping stock; and

    II.   Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; or

vii.   A semiautomatic shotgun that has the ability to accept a detachable magazine; or

viii.   A shotgun with a revolving cylinder;....

51.   The term "assault weapon" is also broadened by the Act to include over 160 specified semiautomatic rifles, pistols, and shotguns that are commonly used for self-defense, hunting, and sporting activities by law-abiding citizens, "or copies or duplicates thereof with the capability of any such [firearms], that were in production prior to or on the effective date of this section." *See* CONN. GEN. STAT. § 53-202a(1)(A)-(D).

52.     The term "assault weapon" is further broadened by the Act to include a "part or combination of parts designed or intended to convert a firearm" into an "assault weapon," or "a combination of parts from which" an "assault weapon" may be assembled ("rapidly" or otherwise, depending on the type of "assault weapon") if those parts are in the possession or under the control of the same person. CONN. GEN. STAT. §§ 53-202(a)(1)(A)(ii) & (F).

### Facts and Impact

53.     The firearms now categorized as banned "assault weapons," and standard magazines holding more than ten rounds, are and have been commonly used by law-abiding citizens in Connecticut and throughout the United States for lawful purposes, including defense of self and family.

54.     Members of Plaintiffs CCDL and CCS ("members") wish to acquire and possess rifles, handguns, shotguns, and ammunition feeding devices that are affected by the Act, and are subject to and adversely affected by each and every restriction on so-called "assault weapons" (including each definition thereof) and "large capacity magazines" challenged in this complaint.

55.     Individual plaintiffs SHEW, ROCKLIN, CYPHER, OWENS, HOLLY and MCCLAIN wish to acquire and possess rifles, handguns, shotguns, and ammunition feeding devices and are subject to and adversely affected by each and every restriction on so-called "assault weapons" (including each definition thereof) and so-called "large capacity magazines" challenged in this complaint.

56.     The business plaintiffs named herein are adversely affected by each and every restriction on "assault weapons" (including each definition thereof) and "large capacity magazines" challenged in this complaint.  Specifically, as a result of the Act, each and every business plaintiff named herein is legally prohibited from importing "assault weapons" into the state, and from

transferring them, or keeping them for sale or offering them for sale.  This prohibition, as explained in greater detail below, has had a direct and adverse impact on each business plaintiff.

57.     For example, business plaintiff HILLER SPORTS, LLC is in the business of buying, selling, and re-selling firearms and ammunition within and without the State of Connecticut.  One segment of HILLER's business involves the purchase of "AR"-type firearms from out-of-state distributors and the sale of these "AR"-type firearms to customers.  As a direct result of the Act, several of HILLER's out-of-state distributors have stopped altogether the shipment of "AR"-type firearms to the Store due to concern and confusion over whether these types of arms can legally be shipped to, received by and/or sold by the holder of an FFL.  In fact, HILLER has to refund approximately $60,000 of back orders on "AR"-type firearms to its customers because the wholesaler would not ship the "AR"-type firearms to fill them. In addition, firearms that were ordered prior to the enactment of the Act, but not paid for, cannot legally be transferred to customers or offered for sale within Connecticut on or after April 4, 2013. In fact, HILLER has received approximately $11,000 worth of firearms that were ordered and shipped prior to the Act's enactment, but must now be returned to the manufacturer(s) and/or distributor(s).   The sale of those types of firearms was a vast majority of HILLER's sales before the passage of the Act. These stoppages have caused actual harm to HILLER's sales and overall business.

58.     Another segment of HILLER's business involves the sale of accessories for "AR"-type firearms. These include, among other things, slings, rails, optics/scopes, grips, and cases.  As a direct result of the Act, HILLER has not sold one accessory, whereas before the passage of the Act the sale of accessories kept pace with the sale of AR-type firearms.

59.     Another segment of HILLER's business involves the sale of ammunition magazines. As a direct result of the Act, HILLER has returned all large capacity ammunition magazines and has

asked, in turn, for the manufacturers to send it magazines that hold ten rounds. HILLER is still waiting to receive those magazines from the manufacturers. In addition, since ten round magazines are not even manufactured for many firearm models, HILLER currently cannot supply magazines for these firearms at all. The Act's legal prohibitions on transfers and offering for sale of magazines of over ten round capacity has caused actual harm to HILLER's sales and overall business.

60.    As a direct result of the Act, HILLER's overall sales of rifles, pistols, and shotguns have declined drastically. HILLER has observed that this decline in sales involves firearms that contain some of the individual features that are banned by the Act (e.g., pistol grips, etc.), but also firearms that are not characterized by the Act as "assault weapons." This decline is due, in large part, to customer confusion over which kinds of firearms are banned and which are not, as well as customer concern that purchasing a firearm will subject the customer to criminal prosecution.

61.    Business plaintiff MD SHOOTING SPORTS has been directly and adversely affected by the passage of the Act. Prior to enactment of the Act, MD typically did $2,000 to $2,500 in business each weekday and $5,000 to $7,000 in business on Saturdays. After enactment of the Act, however, MD is only generally earning about $1,000 per weekday and $2,000 to $2,500 on Saturdays.

62.    The loss in business threatens the financial viability of MD and has caused MD to consider relocating out of state.

63.    As mentioned above, the Act outlaws the sale of semi-automatic rifles that can accept detachable magazines, and also have a thumbhole stock, a telescoping stock, a forward grip, or any grip that permits the fingers of the trigger hand to rest below the firearm's action when firing. These features are commonly found (either individually or in combination) on AR-15 type modern sporting rifles.

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

64.     Prior to enactment of the Act, one segment of MD's business involved the purchase of "AR"-type firearms from out-of-state distributors and the sale of these "AR"-type firearms to customers.  As a direct result of the Act, MD's out-of-state distributors have stopped altogether the shipment of "AR"-type firearms to MD due to concern and confusion over whether these types of arms can legally be shipped to, received by and/or sold by the holder of an FFL.  In addition, all or most of these firearms cannot be legally transferred to customers or offered for sale within Connecticut on or after April 4, 2013.  These reductions and stoppages have caused actual harm to MD's sales and overall business.

65.     Another segment of MD's business involves the sale of ammunition magazines. As a direct result of the Act, MD's sales of magazines have declined significantly.  This decline involves magazines that hold more than ten rounds, which it is now a felony to sell or offer for sale, and those that hold less than ten rounds. This decline has caused actual harm to MD's sales and overall business.

66.     Another segment of MD's business involves the receipt and transfer of firearms pursuant to the FFL MD holds. As a direct result of the Act, the volume of firearms that MD receives and transfers has declined significantly.  Before enactment of the Act, MD regularly received 5-7 used firearms per week that would be resold.  Now, however, MD only receives 1-2 used firearms per week.  This decline has caused actual harm to MD's sales and overall business.

67.     As a direct result of the Act, MD's overall sales of rifles, pistols, and shotguns has declined significantly.  MD has observed that this decline in sales involves firearms that contain some of the individual features that are banned by the Act (e.g., pistol grips, forward grips, etc.), but also firearms that are not characterized by the Act as "assault weapons."  This decline is due, in large part, to customer confusion over which kinds of firearms are banned and which are not, as

well as customer concern that purchasing a firearm will subject the customer to criminal prosecution. In one recent incident, a customer who had come into MD for the purchase of a bolt action rifle ultimately refused to make the purchase because he incorrectly believed that it was illegal under the Act.

68.    Moreover, Connecticut law enforcement members appear to be confused over what is covered by the Act.  For example, an MD representative personally spoke with a detective in the State Police Special Licensing and Firearms Unit in an effort to determine whether MD could continue to sell Smith & Wesson AR-10 firearms in Connecticut after the enactment of the Act. While the detective told the MD representative that Smith & Wesson AR-10 firearms could continue to be sold in Connecticut, the MD representative later concluded that this was incorrect.

69.    But for the Act, member plaintiffs and individual plaintiffs forthwith would obtain and possess magazines with a capacity of more than ten rounds.  Some members of association plaintiffs have moved into Connecticut after the Act's effective date in lawful possession of "large capacity magazines" and desire to possess their "large capacity magazines" within the State.

70.    Some members, individual plaintiffs, and business plaintiffs are unaware of how to convert large capacity magazines so that they will only hold 10 rounds.  Other members, individual plaintiffs, and business plaintiffs might possess the technical ability to attempt such conversions, but are unaware of the definition of "readily restored or converted" or "permanently altered" that the State of Connecticut would apply to such conversions.

71.    But for the Act, members, individual plaintiffs, and business plaintiffs forthwith would acquire and possess "assault weapons" under each and every one of the definitions of "assault weapons" challenged in this complaint.  Additional members and individual plaintiffs have

moved into Connecticut after the Act's effective date in lawful possession of "assault weapons" and desire to possess their "assault weapons" within the State.

72.     As examples, but for the Act, some members, individual plaintiffs, and business plaintiffs would obtain and possess semiautomatic, centerfire rifles that have the ability to accept a detachable magazine with a folding or telescoping stock or a grip that would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing.  Other members, individual plaintiffs, and business plaintiffs would possess such rifles with a flash suppressor.

73.     By way of further illustration, some members, individual plaintiffs, and business plaintiffs would obtain and possess semiautomatic, centerfire rifles with detachable magazines and with a thumbhole stock.  Such rifles are commonly used for hunting game and for target shooting. A thumbhole stock allows the rifle to be held more comfortably and fired more accurately, but it causes the rifle to be defined as an "assault weapon."

74.     But for the Act, other members, individual plaintiffs, and business plaintiffs would forthwith obtain and possess various other rifles, pistols, and shotguns but may not do so in that the Act defines them as "assault weapons" or fails to provide adequate notice of whether they are or are not "assault weapons."

75.     By way of example, on Monday, May 21, 2013 plaintiff STEPHANIE CYPHER visited Hoffman's Gun Center in Newington, CT.  While there, she inquired if she could purchase a magazine that was capable of holding more than ten (10) rounds of ammunition.  In response, she was told that doing so was illegal. But for the Act, CYPHER would have forthwith purchased a magazine that was capable of holding more than ten (10) rounds of ammunition.

76.     CYPHER currently owns a Saiga shotgun, which was originally equipped with a magazine holding more than ten rounds. While at the Hoffman's store, CYPHER inquired as to whether it was legal to purchase a magazine holding more than ten rounds for her shotgun. In response, she was told that such magazines are now classified as "large capacity" magazines and are no longer available because they are illegal. But for the Act, CYPHER would have forthwith purchased a magazine that is capable of holding more than ten (10) rounds of ammunition for her shotgun.

77.     Also during her visit to the Hoffman's store, CYPHER asked which AR-type rifles could or could not be legally sold. The dealer couldn't answer this question, telling CYPHER that she "really wasn't sure what was banned or what wasn't" and that trying to figure out what guns were legal was "really complicated." The dealer referred CYPHER to the State's website and told CYPHER to "try and figure this out for [her]self."

78.     On Monday, May 6, 2013 CYPHER inquired of a local police officer as to whether she could presently purchase a standard capacity magazine that was capable of holding more than ten (10) rounds of ammunition. In response, she was told that she was not able to do that as they are now illegal, and that if she were to do so she would be arrested.

79.     On Wednesday, May 8, 2013 plaintiff MITCHELL ROCKLIN traveled to the K-5 Arms Exchange located in Milford, CT. While there, ROCKLIN inquired as to whether it was legal to purchase a magazine that was capable of holding more than ten (10) rounds of ammunition. In response, he was told that doing so was illegal. But for the Act, ROCKLIN would have forthwith purchased a standard capacity magazine that is capable of holding more than ten (10) rounds of ammunition.

80.     ROCKLIN owns a Glock 9x19 caliber handgun, which was originally equipped with a 15-round magazine.  While at K-5 store, he inquired as to whether it was legal to purchase a 15-round magazine for this firearm.  In response, he was told that 15-round magazines for his firearm were no longer available because they were illegal. But for the Act, ROCKLIN would have forthwith purchased a 15-round magazine for his Glock handgun.

81.     Also during his visit to the K-5 store, ROCKLIN asked if it was legal to buy a Surplus Arms & Ammo AR-15 type modern sporting rifle, (which is NOT on Connecticut's specific "banned" rifles list, CONN. GEN. STAT. § 53-202a(1)(A)(i), (B)).  The salesperson could not determine whether the firearm ROCKLIN asked about was a "copy or duplicate" of a banned gun, and therefore could not determine if it was legal to sell any of this firearm. But for the Act, ROCKLIN would have forthwith purchased a Surplus Arms & Ammo AR-type modern sporting rifle.

82.     Finally, during his visit to the K-5 store, ROCKLIN inquired as to whether it was legal to purchase a Colt Sporter rifle, a Colt Match Target Rifle, a VEPR rifle in 7.62 x 54R with 5 round magazine, and an IZHMASH Saiga 12 Shotgun with 2 round magazine. The dealer advised ROCKLIN that they were on a list of "banned" firearms and thus could not be sold legally. But for the Act's ban, ROCKLIN would have forthwith purchased one or more of these commonly used firearms.

83.     On Wednesday, May 8, 2013, ROCKLIN inquired of a police officer with the Ridgefield Police Department as to whether he could presently purchase a standard magazine that was capable of holding more than ten (10) rounds of ammunition.  In response, he was told that he was not able to do that as it was illegal, and that if he were to do so he would be arrested.

84.     On Wednesday, May 8, 2013 plaintiff BRIAN McCLAIN traveled to the Connecticut Gun Exchange located in Monroe, CT. While there, he inquired as to whether it was legal to purchase a standard magazine that was capable of holding more than ten (10) rounds of ammunition for one of his firearms. In response, MCCLAIN was told that doing so was illegal. But for the Act's ban, MCCLAIN would have forthwith purchased a standard magazine capable of holding more than ten (10) rounds of ammunition.

85.     MCCLAIN currently owns two  Smith & Wesson M-5906 9 mm caliber semiautomatic pistols, each of which accept a standard 15-round magazine. While at the Connecticut Gun Exchange, MCCLAIN inquired as to whether it was legal to purchase a standard 15-round magazine for these pistols. In response, he was told that 15-round magazines for his firearms are no longer available because they are illegal. But for the Act's ban, MCCLAIN would have forthwith purchased one or more 15-round magazines for his Smith & Wesson pistols.

86.     Also during his visit to the Connecticut Gun Exchange, MCCLAIN asked if he could buy any kind of AR-15 type modern sporting rifle. He was told that all AR-15 type modern sporting rifles are now banned.   When MCCLAIN asked if he could purchase an AR-type rifle that was not on the list of "banned firearms," he was advised that Stag AR-15 type rifles do not appear on the list of firearms banned in Connecticut, but that since Stag AR-15s have a pistol grip they are "banned anyway." But for the Act's ban, MCCLAIN would have forthwith purchased a Stag AR-15 type modern sporting rifle.

87.     Finally, during his visit to the Connecticut Gun Exchange, MCCLAIN inquired as to whether it was legal to purchase a Colt Sporter rifle, a Colt Match Target Rifle, or an IZHMASH Saiga 12 Shotgun with 2 round magazine. The dealer advised him that these firearms could no

longer be sold as they are on a list of "banned" firearms. But for the Act's ban, MCCLAIN would have forthwith purchased one of these common modern sporting rifles.

88.     On May 8, 2013, MCCLAIN inquired of a police officer with the Shelton Police Department as to whether he could presently purchase a magazine that was capable of holding more than ten (10) rounds of ammunition. In response, MCCLAIN was told that he was not able to do that as it was now illegal, and that if he were to do so he would be arrested.

89.     Between May 8th and May 11th of 2013 plaintiff JUNE SHEW inquired of different gun sellers as to her ability to acquire various firearms and magazines. SHEW made these inquiries to the Newington Gun Exchange (located in Newington, CT), Remarcable Arms (located in Wallingford, CT), and JoJo's Gun Works (located in Southington, CT).

90.     SHEW currently owns a Browning 9 mm pistol, which was originally equipped with a magazine that holds more than ten (10) rounds. SHEW asked each of the above sellers if it was possible to purchase a magazine holding more than ten rounds for this pistol. In response, she was told that while they had these magazines in stock, they were no longer available for sale. But for the Act, SHEW would have forthwith purchased a standard magazine that is capable of holding more than ten (10) rounds of ammunition.

91.     SHEW also asked each of these sellers which types of AR-type modern sporting rifles could or could not be legally sold. The sellers advised her that with the passage of the Act no AR-15 type modern sporting rifles are legally available for sale to Connecticut residents. One seller advised SHEW that he had gone so far as to strip (disassemble) all of the AR-15 type firearms that he had in inventory for fear that he would be prosecuted for possessing fully assembled versions of them. But for the Act's ban, SHEW would have forthwith purchased a commonly used AR-type modern sporting rifle.

92.     SHEW asked these sellers if it was possible to buy a Colt Sporter rifle, a Colt Match Target Rifle, a VEPR rifle in 7.62 x 54R with 5 round magazine, or an IZHMASH Saiga 12 Shotgun with 2 round magazine. The sellers advised SHEW that this was not possible, since each of these arms was on the Act's list of newly "banned" firearms. But for the Act, SHEW would have forthwith purchased one or more of these commonly used firearms.

93.     SHEW also inquired of the West Hartford Police Department officer as to whether she could presently purchase a magazine that was capable of holding more than ten (10) rounds of ammunition. In response, she was told that this was illegal, and that if SHEW were to do so she would be arrested.

94.     On Wednesday, May 14, 2013, plaintiff STEPHEN HOLLY traveled to Silver City Sporting Arms in West Haven, Connecticut. While there, HOLLY inquired if it was possible to purchase a magazine that is capable of holding more than ten (10) rounds of ammunition. In response, HOLLY was told that doing so was illegal. But for the Act's ban, HOLLY would have forthwith purchased a standard capacity magazine that is capable of holding more than ten (10) rounds of ammunition.

95.     HOLLY currently owns a CZ 75 9x19 caliber handgun, which was originally equipped with a 12-round magazine. While at the Silver City store, HOLLY asked if it was possible to purchase a 12-round magazine for his firearm. In response, he was told that due to the Act's ban on certain magazines 12-round magazines for this firearm are no longer available for sale. But for the Act's ban, HOLLY would have forthwith purchased a 12-round magazine for his CZ handgun.

96.     Finally, during his visit to the Silver City, HOLLY asked if it was possible to purchase a Colt Sporter rifle, a Colt Match Target Rifle, a VEPR rifle in 7.62 x 54R with 5-round

magazine, or an IZHMASH Saiga 12 Shotgun with 2-round magazine. The dealer told HOLLY this was not possible because these firearms are now on the Act's list of "banned" firearms. But for the Act's ban, HOLLY would have forthwith purchased one or more of these commonly used modern firearms.

97.    On May 14, 2013, HOLLY inquired of a police officer with the Cheshire Police Department as to whether he could presently purchase a magazine that was capable of holding more than ten (10) rounds of ammunition. In response, HOLLY was told that this is illegal under the Act, and that if he were to purchase such a magazine, he would be arrested.

98.    On May 14, 2013 plaintiff PETER OWENS traveled to Hoffman's Gun Center and the Newington Gun Exchange, both located in Newington, CT. While there, OWENS asked if it was possible to purchase a magazine that was capable of holding more than ten (10) rounds of ammunition. In response, he was told that this would be illegal. But for the Act's ban, OWENS would have forthwith purchased a magazine capable of holding more than ten (10) rounds of ammunition.

99.    OWENS currently owns a Steyr handgun, which was originally equipped with a magazine that holds more than ten (10) rounds. While at the stores, OWENS asked if there were any such magazines available for his Steyr handgun. In both locations OWENS was told in response that so-called "large capacity" magazines for this handgun were not available for sale. But for the Act's ban, OWENS would have forthwith purchased a magazine capable of holding more than ten (10) rounds of ammunition for his Steyr handgun.

100.    Also during his visit to the stores, OWENS asked what AR-type rifles could or could not be legally sold. The salespersons advised OWENS that, in their opinion, he could not legally

buy any AR-15 type modern sporting rifle models. But for the Act's ban, OWENS would have forthwith purchased an AR-15 type modern sporting rifle.

101.     Finally, during his visit to these stores, OWENS asked if he could buy a Colt Sporter rifle, a Colt Match Target Rifle, a VEPR rifle in 7.62 x 54R with 5 round magazine, or an IZHMASH Saiga 12 Shotgun with 2 round magazine. The dealer told Owens that he could not because these firearms were on a list of "banned" firearms. But for the Act's ban, OWENS would have forthwith purchased one or more of these commonly used modern firearms.

102.     The Act's broadened definition of common firearms as banned "assault weapons," and certain standard magazines as banned "large capacity magazines" impermissibly restricts the right of law-abiding citizens to possess these commonly used firearms and magazines.

103.     The Act's prohibitions on ownership of these firearms and magazines will not reduce unlawful homicides or other violent crime and will reduce public safety.

104.     The Act's ban is irrational in that it prohibits certain semiautomatic firearms but not others. This allows semiautomatic firearms to remain in circulation while placing citizens at a disadvantage against criminals by precluding the lawful use of common semiautomatic firearms with characteristics that promote accuracy, safety and ease-of-use. These characteristics facilitate the safe and effective use by ordinary citizens, and are plainly valuable to law-abiding citizens seeking to protect themselves.

105.     The Act's ban on firearms that are widely-distributed and commonly used by law-abiding citizens has no impact on criminals who, studies have shown, do not generally use the banned firearms, and who use the common handgun instead. Only about 2% or fewer of crimes involving the use of a gun are committed with the types of firearms banned by the 1994 federal

"assault weapons" ban (now expired).  Furthermore, criminals are not deterred by laws of the type challenged in this suit.

106.    According to  a National Institute of Justice report  issued before the federal "assault weapons" ban expired, it was not possible to  credit the ban with any of the nation's drop in violence involving firearms, and  the impact on firearm-related violence of continuing the federal ban on firearms classified as "assault weapons" would likely be small at best.

107.    Studies show that while criminals rarely fire more than ten rounds when committing a crime using a gun, a citizen (or law enforcement officer) defending him or herself must often fire more than 10 rounds to effectively stop a home invasion or an assault.

108.    Criminals are unlikely to concern themselves with whether the magazines they use to commit crimes are lawful.  Even if they did, they could simply use multiple ten-round magazines or multiple firearms, each equipped with a ten-round magazine. In this sense, the Act will do nothing to prevent crimes during which the criminal shooter expends dozens of rounds or uses multiple magazines.

109.    It is the law-abiding citizen who is most disadvantaged by a ban on standard larger sized magazines, since the stress caused by surprise and fear during the commission of a crime makes it very difficult for a citizen to quickly reload or to handle multiple guns. Criminals are better able to remain calm enough to quickly reload since they plan and control the event.

110.    In the rare instances in which criminals fire more than ten rounds, they typically fire those rounds at a rate that would allow them to replace any magazines that they would empty if they used only ten-round magazines.  Given that criminals, not their victims, choose the time and place of attack, criminals are much more likely than victims to be prepared for a confrontation in this respect. The prohibition on magazines with a capacity of more than ten rounds thereby places  law-

abiding citizens exercising their constitutional right to armed self-defense at a disadvantage, while failing to prevent or impede criminal attacks.

## Injury Threatened by Defendants

111.    The provisions of the Act set forth herein prohibit plaintiffs and members of the plaintiff associations from exercising constitutional rights they would exercise forthwith but for such provisions, which thereby violate their constitutional rights.  Should any plaintiff or member of a plaintiff association run afoul of any such provision, such person is subject to arrest, prosecution, conviction, incarceration, fines, forfeitures, loss of the right to keep and bear arms, and loss of other civil rights.  Accordingly, as a proximate cause of the administration and enforcement of the Act by defendants as aforesaid, Plaintiffs have been, and will continue to be, irreparably harmed.

## COUNT ONE

### (Prohibition on Commonly Possessed Magazines Violates the Second Amendment)

112.    The preceding paragraphs are re-alleged and incorporated herein by reference.

113.    Magazines that have a capacity of more than 10 rounds of ammunition are commonly possessed by law-abiding citizens throughout Connecticut and the United States for self-defense, target shooting, hunting, and other lawful purposes.  Many firearms are designed for and sold with magazines that hold more than 10 rounds.

114.    For many firearms, particularly models no longer in production, magazines holding ten rounds or fewer are simply unavailable because they were never manufactured in the past and will never be manufactured in the future.  The plaintiffs and members who own such firearms and who do not meet the January 1, 2014, deadline to possess and declare possession of such magazines, including persons who move into the state, must dispossess themselves of their existing magazines holding more than ten rounds, thereby rendering the firearms themselves unusable.  For all practical

purposes, the Act's magazine ban amounts to a ban on the legal and commonly used firearms that were designed to be used with these standard magazines.

115. The need for and usefulness of standard magazines holding more than 10 rounds for lawful defense of self and others is demonstrated by the fact that they are issued to law enforcement officers. Criminals have and use magazines without any limitation in capacity. The Act's provisions on magazines put law-abiding citizens at a grave disadvantage relative to criminals, who will not comply with the ten-round capacity limit.

116. For the reasons mentioned previously, it is not realistic to expect ordinary citizens to overcome the harm caused by the Act's ban on larger magazines by owning multiple magazines and changing magazines while confronted with a sudden home invasion, robbery, or other attack. Even if citizens could accomplish such a task in the middle of a criminal attack, and despite physical limitations, there are individual plaintiffs and members of association plaintiff CCDL who own common and popular models of firearms for which extra magazines are no longer in production or available.

117. Some members of plaintiff CCDL are unable to change magazines quickly due to old age, major disability, arthritis, and other physical conditions even in a low stress situation, but are able to defend themselves against crime if they can avoid changing magazines by using a firearm equipped with a magazine with more than ten rounds.

118. By way of illustration, plaintiff STEPHANIE CYPHER is a disabled shooter: when she was 12 years old she lost her right arm to cancer. This disability makes it extremely difficult for CYPHER to change magazines with ease or speed. Since CYPHER can only use her left hand, it takes her more time to exchange an empty magazine for a full one than it does an able-bodied shooter.

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

119.    In order to change a spent magazine, CYPHER must place her firearm down on a bench or table, press the magazine eject button, wiggle the magazine free, exchange the spent magazine for a new one, and then pick up the firearm and continue shooting.

120.    Plaintiff PETER OWENS is also a disabled shooter: due to a stroke at age 4, OWENS has no functional use of his left hand.  This disability makes it extremely difficult for OWENS to change magazines with ease or speed.  In order to change a magazine OWENS must discard the spent magazine from his firearm, tuck the empty firearm under his left arm, pick up a new magazine with his right hand, insert the new magazine into the firearm and then continue firing.  Since OWENS cannot use his left hand, it takes him more time to exchange an empty magazine for a full one than it does an able-bodied shooter.

121.    Plaintiff STEPHEN HOLLY is also a disabled shooter: due to multiple sclerosis, HOLLY has limited functional use of his left hand.  This disability makes it extremely difficult for HOLLY to change magazines with ease or quickness.  In order to change a magazine HOLLY must discard the spent magazine from his firearm, tuck the empty firearm under his left arm, pick up a new magazine with his right hand, insert the new magazine into the firearm and then continue firing.  Since HOLLY cannot use his left hand, it takes him more time to exchange an empty magazine for a full one than it does an able-bodied shooter.

122.    During a magazine change plaintiffs CYPHER, OWENS and HOLLY are effectively unarmed, and the extended time they need to re-load their firearms increases their vulnerability to a criminal attacker advancing during the change. This vulnerability is eliminated if they are allowed to use standard  magazines that hold greater than ten rounds: the more rounds these plaintiffs are able to fire in a self-defense situation, the less exposed they are to the physical danger presented by

a criminal during re-loading. However, the Act's prohibition on so-called "large capacity magazines" only reinforces their vulnerability.

123.    Regarding magazines that have the capacity to accept more than ten rounds of ammunition, plaintiffs generally do not know how to convert, and do not have the parts and tools required to convert, such magazines to hold no more than ten rounds, and even if they had such knowledge, parts, and tools, have no way of knowing whether such magazines would be considered to be ones that could be "readily restored or converted" to accept a higher capacity.

124.    As described above, but for the provisions of the Act forbidding them to do so, members and individual plaintiffs forthwith would acquire and possess magazines with a capacity of over 10 rounds for handguns, rifles, and shotguns for protection of themselves and their families in their homes and for other lawful purposes.  Similarly, but for the provisions of the Act forbidding them to do so, members, individual plaintiffs, and business plaintiffs forthwith would within the State of Connecticut distribute, import into the State, keep for sale, offer or expose for sale, purchase, or transfer such magazines for use for defense of self and family within the home and other lawful purposes.

125.    The Act's prohibitions and restrictions on standard and common magazines that it classifies as "large capacity magazines" that are challenged here appear at the following sections of the Act:  CONN. GEN. STAT. § 53-202p(b) (unlawful to distribute, import into the State, keep for sale, offer or expose for sale, purchase, or transfer "large capacity magazine"); CONN. GEN. STAT. § 53-202p(c) (unlawful to possess "large capacity magazine" on or after January 1, 2014); CONN. GEN. STAT. § 53-202q(d) (requirement, within 90 days, to render permanently inoperable, sell to a licensed gun dealer, or remove from the State "large capacity magazine" in lawful possession of person who moves into the State).

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

126.    Finally, a grandfathered "large capacity magazine," for which an owner may obtain a certificate of possession under the Act, may only be possessed at narrowly-defined locations, and may not contain "more than ten bullets" when possessed at the owner's place of business or other property owned by such person, transporting it between certain places, or under a permit to carry a pistol or revolver, which is restricted to a pistol the person lawfully possessed before the Act's effective date, in which the magazine does not extend beyond the bottom of the pistol grip. CONN. GEN. STAT. § 53-202q(f). But for the Act's prohibitions, plaintiffs who obtain certificates of possession would not limit their possession of such magazines to the restricted locations, would possess them with more than ten cartridges, and would possess them with pistols lawfully possessed both before and after the effective date, including pistols in which the magazine extends beyond the bottom of the pistol grip.

127.    The aforesaid prohibitions and restrictions on "large capacity magazines," facially and as applied, infringe on the right of the people, including plaintiffs, business plaintiffs, and members of plaintiff associations, to keep and bear arms as guaranteed by the Second Amendment of the United States Constitution, and as made applicable to the States by the Fourteenth Amendment.

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

## COUNT TWO

### (Prohibition on Commonly Possessed Firearms Violates the Second Amendment)

128.   The preceding paragraphs are re-alleged and incorporated herein by reference.

129.   Prior to the Act, Connecticut law used the pejorative term "assault weapon" to describe certain commonly-possessed rifles, handguns, and shotguns and to prohibit their possession, distribution, transportation or importation into the State, keeping for sale, offering or exposing for sale, or giving.  The pre-Act law exempted certain of the banned firearms  from the possession and transfer restrictions if the firearm was manufactured before September 13, 1994; certain other pre-Act banned firearms  could be possessed if their owners lawfully possessed them before October 1, 1993, and applied for a certificate of possession by October 1, 1994.

130.   The Act radically broadens the category of commonly used rifles, handguns, and shotguns that are banned to prohibit the possession of any such firearms if they were not lawfully possessed on April 3, 2013, and to require the registration of any such firearms lawfully possessed on that date by applying for a certificate of possession.

131.   Under the Act, a semiautomatic, centerfire rifle that can accept a common ease-of-use feature such as detachable magazine is not classified as an "assault weapon."  But under the Act's "single feature" test, this ordinary modern rifle becomes an "assault weapon" merely by reason of having one additional safety, accuracy, or ease-of-use feature. CONN. GEN. STAT. § 53-202a(1)(E)(i).

132.   A "telescoping stock" allows the length of the stock to be shortened or lengthened to accommodate the varying size of shooters, and to allow smaller shooters (such as women and the elderly) to better balance the firearm and fire safely and accurately.  Its usefulness as a safety and

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

accuracy feature makes the adjustable stock a standard feature on many sporting firearms, military-issue rifles, and police-issue rifles.

133.    A "flash suppressor" is a commonly used device that assists law-abiding citizens in avoiding detection by criminals while using a firearm for self defense at night, and reduces the likelihood of momentarily blindness after firing in self-defense.

134.    Firearm grips and stocks (including pistol grips, thumbhole stocks, forward grips, or any other stock or grip which allows an individual to grip the weapon such that any finger on the trigger hand (in addition to the trigger finger) is directly below any portion of the action of the weapon when firing) are common safety, accuracy, and ease-of-use features that allow citizens greater ability to balance and hold onto a rifle.

135.    Under the Act, a semiautomatic pistol that has an ability to accept a detachable magazine is not an "assault weapon."  Yet the Act's "single feature" test turns this ordinary and common pistol into a banned  "assault weapon" as soon as a single common safety, accuracy, or ease-of-use feature is added.  CONN. GEN. STAT. § 53-202a(1)(E)(iv).

136.    The "ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip" is a design feature that allows a  more accurate trigger mechanism.  For this reason, this accuracy feature is found on Olympic-style sporting pistols.

137.    A "second pistol grip," and  a "threaded barrel capable of accepting a … forward pistol grip," allow for greater control of the pistol and  promote accuracy and the ability of a citizen to hold onto a gun when defending against a criminal attack.

138.    As explained above, a "flash suppressor"—and hence a "threaded barrel capable of accepting a flash suppressor"—are useful to citizens protecting themselves from criminal attacks and home invasions at night.

139.   A "shroud" on the barrel of a pistol is a common safety feature that protects a citizen from being burned while shooting a firearm.

140.   The Act turns any semiautomatic shotgun that has the ability to accept a detachable magazine into a banned "assault weapon." CONN. GEN. STAT. § 53-202a(1)(E)(vii).  Yet, the ability of a shotgun to accept a detachable magazine makes it a common safety and ease of use feature, since it simply makes the shotgun safer to unload, as all of the shells in a loaded magazine may be removed at once, while many shotguns with fixed magazines are unloaded by repeatedly cycling the action and running each shell through the firing chamber.

141.   The Act turns other common and useful semiautomatic shotguns into banned "assault weapons" if they have both "a folding or telescoping stock" *and* a "grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing.' CONN. GEN. STAT. § 53-202a(1)(E)(vi).  As explained in connection with rifles, these features are common safety, accuracy and ease-of-use features found in many modern firearms.

142.   None of the safety, accuracy, and ease-of-use features discussed here make a rifle, shotgun, or pistol more powerful or dangerous.  Prohibiting guns with features that promote safety, accuracy, defensive utility, and user comfort infringes Second Amendment rights.  It decreases safety, accuracy, and ease-of-use for law-abiding citizens and is not rational.

143.   Prior to the Act, Connecticut law classified more than 60 "specified semiautomatic firearms" as "assault weapons."  The Act maintains the identification of these firearms as "assault weapons," and it adds to the list more than 100 common and popular modern firearms that fall into the categories of "specified semiautomatic rifles," "semiautomatic pistols," and "semiautomatic

shotguns." The Act also adds many other commonly used firearms that could be classified as "copies or duplicates thereof with the capability of any such [specified semiautomatic firearms], that were in production prior to [April 4, 2013]." CONN. GEN. STAT. § 53-202a(1)(A)-(D).  No rational basis exists to ban commonly used firearms that fire only once per trigger pull, such as the extremely popular and widely used AR-15 type modern sporting rifle. This type of rifle is owned by millions of Americans who have made it the firearm of choice for self-defense, hunting, target shooting, and other lawful purposes.

144.    For instance, the list includes the "AR-15." CONN. GEN. STAT. § 53-202a(1)(B)(xx). That term is often used to describe perhaps the most widely-produced and popular rifle in the United States, although the term is vague for a criminal statute inasmuch as no semiautomatic rifle is actually marked with "AR-15" as its model name.  The list includes the Colt Match Target Rifles and various rifle models made by Springfield Armory, Armalite, Olympic Arms, Smith and Wesson, and other leading manufacturers. CONN. GEN. STAT.§ 53-202a(1).  While the list purports to include only "semiautomatic centerfire rifles," it includes the pump-action "Remington Tactical Rifle Model 7615," which is sold with a ten-round magazine. CONN. GEN. STAT. § 53-202a(1)(B)(xxxv).  The list singles out just one brand of shotguns, "[a]ll IZHMASH Saiga 12 Shotguns," which includes models with traditional wood stocks and two-round detachable magazines, which are safer to unload than other designs. CONN. GEN. STAT. § 53-202a(1)(D).

145.    The Act defines the term "assault weapon" to include a "part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined [elsewhere in the Act], or any combination of parts from which an assault weapon, as defined [elsewhere in the Act] may be assembled"—or "rapidly assembled", depending on the type of firearm—"if those parts are in the possession or under the control of the same person." CONN. GEN. STAT. § 53-202a(1)(A)(ii),

(F).  For the same reasons that the Second Amendment does not allow Connecticut to ban the common modern rifles, shotguns, and pistols that the Act defines as "assault weapons," the Second Amendment  also does not allow Connecticut to ban the parts that make up those useful firearms.

146.    But for the provisions of the Act forbidding them to do so, member plaintiffs, individual plaintiffs, and business plaintiffs forthwith would acquire and possess within the State rifles, shotguns, and pistols with the above features and names for protection of themselves and their families, for target shooting, and for hunting.  But for the provisions of the Act forbidding them to do so, member plaintiffs, individual plaintiffs, and business plaintiffs likewise forthwith would distribute, transport or import into the State, keep for sale, offer or expose for sale, or give such firearms for such purposes.

147.    The prohibitions and restrictions on the common and ordinary rifles, pistols, and shotguns banned by the Act challenged here appear at the following sections of the General Statutes of Connecticut, as amended by the Act: § 53-202b(a)(1) (unlawful to distribute, transport or import into the state, keep for sale, offer or expose for sale, or give "assault weapon"); § 53-202c(a) (unlawful to possess "assault weapon"); § 53-202d(d) (requirement for person who moves into state in lawful possession of an "assault weapon" to, within 90 days, render it permanently inoperable, sell it to a licensed gun dealer, or remove it from the State).  These provisions are challenged to the extent they apply to "assault weapons" as defined in CONN. GEN. STAT. § 53-202a(1)(A)(i), (B)-(D), (E)(i)(I)-(IV), (E)(ii), (E)(iii), (E)(iv)(I)-(IV), (E)(v)-(vii), and to the extent they apply to parts in light of these provisions, CONN. GEN. STAT. § 53-202a(1)(A)(i), (F), except the Act is not challenged to the extent it defines an "assault weapon" to include "any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user," CONN. GEN. STAT. § 53-202a(1)(A).

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

148.     The aforesaid prohibitions and restrictions on rifles, pistols, and shotguns, which are commonly possessed throughout the United States by law-abiding persons for lawful purposes, facially and as applied, infringe on the right of the people, including plaintiffs and members of plaintiff associations, to keep and bear arms as guaranteed by the Second Amendment of the United States Constitution, and as made applicable to the States by the Fourteenth Amendment.

## COUNT THREE

**(Prohibition on Commonly Possessed Magazines Denies Equal Protection of the Laws)**

149.     The preceding paragraphs are re-alleged and incorporated herein by reference.

150.     As explained above, the Act denies law-abiding, responsible citizens the right to possess, purchase, and import into the State certain common and standard magazines for the self defense and other lawful purposes.   Yet the Act provides that such banned magazines  may be "possessed, purchased or imported by:  Members or employees of the Department of Emergency Services and Public Protection, police departments, the Department of Correction or the military or naval forces of this state or of the United States for use in the discharge of their official duties or when off duty …." CONN. GEN. STAT. § 53-202p(d)(1).

151.     Thus, the Act allows any member or employee of these governmental entities to possess, purchase, or import a magazine that is otherwise banned by the Act  even if the member or employee is off-duty and regardless of whether the member or employee uses such a  magazine as part of his or her official duties, yet the Act  denies the same rights to other law-abiding citizens.

152.     Similarly, a non-military person who moves into Connecticut in lawful possession of a magazine now banned by the Act  must, within ninety days, either render it permanently inoperable, sell it to a licensed gun dealer, or remove it from the State, while a military person who

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

moves into the State may declare possession of such magazine and keep it, including for private, non-duty purposes. CONN. GEN. STAT. § 53-202q(1)(A).

153.    The aforesaid discrimination against law-abiding citizens who wish to protect themselves and their families from violence and engage in other lawful activities with firearms denies to plaintiffs and members of plaintiff associations the equal protection of the laws, contrary to the Fourteenth Amendment to the United States Constitution.

## COUNT FOUR

### (Prohibition on Commonly Possessed "Assault Weapons" Denies Equal Protection of the Laws)

154.    The preceding paragraphs are re-alleged and incorporated herein by reference.

155.    A non-military person who moves into Connecticut in lawful possession of a firearm banned by the Act as an "assault weapon" must, within ninety days, either render it permanently inoperable, sell it to a licensed gun dealer, or remove it from the State.  Yet, a military person who moves into the State, by contrast, may declare possession of such firearm and keep it, including for any private, non-duty purpose. CONN. GEN. STAT. § 53-202d(d).

156.    The aforesaid discrimination against law-abiding citizens who wish to protect themselves and their families from violence, or use such common firearms for other lawful purposes,  denies to plaintiffs and members of plaintiff associations the equal protection of the laws, contrary to the Fourteenth Amendment to the United States Constitution.

## COUNT FIVE

### (Provisions of the Act are Vague, Fail to Give Notice, and Violate Due Process)

157.    The preceding paragraphs are re-alleged and incorporated herein by reference.

158.    Parts of the Act fail to provide adequate notice and are vague, in violation of the Due Process Clause of the Fourteenth Amendment.  The following sets forth vague portions of the Act

involving the defined terms "large capacity magazines" and "assault weapons." Plaintiffs and members possess certain items and other plaintiffs and members of plaintiff associations would forthwith obtain such items, but for the fact that they cannot determine whether such items constitute restricted "large capacity magazines" or "assault weapons" as described below.

### "Large Capacity Magazines"

*"can be readily restored or converted to accept"*

159.   The Act's definition of a "large capacity magazine" includes a device that "can be readily restored or converted to accept, more than ten rounds of ammunition," excluding "a feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition." CONN. GEN. STAT. § 53-202p(a)(1).

160.   These terms fail to inform a reasonable person as to *who* can readily restore or convert such devices, whether lay persons or trained experts with the requisite knowledge and skill, and with what equipment, ranging from common household tools to machine shops. Nor do these provisions inform a reasonable person as to how much time or ease of effort is signified by "readily." Moreover, an ordinary person has no way to know whether such device "has been permanently altered" not to hold more than ten rounds.

161.   An ordinary person may be able to ascertain the capacity of a magazine by counting the number of rounds that may be inserted into the magazine. However, such person would not know by outward examination of a magazine if it "can be readily restored or converted to accept, more than," and "permanently altered so that it cannot" accept more than, a certain number of rounds. Just to begin the inquiry, one would be required to disassemble every magazine in one's possession, if one has the knowledge and skill to do so, and if the magazine is capable of being disassembled without destroying it.

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

162.    If the magazine is disassembled, the resultant pile of parts would not inform one whether it "can be readily restored or converted to accept, more than," or is "permanently altered" not to accept, a certain number of rounds, and if so, how many.  The average person may not be able to reassemble the magazine, and to do so in a manner that would decrease the number of rounds it will hold.  That would likely require the alteration, cutting, filing, or other manipulation of parts, matters about which the ordinary person would have no information or skill.

163.    Accordingly, the terms "can be readily restored or converted to accept" are unconstitutionally vague.

## "Assault Weapons"

### Inaccurate Names

164.    The Act inaccurately and ambiguously lists "assault weapons" by reference to manufacturer, model, and other terms.  The words listed in the Act in many cases do not correspond to what is actually engraved on specific firearms, leaving the possessor or the person who would obtain possession, without knowledge of what is prohibited.

165.    For instance, the Act refers to "the following specified semiautomatic firearms: . . . Avtomat Kalashnikov AK-47 type," oblivious to the fact that "Avtomat" refers not to a semiautomatic but to a machine gun in Russian, and that "Avtomat Kalashnikov" is not engraved on any known firearm.  CONN. GEN. STAT. § 53-202a(1)(A)(i).  It refers to "Colt AR-15" and "AR-15," § 53-202a(1)(A)(i) & (B)(xx), despite that those were the original model names not of semiautomatics but of machine guns, and that Colt never manufactured semiautomatic rifles with just those model names.

166.    In other instances, the Act correctly names firearm models, but such firearms are not what the Act represents them to be.  For instance, the Act defines "assault weapon" in part as "[a]ny

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

of the following specified semiautomatic centerfire rifles . . . Remington Tactical Rifle Model 7615 . . . ." CONN. GEN. STAT. § 53-202a(1)(B)(xxxv). However, that is not a semiautomatic rifle at all, and instead is a pump rifle.

167.    The Act also lists manufacturers and models that bear little relation to actual features. For instance, Beretta originally manufactured rifles stamped with the name "BM59," but with quite diverse features. But the only "BM59" listed in the Act is the "Springfield Armory BM59," without reference to the diverse features used by that manufacturer. CONN. GEN. STAT. § 53-202a(1)(A)(i). Out of the scores of listings, only a single rifle is identified with a feature – the "Ruger Mini-14/5F folding stock model only." CONN. GEN. STAT. § 53-202a(1)(A)(i).

*"in production prior to or on the effective date of this section"*

168.    "Assault weapon" is defined in part as "[a]ny of the following specified semiautomatic centerfire rifles, or copies or duplicates thereof with the capability of any such rifles, that were in production prior to or on the effective date of this section," following which is a list of more than 160 names, such as "(xx) AR-15; . . . (xxii) Colt Match Target Rifles," etc. CONN. GEN. STAT. § 53-202a(1)(B). Identical language about being "in production prior to or on the effective date of this section" appears in reference to semiautomatic pistols, CONN. GEN. STAT. § 53-202a(1)(C), and semiautomatic shotguns, CONN. GEN. STAT. § 53-202a(1)(D). These terms are unconstitutionally vague and, as everything that follows in each of those provisions is dependent on the validity of these terms, the provisions are void in their entirety.

169.    It is unclear whether the reference to firearms "that were in production" before or on the effective date refers to (a) the "specified" firearms that are listed by name (model, manufacturer, or other) or (b) to the "copies or duplicates" of such firearms. Under either reading, vagueness pervades these provisions.

170.    An average person has no way to know just by the name of a "specified" firearm, *e.g.*, "Colt Match Target Rifles," that it was or was not "in production" before or on any specific date. The words engraved on a firearm, such as "Colt Match Target Rifles," do not inform a person whether that firearm was "in production" at any given time. Such a listed name could be used on two or more firearms that differ substantially in design and features and that were in production at different time periods. Since each and every listed firearm name is prohibited or not prohibited depending on whether it was "in production prior to or on the effective date of this section," each and every listed firearm name is fatally vague.

171.    Alternatively, if the firearms "that were in production" before or on the effective date refers to the "copies or duplicates thereof with the capability of any such [firearm]," the average person has no way to know this either. While the terms "copies or duplicates" and "capability" themselves are vague, a reasonable person lacks knowledge of when specific firearms "were in production."

172.    Accordingly, the following provisions are, in their entirety, unconstitutionally vague both facially and as applied: CONN. GEN. STAT. § 53-202a(1)(B), § 53-202a(1)(C), and § 53-202a(1)(D).

*"copies or duplicates thereof with the capability of any such [firearms], that were in production prior to or on the effective date of this section"*

173.    "Assault weapon" is defined in part as "specified" firearms, "or copies or duplicates thereof with the capability of any such [firearms], that were in production prior to or on the effective date of this section," following which are listings of over 160 names of rifles, pistols, and shotguns. CONN. GEN. STAT. § 53-202a(1)(B), § 53-202a(1)(C), & § 53-202a(1)(D).

174.    The Act fails to inform a reasonable person how similar a firearm must be to an "assault weapon" named in the Act to be deemed a "copy" or "duplicate" thereof, or how such

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

person who possesses a firearm that may or may not be a copy or duplicate, but does not possess or have knowledge of a named "assault weapon" listed in the Act for comparison, would know that it is a copy or duplicate. This requires a person (a) to have specialized knowledge of the more than 160 named "assault weapons" in the Act identified by manufacturer, model, or other term, (b) to understand the design and feature details that would elude virtually anyone but the engineers who designed such firearms, and (c) to know that a firearm not named in the Act is a copy or duplicate of an "assault weapon" named in the Act, rather than vice versa. By the Act's definition, if a listed "assault weapon" is a "copy or duplicate" of a non-listed firearm, the non-listed firearm would not be an "assault weapon."

175.    For instance, the Act lists as an "assault weapon" the "Springfield Armory BM59." CONN. GEN. STAT. § 53-202a(1)(A)(i). Beretta manufactured a "BM59" and then discontinued such manufacture long before Springfield Armory manufactured a rifle with that model name. The Beretta BM59 would thus not be a copy or duplicate of the Springfield Armory BM59 and thus would not be prohibited. But an ordinary person would have no knowledge of such history.

176.    The Act further fails to inform a reasonable person what the word "capability" means, including what factors would be considered and how they would be measured. Even if "capability" was defined, a person would need to have possession both of the firearm in question and of the named "assault weapon," and to be able to test them, to determine whether they have, for instance, the same rate of fire, caliber, ballistics, range, durability, accuracy or whatever the attributes of "capability" are determined to be. That would require highly specialized equipment and knowledge. Moreover, possession of the "assault weapon" needed for testing would be unlawful. The task is impossible for the ordinary person, who has no way to know that a firearm

possessed would have "the capability" of a named "assault weapon" about which the person knows nothing.

177.    Finally, compliance with the Act requires the average person to know not only that a firearm is a copy or duplicate of one of more than 160 named firearms and that it has "the capability" of any such named firearm, but also that the "specified semiautomatic [firearms]" were such as "were in production prior to or on the effective date of this section . . . ." The listings of firearms "specified" by manufacturer, model, or other words to be "assault weapons" are limited to those that "were in production prior to or on the effective date of this section," but firearms "specified" by one and the same manufacturer, model, or other words are *not* "assault weapons" if they were *not* "in production prior to or on the effective date of this section." Whatever the meaning of these convoluted terms, the average person has no reasonable means of ascertaining with any reasonable degree of certainty whether a firearm is a "copy or duplicate" with "the capability" of another firearm that was or was not "in production prior to" April 4, 2013.

178.    Accordingly, the following provisions are, in their entirety, unconstitutionally vague both facially and as applied: CONN. GEN. STAT. § 53-202a(1)(B), § 53-202a(1)(C), and § 53-202a(1)(D).

*"part or combination of parts designed or intended*
*to convert a firearm into an assault weapon"*

179.    As amended by the Act, the General Statutes include in the definition of an" assault weapon" a "part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in" other provisions of the subdivision defining an "assault weapon." CONN. GEN. STAT. § 53-202a(1)(A)(ii), (F).

180.    The Act does not specify how an ordinary person is to determine whether firearm parts are "designed or intended to convert a firearm into an assault weapon." Even if an ordinary

GOLDBERG SEGALLA, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
(860) 760-3300

person could determine whether firearm parts were *capable* of being used to convert a firearm into an "assault weapon," that person still would have no reasonable means of ascertaining with a reasonable degree of certainty whether the parts were *designed* or *intended* for that purpose.

181.    Accordingly, the terms "part or combination of parts designed or intended to convert a firearm into an assault weapon" are unconstitutionally vague.

*"any combination of parts from which an assault weapon ... may be assembled [or 'rapidly assembled'] if those parts are in the possession or under the control of the same person"*

182.    As amended by the Act, the General Statutes include in the definition of an "assault weapon" "any combination of parts from which an assault weapon, as defined in" other provisions of the subdivision defining an "assault weapon," that "may be assembled"—or "rapidly assembled," depending on the type of "assault weapon"—if those parts are in the possession or under the control of the same person."  CONN. GEN. STAT. § 53-202a(1)(A)(ii), (F).

183.    These terms fail to inform a reasonable person as to *who* can assemble or rapidly assemble an "assault weapon" from such parts, whether lay persons or trained experts with the requisite knowledge and skill and with what equipment, or even whether the provisions refer to potential assembly by *any* person or the *particular* person in possession or control of the parts in question.

184.    Further, where the requirement is that parts "may be rapidly assembled" into an "assault weapon," the law does not indicate how much time is signified by the term "rapidly."

185.    Accordingly, the terms "any combination of parts from which an assault weapon ... may be assembled"—or "rapidly assembled"—"if those parts are in the possession or under the control of the same person." are unconstitutionally vague.

**WHEREFORE**, Plaintiffs pray that this Honorable Court:

186.     Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Act and General Statutes specified herein (CONN. GEN. STAT. §§ 53-202a(1)(A)(i); 53-202a(1)(A)(ii); 53-202a(1)(B); 53-202a(1)(C); 53-202a(1)(D); 53-202a(1)(E); 53-202a(1)(F); 53-202b(A)(1); 53-202c(a); 53-202d(a)(2); 53-202d(d); 53-202d(f); 53-202d(f)-(g);  53-202p(a)(1); 53-202p(b); 53-202p(c); 53-202p(d); 53-202p(d)(1); 53-202p(e)(3); 53-202p(f); 53-202q(1)(A); and 53-202q(f)-(g)) infringe on the right of the people to keep and bear arms, in violation of the Second and Fourteenth Amendments to the United States Constitution and are void;

a.     Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Act and General Statutes, as specified herein, deny to Plaintiffs the equal protection of the laws, contrary to the Fourteenth Amendment to the United States Constitution.

b.     Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Act and General Statutes, as specified herein, are vague, fail to give notice, and violate the right of Plaintiffs to due process of law, contrary to the Fourteenth Amendment to the United States Constitution.

c.     Enter a preliminary and permanent injunction enjoining the Defendants and their officers, agents, and employees from administration and enforcement of the provisions alleged herein to violate the United States Constitution;

d.     Award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

e.      Grant such other relief as may be proper.

Dated:  May 22, 2013
        Hartford, CT

                              GOLDBERG SEGALLA, LLP

                              By:_____
                              Brian T. Stapleton, Esq.
                              100 Pearl Street, Suite 1100
                              Hartford, CT 06103
                              (860) 760-3300
                              bstapleton@goldbergsegalla.com

                              *Counsel For Plaintiffs*

364519.1