## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

JUNE SHEW, *et al.*,                       :
                                            :
                                            :
              Plaintiffs,                   :
                                            :
v.                                          :        CASE NO.: 3:13-CV-00739 (AVC)
                                            :
                                            :
DANNEL P. MALLOY, *et al.*,                 :
                                            :
                                            :
              Defendants.                   :
_____ :        July 15, 2013

## NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.'S AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF AMICUS CURIAE ................................................................................1

BACKGROUND AND SUMMARY OF THE ARGUMENT ........................................1

ARGUMENT ...................................................................................................................2

I.      Principles Established by *Heller* and *McDonald*. ..............................................2

II.     The Second Amendment's Protection of Certain "Arms" Is Absolute ...............6

III.    The Act's "Assault Weapon" Ban Outlaws Firearms Commonly Used
        for Lawful Purposes and Is Therefore Unconstitutional. ...................................7

IV.     The Act Is Unconstitutional Under Any Level of Scrutiny Even if Such
        Balancing Tests Are Appropriate. ....................................................................12

V.      The Ban on Magazines Capable of Holding More than Ten Rounds Also
        Violates the Second Amendment. .....................................................................17

VI.     *Heller II* ...........................................................................................................20

CONCLUSION ...............................................................................................................26

## TABLE OF AUTHORITIES

**Cases**  **Page**

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) .........................................................22

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)....................................16

*Clark v. Jeter*, 486 U.S. 456 (1988)..................................................................................12

*Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ......................................................16, 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..................2, 3, 6, 7, 9, 12, 18, 21, 22, 23, 24

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .....................................................5

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)..................4, 9, 21, 22, 23, 24, 25

*Houston v. City of New Orleans*, 675 F.3d 441 (5th Cir. 2012), *withdrawn and superseded on reh'g on other grounds*, 682 F.3d 361 .................................................4

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) ........................5, 6, 12, 13

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)..................................................2, 4

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)..............................................................5

*Nguyen v. INS*, 533 U.S. 53 (2001)...................................................................................16

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)....................................................22

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983).....................12

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .....................................12

*Staples v. United States*, 511 U.S. 600 (1994) .....................................................8, 10, 24

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ......................................................................11

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)..................................................3, 4

*United States v. Miller*, 307 U.S. 147 (1939).....................................................................7

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................................13, 16

**Constitutional Materials and Statutes**

U.S. CONST. amend. II ........................................................................................................6

CONN. GEN. STAT. § 53-202a..................................................................................1, 8, 9, 10

CONN. GEN. STAT. § 53-202b ............................................................................................1, 2

CONN. GEN. STAT. § 53-202c...............................................................................................2

CONN. GEN. STAT. § 53-202d...............................................................................................2

The Connecticut Act Concerning Gun Violence Prevention and Children's Safety,
Pub. Act. No. 13-3, as amended by An Act Concerning Revisions to the Gun Violence
Prevention and Children's Safety Act, Pub. Act. No. 13-220

§ 23 .................................................................................................................................1

§ 24 ........................................................................................................................1

**Other**

1 HAWKINS, TREATISE OF THE PLEAS OF THE CROWN (1716) ......................................6, 7

Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*,
    80 GEO. WASH. L. REV. 703 (2012) ................................................................4

Christopher S. Koper et al., Report to the National Institute of Justice, United States
    Department of Justice, *An Updated Assessment of the Federal Assault Weapons Ban:
    Impacts on Gun Markets and Gun Violence, 1994-2003* (2004) .............................14, 15, 17, 19

Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can
    Teach Us About the Second*, 122 YALE L.J. 852 (2013)..............................................4

David B. Kopel, *Assault Weapons*, in GUNS: WHO SHOULD HAVE THEM? 159
    (David B. Kopel ed., 1995)........................................................................10

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
    20 J. CONTEMP. L. 381 (1994) ........................................................8, 10, 15

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:
    An Analytical Framework and A Research Agenda*, 56 UCLA L. REV. 1443 (2009)...............15

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997) ....... 13, 14, 15, 19, 20

GUN DIGEST 2013 (Jerry Lee ed., 67th ed. 2012) ..........................................................18

Josh Sugarmann, *Assault Weapons and Accessories in America*,
    VIOLENCE POLICY CENTER, http://www.vpc.org/studies/awaconc.htm ................................11, 12

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW
    (Charles F. Wellford et al. eds., 2005)..............................................................15

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion
    Analogue*, 60 HASTINGS L.J. 1285 (2009) ..............................................8, 9, 10, 11, 15

Peter Reuter & Jenny Mouzos, *Australia: A Massive Buyback of Low-Risk Guns*, in
    EVALUATING GUN POLICY (Jens Ludwig & Philip J. Cook eds., 2003) ..............................14, 15

Professor Randy Barnett, *Gun Control Fails Rationality Test*, WASH. EXAMINER
    (Jan. 29, 2013), http://washingtonexaminer.com/gun-control-fails-
    rationality-test/article/2519971 ........................................................................16

Thomas E. Romano, *Firing Back: Legislative Attempts to Combat Assault Weapons*,
    19 SETON HALL LEGIS. J. 857 (1995)..................................................................14, 15

*What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the
    Judiciary*, 113th Cong. (2013) (written testimony of David B. Kopel, Research Director,
    Independence Institute), *available at* http://www.judiciary.senate.gov/pdf/1-30-
    13KopelTestimony.pdf ........................................................................10, 11, 18, 20

## INTEREST OF AMICUS CURIAE

The National Rifle Association of America, Inc. ("NRA") is America's foremost and oldest defender of Second Amendment rights. Founded in 1871, the NRA today has approximately five million members. The NRA is America's leading provider of firearms marksmanship and safety training for civilians. The NRA has a strong interest in this case, and in the granting of Plaintiffs' Motion for a Preliminary Injunction, because the law at issue here violates the Second Amendment rights of its many members residing in Connecticut by prohibiting them from possessing or acquiring commonly-owned firearms and ammunition magazines.

## BACKGROUND AND SUMMARY OF THE ARGUMENT

The Connecticut Act Concerning Gun Violence Prevention and Children's Safety, Pub. Act. No. 13-3, as amended by An Act Concerning Revisions to the Gun Violence Prevention and Children's Safety Act, Pub. Act. No. 13-220 (the "Act"), labels magazines capable of holding more than ten rounds "large capacity magazines." Act § 23(a)(1). In general, the Act prohibits the transfer of such magazines and, starting January 1, 2014, prohibits their possession. Act § 23(b)-(c). A person who lawfully possesses a "large capacity magazine" on April 5, 2013 may continue to possess it after that date, provided he registers it with the State before January 1, 2014. Act §§ 23(e)(4), 24(f) The Act also expands the list of specified firearms that Connecticut considers "assault weapons" and broadens the general definition of "assault weapons" to, among other things, include semi-automatic firearms capable of accepting detachable magazines that also have one of a list of enumerated features. *See* CONN. GEN. STAT. § 53-202a(1)(B)-(E).[1] Transfer and possession of such a firearm is generally prohibited. *See* CONN. GEN. STAT. § 53-

---

[1] Citations to the General Statutes reflect any changes made by the Act.

202b(a), § 53-202c(a).  A person who possessed such a firearm before passage of the Act may continue to do, but only if she registers it with the State by January 1, 2014.  CONN. GEN. STAT. § 53-202d(a)(2), (f).  Because these provisions outlaw firearms and standard magazines that are "of the kind in common use . . . for lawful purposes," *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008), they cannot be reconciled with the Second Amendment.

## ARGUMENT

**I.      Principles Established by *Heller* and *McDonald*.**

The Supreme Court's recent decisions in *Heller* and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), provide authoritative guidance for interpreting and applying the Second Amendment.

*First*, the Second Amendment protects an "*individual right*" that "*belongs to all Americans*." *Heller*, 554 U.S. at 581, 595 (emphasis added).  And as the Court repeatedly emphasized in both *Heller* and *McDonald*, the "inherent" and "pre-existing" right of self-defense is the "core" and "the *central component* of the [Second-Amendment] right itself." *Id.* at 592, 599, 628, 630; *accord McDonald*, 130 S. Ct. at 3036; *id.* at 3047 (controlling opinion of Alito, J.).

*Second*, the right to keep and bear arms is a *fundamental* right, implicit in our constitutional scheme of ordered liberties and "deeply rooted in this Nation's history and tradition." *McDonald*, 130 S. Ct. at 3036.  This fundamental right is entitled to no less respect than the other fundamental rights protected by our Constitution and may not to be "treat[ed] . . . as a second-class right" or "singled out for special—and specially unfavorable—treatment." *McDonald*, 130 S. Ct. at 3043, 3044.

*Third*, the Second Amendment is "enshrined with the scope [it was] understood to have *when the people adopted [it]*, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35 (emphasis added). Accordingly, the Second Amendment's scope is determined through "historical analysis" and any limits on the right must be supported by "historical justifications." *Id.* at 627, 635.

*Fourth*, and relatedly, the line between permissible and impermissible arms regulations *is not* to be established by balancing the individual right protected by the Second Amendment against purportedly competing government interests. This balance has already been struck, for the Second Amendment "is the very *product* of an interest-balancing by the people," and "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634, 635.

Thus, while *Heller* made clear that the District of Columbia's handgun ban would fail "any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights," *id.* at 628, the Court pointedly did not apply any of those standards but rather flatly and categorically struck down the ban after finding it irreconcilable with the Second Amendment's text and history. Likewise, the Court categorically invalidated the so-called "trigger-lock requirement"—the separate, independent provision of D.C. law requiring "that firearms in the home be rendered and kept inoperable at all times"—without subjecting it to any of the forms of scrutiny. *Id.* at 630.

Further, the Court expressly rejected the "interest-balancing" approach proposed by Justice Breyer in dissent, *see id.* at 634-35, an approach that was in substance, if not in name, a form of intermediate scrutiny, *see, e.g.*, *id.* at 704-05 (Breyer, J., dissenting) (finding "no cause here to depart from the standard set forth in *Turner* [*Broadcasting System, Inc. v. FCC*, 520 U.S.

180 (1997)],'' a "First Amendment case[] applying intermediate scrutiny"). *McDonald* reiterated

that *Heller* "expressly rejected the argument that the scope of the Second Amendment right

should be determined by judicial interest balancing." 130 S. Ct. at 3047 (controlling opinion of

Alito, J.). And *McDonald* emphasized that resolving Second Amendment cases *would not*

"require judges to assess the costs and benefits of firearms restrictions and thus to make difficult

empirical judgments in an area in which they lack expertise." *Id.* at 3050.

    Despite the Supreme Court's clear guidance, a number of lower courts in the wake of

*Heller* have resolved Second Amendment claims by applying a levels-of-scrutiny analysis, often

settling on an intermediate scrutiny approach closely resembling Justice Breyer's rejected

interest-balancing test. These decisions, we respectfully submit, are not faithful to *Heller* and

*McDonald*. *See, e.g.*, Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the*

*Second Amendment*, 80 GEO. WASH. L. REV. 703, 706-07 (2012) ("The lower courts . . . have

effectively embraced the sort of interest-balancing approach that Justice Scalia condemned

. . . ."); Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can*

*Teach Us About the Second*, 122 YALE L.J. 852, 855 (2013) ("Some judges . . . have simply

ignored the Court's rejection of balancing tests."); *Heller v. District of Columbia*, 670 F.3d 1244,

1271 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave

little doubt that courts are to assess gun bans and regulations based on text, history, and tradition,

not by a balancing test . . . ."); *Houston v. City of New Orleans*, 675 F.3d 441, 448 (Elrod, J.,

dissenting) (5th Cir. 2012), *withdrawn & superseded on reh'g on other grounds*, 682 F.3d 361

("*Heller* and *McDonald* rule out scrutiny analysis.").

    The Second Circuit erroneously applied intermediate scrutiny in *Kachalsky* to uphold the

State of New York's requirements for obtaining a license to carry a handgun in public. *See*

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012). But regardless of whether *Kachalsky* was correctly decided—and we submit that it was not, both in its application of intermediate scrutiny and in its ultimate result—its interest-balancing analysis does not control here. For unlike the Act, the New York law under review in *Kachalsky* did not amount to a flat ban, *see id.* at 98 (New York did not categorically "forbid[] anyone from carrying a handgun in public"), and it did not extend into the home, *see id.* at 94 ("New York's licensing scheme affects the ability to carry handguns only *in public. . . .*"). In contrast, the Act bans anyone from purchasing or taking possession of newly banned firearms and magazines.

*Kachalsky* thus does not foreclose application of *Heller*'s categorical approach to a law that *does* amount to a flat ban and that *does* extend into the home. Indeed, even the first distinction standing alone is sufficient: the Seventh Circuit, for example, eschewed the levels-of-scrutiny analysis it had applied in other Second Amendment cases in striking down the State of Illinois's "flat ban on carrying ready-to-use guns outside the home." *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012); *see also id.* at 941 (declining to rely "on degrees of scrutiny" in deciding case). And the case is even stronger, of course, when, as here, both distinctions are present. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional.").

In sum, as even *Kachalsky* recognized, "where a state regulation is entirely inconsistent with the protections afforded by an enumerated right—as understood through that right's text, history, and tradition—it is an exercise in futility to apply means-end scrutiny." 701 F.3d at 89

n.9. That is the case here. The Act can and should be struck down without resort to means-end scrutiny.

## II.    The Second Amendment's Protection of Certain "Arms" Is Absolute.

The text of the Second Amendment provides that "the right of the people to keep and bear *Arms*, shall not be infringed." U.S. CONST. amend. II (emphasis added).  It follows that there are certain "instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, that law-abiding, responsible, adult citizens have an inviolable right to acquire, possess, and use.  Indeed, the Second Amendment's "core protection"—the right to armed self-defense, including, most acutely, in the home—is no less absolute than the First Amendment's protection of the expression of unpopular opinions:

> The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrongheaded views.  The Second Amendment is no different.  . . .  And whatever else it leaves to future evaluation, it surely *elevates above all other interests* the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Id.* at 634-35 (emphasis added).

As the Supreme Court has made clear, the arms protected by the Second Amendment are those weapons "of the kind in common use . . . for lawful purposes like self-defense." *Id.* at 624. Conversely, "the Second Amendment *does not* protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625 (emphasis added).[2]

---

[2] This distinction is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—a tradition that did not bar

> Persons of Quality [from] wearing *common Weapons* . . . for their Ornament or Defence, in such places, and upon such Occasions, in

According to *Heller*, then, the possession and use of short-barreled shotguns, like the possession and use of modern-day "M-16 rifles" and other "sophisticated arms that are highly unusual in society at large," can be restricted without constitutional concern. *Id.* at 628. But the possession and use of firearms of the kind in common use for self-defense and other lawful purposes is constitutionally protected.

Applying this "common use" test, *Heller* flatly and categorically struck down the District of Columbia's handgun ban. As the Court explained, that ban "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." *Id.*; *see also id.* at 628-29 (Handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family."); *id.* at 629 ("[T]he American people have considered the handgun to be the quintessential self-defense weapon."); *id.* ("[H]andguns are the most popular weapon chosen by Americans for self-defense in the home . . . .").

## III.    The Act's "Assault Weapon" Ban Outlaws Firearms Commonly Used for Lawful Purposes and Is Therefore Unconstitutional.

The constitutionality of the Act at issue here thus turns on whether the banned rifles, shotguns, and pistols are in common use for lawful purposes in this Nation. The answer to that question is plainly yes.

---

> which it is common Fashion to make use of them, without causing the least Suspicion of an Intention to commit any Act of Violence or Disturbance of the Peace.

1 HAWKINS, TREATISE OF THE PLEAS OF THE CROWN 136 (1716) (emphasis added). And this distinction is rooted in founding-era militia practices: "Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind *in common use* at the time." *Heller*, 554 U.S. at 625 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939) (brackets omitted) (emphasis added)).

Indeed, the answer to that question should be apparent from the very definition the Act uses for the weapons it seeks to ban. It describes "assault weapons" as "semiautomatic" rifles, shotguns, and pistols of particular makes and models or with additional features that, as explained below, generally make those firearms easier and safer to use. *See* CONN. GEN. STAT. § 53-202a(1). And while, as also explained below, "assault weapon" is a term of opprobrium invented for political and public relations purposes, "semiautomatic" is a term that has a distinct meaning, and it is a weapon type that has been in existence for over a hundred years. *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994) ("semiautomatics are more than a century old"). And unlike "machineguns, sawed-off shotguns, and artillery pieces," semiautomatic firearms "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 611-12 (1994). Indeed, semiautomatic firearms are one of the most widely used kinds of firearms and are commonly employed for lawful purposes including home protection, hunting, and recreational shooting.

The "automatic" part of "semi-automatic" refers to the fact that the user need not manipulate the firearm (via mechanisms such as a bolt or lever) to place another round in the chamber after each single round is fired. But unlike a fully automatic firearm, a semiautomatic firearm will *not* fire continuously on one pull of its trigger; rather, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round. *See id.* at 602 n.1. In that regard, it is functionally no different than another common handgun, the revolver.

A large percentage of firearms in common civilian use in the United States are semiautomatic, including many handgun, rifle, and shotgun models that fall outside the Act's definition of "assault weapons." Indeed, "it is just not credible to say that semiautomatic technology is unusual or uncommon," given that "sixty percent of gun owners [own] some type

8

of semiautomatic firearm." Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller

*and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1293-95 (2009) (discussing 1994 survey).

Further, "[t]he vast majority of handguns today are semi-automatic." *Heller II*, 670 F.3d at 1286

(Kavanaugh, J., dissenting); *accord* Declaration of Mark Overstreet, Doc. 15-1 ("Overstreet

Decl."), ¶ 13 ("Annual firearm manufacturing and export statistics released by the [ATF]

indicate that semiautomatic pistols rose as a percentage of total handguns made in the United

States and not exported, from 50 percent of 1.3 million handguns in 1986, to 82 percent of three

million handguns in 2011."). And given that handguns are generally regarded by the American

people as "the quintessential self-defense weapon" and thus cannot be prohibited, *Heller*, 554

U.S. at 629, it follows that "semi-automatic handguns are constitutionally protected under the

Supreme Court's decision in *Heller*," *Heller II*, 670 F.3d at 1289.

Again, all semiautomatic firearms—including the safety-enhanced firearms banned under

the Act—discharge only a single shot per trigger pull. They are thus fundamentally different

from fully automatic, military weapons. But the firearms banned by the Act are *not*

fundamentally different from some of the semiautomatic firearms that it permits.

Indeed, Americans own millions of the very semiautomatic firearms the Act bans. The

prohibited AR-15 rifle,[3] for example, is America's "most popular semi-automatic rifle." *Heller*

*II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting). Since 1986, nearly four million AR-15-type

rifles have been manufactured for the U.S. commercial market. Overstreet Decl. ¶ 5. In 2011,

AR-15s *alone* "accounted for at least seven percent of firearms, and 18 percent of rifles, made in

the U.S. for the domestic market that year. *Id.* ¶ 8; Johnson, 60 HASTINGS L.J. at 1296 ("the AR-

15" is "now the best-selling rifle type in the United States"). Indeed, the AR-15 is the very

---

[3] *See* CONN. GEN. STAT. § 53-202a(1)(B)(xx).

firearm that the Supreme Court in *Staples* identified as being among those firearms that "traditionally have been widely accepted as lawful possessions." 511 U.S. at 612.

The Act outlaws many other commonly used firearms through its ban on semiautomatic rifles, handguns, and shotguns with certain features. Semiautomatic rifles with the capacity to accept detachable magazines, for example, are banned if they have one additional enumerated feature, such as certain grips (*e.g.*, a pistol grip or thumbhole stock), or a folding or telescoping stock. *See* CONN. GEN. STAT. § 53-202a(1)(E)(i). A detachable magazine in such a rifle does nothing to distinguish a semiautomatic firearm from other familiar, commonly-possessed firearms. Indeed, most semiautomatic firearms in America have a detachable magazine. *See* Johnson, 60 HASTINGS L.J. at 1298 n.100 (citing David B. Kopel, *Assault Weapons*, in GUNS: WHO SHOULD HAVE THEM? 159, 165 (David B. Kopel ed., 1995)).

To be sure, under the Act a detachable magazine, standing alone, is not enough to transform an otherwise lawful pistol or rifle into a banned "assault weapon." But to the extent the additional attributes that, when combined with a detachable magazine, push a firearm over the line from acceptable to contraband are functional, they tend to *improve* the firearm's utility and safety for self-defense, recreational shooting and other lawful purposes. A pistol grip, for example, makes it easier to hold and stabilize a rifle or shotgun when fired from the shoulder and therefore promotes accuracy. *See* Kopel, 20 J. CONTEMP. L. at 396 ("The defensive application is obvious, as is the public safety advantage in preventing stray shots."). A thumbhole stock also promotes better control by the user. A telescoping or folding stock not only makes it easier to transport a firearm in a vehicle or to store it in the home, *id.* at 398-99, but, more importantly, also promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting position. *What Should America Do About Gun Violence?:*

10

*Hearing Before the S. Comm. on the Judiciary*, 113th Cong. 8 (2013) (written testimony of

David B. Kopel, Research Director, Independence Institute) ("Kopel Testimony"), *available at*

http://www.judiciary.senate.gov/pdf/1-30-13KopelTestimony.pdf. Features such as these are at

least as useful for lawful self-defense and recreational use as for criminal aggression.

What, then, can possibly explain why the Act singles out the firearms that it does?  A

little history goes a long way towards providing an explanation.  The term "assault weapon" is a

neologism—a recent invention that does not denote any pre-existing category of weapon

recognized in the history of firearms:

> Prior to 1989, the term 'assault weapon' did not exist in the
> lexicon of firearms.  It is a political term, developed by anti-gun
> publicists to expand the category of 'assault rifles' so as to allow an
> attack on as many additional firearms as possible on the basis of
> undefined 'evil' appearance.

*Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (internal

quotation marks omitted).  The leaders of this movement were not coy about the political agenda

behind their invention of this term:

> Assault weapons . . . are a new topic.  The weapons' menacing
> looks, coupled with the public's confusion over fully automatic
> machine guns versus semi-automatic assault weapons—anything
> that looks like a machine gun is assumed to be a machine gun—
> can only increase the chance of public support for restrictions on
> these weapons.

Josh Sugarmann, *Assault Weapons and Accessories in America*, VIOLENCE POLICY CENTER,

http://www.vpc.org/studies/awaconc.htm (last visited July 11, 2013) (emphasis omitted). *See*

*also* Johnson, 60 HASTINGS L.J. at 1289-90 ("Some people still believe the assault weapons

debate is about machine guns.  This is not surprising given that proponents of the 1994 ban were

counting on precisely that confusion.  The calculation was political.").

In accord with this pedigree, the Act's definition of "assault weapons" turns not on a firearm's value or appropriateness for self-defense or other lawful civilian purposes, nor on features that render a firearm unusually dangerous to the public or the police. *See Heller*, 554 U.S. at 627. Rather, firearms are classified (and banned) based primarily on whether they have features frequently found on military firearms (other than automatic action, of course, which has long been sharply restricted on civilian firearms) or are believed simply to have particularly "menacing looks." Sugarmann, *Assault Weapons and Accessories in America*.

## IV.   The Act Is Unconstitutional Under Any Level of Scrutiny Even if Such Balancing Tests Are Appropriate.

As an initial matter, the only balancing test that possibly could be appropriate is strict scrutiny, which requires that a restriction on a fundamental constitutional right be narrowly tailored to serve a compelling governmental interest. As explained above, the Supreme Court held in *McDonald* that the Second Amendment right to keep and bear arms is *fundamental*. And when a law interferes with "fundamental constitutional rights," it generally is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973). *See also, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("[C]lassifications affecting fundamental rights . . . are given the most exacting scrutiny."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("[S]trict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution."). Because the Act strikes directly at the fundamental, enumerated right to keep and bear arms, nothing less than strict scrutiny would be appropriate.[4]

---

[4] Although it ultimately left the question open, *see Kachalsky*, 701 F.3d at 93, *Kachalsky* supports application of strict scrutiny to laws that limit the right to keep and bear arms in the home. *See, e.g., id.* at 89 ("Second Amendment guarantees are at their zenith within the home."); *id.* at 93-94 ("[A]pplying less than strict scrutiny when the regulation *does not* burden

At any rate, the Act could not pass even intermediate scrutiny, for it is not even "substantially related to the achievement" of the government's objective of advancing public safety. *United States v. Virginia*, 518 U.S. 515, 533 (1996). As an initial matter, to the extent that some of the forbidden features—such as a pistol grip, thumbhole stock, and folding or telescopic stock—singled out by the Act actually serve to *enhance* a firearm's utility and safety for self-defense, the Act's ban on certain types of semiautomatic firearms not only does not *substantially serve* its goal of advancing public safety, it is affirmatively at war with it.

In addition, it is wholly implausible that criminals bent on committing murder or other acts of deadly violence would give serious thought to whether their weapon of choice would be legal for them to possess. And even if this were not the case, a criminal could simply substitute for a banned safety-enhanced firearm another equally powerful—or even more powerful— semiautomatic firearm. *See* GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 128 (1997) (Assault rifles "are generally less lethal than ordinary hunting rifles, while ['assault weapon'] pistols are no more lethal than [non-'assault weapon'] handguns."). Again, the term "assault weapon" does not denote any mechanically distinct category of semiautomatic firearms but rather bans certain semiautomatic firearms because of certain user-friendly features or simply because of the way they look, while leaving other functionally indistinguishable and equally (or more) lethal firearms untouched. *See id.* at 121 (noting that "[t]he few dozen models of semiautomatic guns that ha[d] been banned as ['assault weapons' by the 1994 federal ban and similar State laws] are, as a group, mechanically identical to the hundreds of models not banned"

---

the 'core' protection of self-defense in the home . . . is . . . consistent with jurisprudential experience analyzing other enumerated rights. For instance, when analyzing First Amendment claims, content-based restrictions on noncommercial speech are subject to strict scrutiny, while laws regulating commercial speech are subject to intermediate scrutiny." (emphasis added) (citations omitted)).

in relevant respects, and "[t]herefore, there is no basis for expecting that the outcomes of *any*

shootings would be different . . . if unbanned semiautomatic guns capable of accepting

detachable magazines were used instead of mechanically identical, though cosmetically different,

banned ['assault weapons']").

Not surprisingly, empirical evidence from the now-expired 1994 federal ban on

semiautomatic "assault weapons" supports the commonsense proposition that the Act will not

materially advance public safety. To begin, this evidence indicates that criminals use "assault

weapons" so infrequently that it cannot reasonably be expected that banning them will have a

significant impact on crime or homicide rates. "Assault weapons" "were used in only a small

fraction of gun crimes prior to the [1994] ban: about 2% according to most studies and no more

than 8%." Christopher S. Koper et al., Report to the National Institute of Justice, United States

Department of Justice, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on*

*Gun Markets and Gun Violence, 1994-2003* 2 (2004); *see also* KLECK, TARGETING GUNS at 41-

42, 112. These results are consistent with studies conducted in prisons indicating that

"criminals not only did not 'prefer' military-style guns, they were strongly *dis*inclined to carry

them during commission of their crimes, even when they owned one." KLECK, TARGETING

GUNS at 117. Police officers also report that criminals prefer not to use "the sophisticated and

expensive assault weapons as commonly thought." Thomas E. Romano, *Firing Back:*

*Legislative Attempts to Combat Assault Weapons*, 19 SETON HALL LEGIS. J. 857, 890 & n.171

(1995) (citing George R. Wilson, chief of the firearms division for the Washington, D.C. police

department).

It is thus not surprising that the effects on homicide of the national "assault weapons"

ban were "statistically insignificant." Peter Reuter & Jenny Mouzos, *Australia: A Massive*

*Buyback of Low-Risk Guns*, in EVALUATING GUN POLICY 121, 141 (Jens Ludwig & Philip J.

Cook eds., 2003); NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL

REVIEW 97 (Charles F. Wellford et al. eds., 2005) ("[G]iven the nature of the [1994 assault

weapons ban], the maximum potential effect of the ban on gun violence outcomes would be

very small and, if there were any observable effects, very difficult to disentangle from chance

yearly variation and other state and local gun violence initiatives that took place

simultaneously."). Indeed, before the 1994 ban expired in 2004, a study sponsored by the

National Institute of Justice reported that, if the ban were continued, "effects on gun violence

[were] likely to be small at best and perhaps too small for reliable measurement." Koper, Report

to the National Institute of Justice at 3. *See also* Johnson, 60 HASTINGS L.J. at 1290, 1302;

Kopel, 20 J. CONTEMP. L. at 404-13.

To be sure, the Act's definition of prohibited weapons is broader than that contained in

the 1994 ban. But a definition of assault weapons that sweeps in a broader range of guns used by

criminals simply means that more criminals will either ignore the law or use different firearms

that are equally effective for their criminal purposes. Thus, at most, "violent criminals will

simply resort to more easily attainable, equally lethal weapons." Romano, 19 SETON HALL

LEGIS. J. at 892; Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-*

*Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. REV. 1443, 1468

(2009) ("[A]nyone who is denied an 'assault weapon' will almost certainly substitute another

gun that is equally lethal. It's therefore hard to see how assault weapons bans will do much to

reduce danger of crime or injury."); KLECK, TARGETING GUNS at 106 ("[R]estrictions on one

subtype of firearms encourage criminals to substitute other gun types, and in some cases the most

likely substitutes are even more dangerous than the targeted weapons.").

15

In sum, given the Act's arbitrary classification of firearms on the basis of largely cosmetic differences, its effect of making unavailable firearm features that improve functionality for personal protection, and the ready ability of criminals to substitute functionally indistinguishable lawful firearms for the firearms it would ban, the Act's prohibition against *law-abiding* citizens owning certain semiautomatic firearms plainly will not improve public safety. This dooms the Act under intermediate scrutiny, for a legislative restriction on a constitutional right is presumed invalid unless the state can carry its burden of proof to show that the restriction serves an important government interest in a direct and substantial way. *See, e.g.*, *Nguyen v. INS.*, 533 U.S. 53, 73 (2001) (upholding sex classification because it was based on "basic biological differences" between men and woman, not "misconceptions and prejudices"); *Virginia*, 518 U.S. at 533 (striking down sex classification that the Court deemed relied on "overbroad generalizations" rather than "enduring" or "inherent" differences between men and women). Indeed, prohibitions on certain semiautomatic firearms such as the Act are, as Professor Randy Barnett has recently noted, "simply irrational and therefore unconstitutional" under any standard of review. Professor Randy Barnett, *Gun Control Fails Rationality Test*, WASH. EXAMINER (Jan. 29, 2013), http://washingtonexaminer.com/gun-control-fails-rationality-test/article/2519971; *see also, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (requiring a special use permit for a home for the mentally disabled failed rational basis review when there was no "rational basis for believing" that the "home and those who would occupy it would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not"); *Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973) (a limitation on food stamp eligibility failed rational basis review when "[m]ost people in th[e]

category" targeted by Congress "can and will alter their living arrangements in order to remain eligible for food stamps").

## V.   The Ban on Magazines Capable of Holding More than Ten Rounds Also Violates the Second Amendment.

1.     The principles established by *Heller* and *McDonald* likewise demonstrate that the Act's prohibition on the use of firearms equipped with magazines capable of holding more than ten rounds of ammunition is unconstitutional.[5]   Again, the key question is whether firearms equipped with such magazines are of a kind that are in common use for lawful purposes.  Clearly they are.

Americans own tens of millions of magazines fitting this description.  *See* Koper, Report to the National Institute of Justice at 65 ("[G]un industry sources estimated that there were 25 million [such magazines] available as of 1995 . . . .  [N]early 4.8 million . . . were imported for commercial sale . . . from 1994 through 2000 . . . .  During this period, furthermore, importers received permission to import a total of 47.2 million [such magazines]; consequently, an additional 42 million . . . may have arrived after 2000 or still be on their way, based on just those approved through 2000.").  Indeed, such magazines are standard equipment on many popular firearms owned by many millions of Americans for self-defense, hunting, and target shooting. *See* Overstreet Decl. ¶ 14 ("Standard magazines for very commonly owned semiautomatic pistols hold up to 17 rounds of ammunition.  In 2011, about 61.5 percent of the 2.6 million pistols made in the U.S. were in calibers typically using magazines that hold over 10 rounds.");

---

[5] While the Act bans the magazine themselves, the effect of that ban is to prohibit the use of any firearm that is equipped with such a magazine.

*id.* ¶ 17 (there are millions of "rifles equipped with detachable magazines holding more than 10 rounds" privately owned in the United States); Kopel Testimony at 15-17.[6]

    2.    Because firearms equipped with magazines capable of holding more than ten rounds of ammunition are in "common use" for "lawful purposes," the Constitution guarantees the right of law-abiding, responsible citizens to acquire, possess, and use them. *Heller*, 554 U.S. at 624. But even if a levels-of-scrutiny analysis were to apply, and even if, contrary to *Heller*, intermediate scrutiny was the applicable standard of review, the Act's magazine ban could not stand.

    By definition, the magazines banned by the Act hold more rounds of ammunition than do those permitted. This allows the user to continue to operate his or her semiautomatic firearm—one round at a time—for a longer period of time without having to change magazines, a benefit both in a defensive confrontation (where many lawful firearm owners may not carry spare magazines) and also for developing precision in target shooting and other sporting uses. To the extent the time and presence of mind it takes to change magazines could, in some situations, make a difference in the outcome of a confrontation, it is clear that, on balance, restricting citizens to ten-round magazines will work to the advantage of criminals, not law-abiding citizens. First, there are many millions of higher capacity magazines already in circulation, and

---

    [6] A review of the 2013 edition of Gun Digest, a standard reference work that includes specifications of currently available firearms, indicates that about two-thirds of the distinct models of semiautomatic centerfire rifles listed are normally sold with detachable magazines that hold more than ten rounds of ammunition. (Even many rifles normally sold with magazines of smaller capacity are also capable of accepting standard magazines without modification.) GUN DIGEST 2013 455-64, 497-99 (Jerry Lee ed., 67th ed. 2012). The same book indicates that about one-third of distinct models of semiautomatic handguns listed—even allowing for versions sold in different calibers, which often have different ammunition capacities—are normally sold with magazines that hold more than ten rounds of ammunition. *Id.* at 407-39. In both cases, but especially for handguns, these figures underestimate the ubiquity of magazines capable of holding more than ten rounds of ammunition, because they include many minor variations of lower-capacity firearms offered by low-volume manufacturers.

while most law-abiding citizens will obey any new law restricting the purchase or transfer of

such magazines, most criminals will not. And even if one indulges the notion that such a ban

will operate equally on law-abiding citizens and criminals alike, it is criminals, not their victims,

that generally choose the time and place of an armed confrontation. A criminal can thus plan in

advance for the possibility that he will need more than a single ten-round magazine and equip

himself accordingly.

Nor does available empirical evidence support a substantial connection between limiting

citizens to ten-round magazines and public safety. As an initial matter, such a limit will be

simply irrelevant to the vast majority of gun crimes. *See* KLECK, TARGETING GUNS at 123 ("It is

unlikely that large-capacity magazines are currently relevant to the outcome of a large number of

violent incidents, since few cases involve large numbers of shots fired."). "[A]vailable studies

on shots fired show that assailants fire less than four shots on average . . . ." Koper, Report to the

National Institute of Justice at 90. Further, it is unlikely that such a limit would have much of an

impact even in those rare instances in which criminals fire more than ten shots. A study of

"mass shootings"—*i.e.*, incidents in which "six or more victims were shot dead with a gun, or

twelve or more total were wounded"—from 1984 to 1993 found that "[f]or those incidents where

the number of rounds fired and the duration of the shooting were both reported, the rate of fire

never was faster than about one round every two seconds, and was usually much slower than

that." KLECK, TARGETING GUNS at 124-25. Thus, "[n]one of the mass killers maintained a

sustained rate of fire that could not also have been maintained—even taking reloading time into

account—with either multiple guns or with an ordinary six-shot revolver and the common

loading devices known as 'speedloaders.' " *Id.* at 125. Furthermore, as more recent incidents

demonstrate, a mass shooter may simply quickly change magazines each time one is spent. *See*

Kopel Testimony at 19 ("At Newtown, the murderer changed magazines many times, firing only a portion of the rounds in each magazine. . . . In the Virginia Tech murders, the perpetrator changed magazines 17 times."). Finally, a criminal with multiple guns can avoid the need to reload by merely changing guns when the first gun runs out of ammunition. The perpetrators of the majority of mass shootings between 1984 and 1993 carried multiple firearms. KLECK, TARGETING GUNS at 125, 144 (table 4.2). The same is true for similar incidents taking place since that time period.

By contrast, the defensive utility of having a magazine capable of holding more than ten rounds of ammunition is obvious. A law-abiding person who runs out of ammunition before her attacker does is very likely to become a crime victim. And a person faced with one or more armed assailants could well need to fire more than ten shots to defend herself and may not be able to change magazines immediately. Indeed, because criminals rarely announce their intentions in advance, victims will rarely have more than a single magazine immediately available, and even if a victim has additional magazines, a law-abiding person suddenly confronted by the stress of a surprise confrontation by an armed assailant is likely to take longer to change magazines than when calmly shooting at the firing range. If she is elderly or disabled, changing magazines may prove to be no easy task.

## VI.  *Heller II.*

1.     In *Heller II*, a divided panel of the D.C. Circuit held that the District of Columbia's ban on semiautomatic "assault rifles" did not violate the Second Amendment. Judge Kavanaugh's dissent forcefully and compellingly explains why *Heller* and *McDonald* mandate a textual and historical inquiry, not an intermediate scrutiny analysis, and why D.C.'s "assault rifle" ban—and thus the Act's "assault weapon" ban—is unconstitutional under either of these

approaches.  Indeed, the majority opinion in *Heller II* was deeply flawed for a variety of reasons pertinent to the constitutionality of the Act.

*First*, the panel majority acknowledged that semi-automatic rifles are in "common use" (without identifying the purposes for which they are commonly used) and that there is no "longstanding" tradition of prohibiting their use. *See Heller II*, 670 F.3d at 1260-61.  Under *Heller*, that should have been the end of the matter, and the District of Columbia's ban should have been struck down.  But the panel majority instead proceeded to apply a levels-of-scrutiny analysis, with the level of scrutiny turning on the Court's view of "how severely the prohibitions burden the Second Amendment right."  *Id.* at 1261.  Under the panel majority's analysis, in other words, the level of scrutiny to be applied in Second Amendment cases turns on the very type of balancing of interests assessment that *Heller* forbids.

*Second*, the panel majority erred by deeming intermediate scrutiny the proper standard. As explained above, the *Heller* majority rejected the test Justice Breyer advanced in his dissent, which was a form of intermediate scrutiny.  Indeed, it is telling that in explicating the intermediate scrutiny standard it was applying, the panel majority in *Heller II* repeatedly invoked *Turner*, the very case that Justice Breyer held up as exemplary of the interest-balancing approach he was advocating, and indeed the panel majority *quoted much of the same language from* Turner *quoted by Justice Breyer*.  *Compare Heller II*, 670 F.3d at 1259, *with Heller*, 554 U.S. at 704-05 (Breyer, J., dissenting).  *Heller* prohibits application of this standard to a ban on possessing arms protected by the Second Amendment.

*Third*, the panel majority's rationale for applying intermediate scrutiny cannot be squared with *Heller*.  In particular, the panel majority reasoned that "the laws at issue here do not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun," *Heller II*, 670

21

F.3d at 1261-62 (quoting *Heller*, 554 U.S. at 629), and thus that "the ban on certain semi-automatic rifles [does not] prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting," *id.* at 1262. Leaving aside the fact that the Act *does* prohibit many common handguns, the *Heller II* panel majority's reasoning is unpersuasive. Indeed, its argument is "a bit like saying books can be banned because people can always read newspapers. That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right." *Id.* at 1289 (Kavanaugh, J., dissenting). And under *Heller*, it is not the government's prerogative to pick and choose which constitutionally protected arms may be used for lawful purposes; rather, that right is reserved to the law-abiding citizens of this Nation. Thus, in *Heller*, "[i]t [was] no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms . . . is allowed." 554 U.S. at 629. And in *Heller II*, it likewise should have been no answer to say that it is permissible to ban some semiautomatic rifles so long as the possession of other firearms is allowed.

*Fourth*, the panel majority's application of intermediate scrutiny cannot be reconciled with *Heller*. *Heller* concluded, as noted earlier, that the District of Columbia's handgun ban would "fail constitutional muster" under "any of the standards of scrutiny the Court has applied to enumerated constitutional rights," 554 U.S. at 571, including intermediate scrutiny, which is applied in some situations in which an enumerated right is burdened in an incidental or marginal way. *See, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) ("expressive conduct within the outer perimeters of the First Amendment, though . . . only marginally so"); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (commercial speech, which has a "subordinate position in the scale of First Amendment values"). If the District of Columbia's ban on handguns could not pass intermediate scrutiny (*i.e.*, was not substantially related to public

22

safety), it follows that its ban on certain semiautomatic firearms likewise could not pass this level

of heightened scrutiny. For while the panel majority attempted to build a case that criminals

could misuse "assault weapons," *see Heller II*, 670 F.3d at 1262-63, the same was certainly true

of the handguns at issue in *Heller*. *See, e.g.*, *Heller*, 554 U.S. at 697-99 (Breyer, J., dissenting)

("From 1993 to 1997, 81% of firearm-homicide victims were killed by handgun. . . . Handguns

also appear to be a very popular weapon among criminals. . . . [T]he linkage of handguns to

firearms deaths and injuries appears to be much stronger in urban than in rural areas.").

Indeed, this point illustrates what is perhaps the most fundamental flaw in the panel

majority's reasoning: its focus on ways in which certain firearms may be misused by criminals,

rather than on ways in which they may be put to lawful defensive use by law-abiding citizens.

Unlike the *Heller* dissenters, the Supreme Court's majority opinion focused on the latter, not the

former, explaining that a handgun

> is easier to store in a location that is readily accessible in an
> emergency; it cannot easily be redirected or wrestled away by an
> attacker; it is easier to use for those without the upper-body
> strength to lift and aim a long gun; it can be pointed at a burglar
> with one hand while the other hand dials the police.

554 U.S. at 629. Many of these attributes, of course, likely also explain why criminals prefer to

use handguns, but that is not what the *Heller* majority deemed relevant. Conversely, many of the

attributes of "assault weapons" that the *Heller II* panel majority deemed pernicious enhance their

fitness as defensive, *anti-assault* weapons when in the hands of law-abiding citizens. *See Heller*

*II*, 670 F.3d at 1262-63.

The Supreme Court's approach is authoritative, of course, but it also makes more sense.

Criminals are by definition much less likely than law-abiding citizens to abide by restrictions on

the types of firearms that may be owned. Thus, to the extent a certain firearm gives one party to

a confrontation an advantage, banning that firearm will on the whole work to the benefit of the criminals, not the law-abiding.

At any rate, the panel majority's intermediate scrutiny analysis ultimately is at war with itself. For recall the panel majority's reasoning for applying intermediate scrutiny in the first place: that the ban would not "prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting." *Id.* at 1262. Of course, it is also true that the ban would not prevent a criminal from simply substituting for a banned semiautomatic "assault rifle" another equally lethal semiautomatic firearm just as "suitable and commonly used" for criminal purposes. As explained above, it is therefore simply irrational to expect that dubbing a subcategory of semiautomatic firearms "assault weapons" and banning their possession will improve public safety.

*Fifth*, and finally, the panel majority erred by likening semiautomatic firearms like the AR-15 to fully automatic firearms like the M-16. According to the panel majority, "*Heller* suggests 'M-16 rifles and the like' may be banned because they are 'dangerous and unusual.' " *Heller II*, 670 F.3d at 1263 (quoting *Heller*, 554 U.S. at 627). Citing the *Staples* decision, the panel majority then concluded that the two firearms are essentially equivalent: "The Court had previously described the 'AR-15' as 'the civilian version of the military's M-16 rifle.' " *Id.* (quoting *Staples*, 511 U.S. at 603). But *Staples* was not *equating* the AR-15 with the M-16; to the contrary, it held that the AR-15, *unlike* the M-16, is among weapons that "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. The key distinction between these two firearms, of course, is that the AR-15 is semiautomatic, while the M-16 is fully automatic and thus has long been effectively restricted to military use. The *Heller II* panel majority acknowledged this difference, but instead of recognizing it as an essential distinction,

24

sought to diminish it: "Although semi-automatic firearms, unlike automatic M-16s, fire only one

shot with each pull of the trigger, semi-automatics still fire almost as rapidly as automatics." 670

F.3d at 1263 (citation omitted) (internal quotation marks omitted). There are two problems with

this argument. Not only does "the majority opinion's data indicate that semi-automatics actually

fire two-and-a-half times slower than automatics," *id.* at 1289 (Kavanaugh, J., dissenting), but,

taken to its logical conclusion, the majority opinion's reasoning would justify a ban on *all*

semiautomatic weapons. This cannot possibly be right under *Heller*, given that semiautomatic

firearms are ubiquitous and used by tens of millions of Americans for self-defense and other

lawful purposes.

      2.      The plaintiffs in *Heller II* also challenged the District of Columbia's ban on

magazines capable of holding more than ten rounds of ammunition. The *Heller II* panel majority

also rejected this challenge. (Judge Kavanaugh would have remanded for further proceedings on

this issue.) Given that the panel majority addressed both bans together, the panel majority's

ruling on the magazine ban is subject to many of the same criticisms as its ruling on the

semiautomatic "assault rifle" ban. For example, like "assault rifles," the panel majority found it

"clear enough" that "magazines holding more than ten rounds are indeed in 'common use.' " *Id.*

at 1261. That should have been the end of the matter, yet rather than striking down the law, the

panel majority proceeded to apply intermediate scrutiny. And in applying intermediate scrutiny,

the panel majority invoked testimony that "the '2 or 3 second pause' during which a criminal

reloads his firearm 'can be of critical benefit to law enforcement' " without acknowledging the

fact that a 2 or 3 second pause during which a victim reloads a firearm can be of equally critical

benefit to a criminal. *Id.* at 1264. And the panel majority did not address the evidence discussed

above showing that banning magazines capable of holding more than ten rounds of ammunition is unlikely to promote public safety.

Given this, any reliance upon *Heller II* to support the constitutionality of the Act is ill-founded. *Heller* and *McDonald* (and not the flawed analysis of *Heller II*) govern the examination to be given to the Act. The firearms and magazines which are banned by the Act and which future firearms owners cannot even consider purchasing are clearly ones long in common use. Thus, *Heller II* notwithstanding, the Act is in violation of the Second Amendment.

## CONCLUSION

In sum, the principles established by the Supreme Court's decisions in *Heller* and *McDonald* make it clear that the Act's ban on safety-enhanced firearms and on magazines capable of holding more ten rounds of ammunition violates the Second Amendment by prohibiting the use of arms that are in common use by ordinary Americans for self-defense and other lawful purposes.

Dated:  July 15, 2013                                            Respectfully submitted,

                                                                        s/ Joseph G. Fortner, Jr.
Of Counsel:                                                       Joseph G. Fortner, Jr.
Charles J. Cooper*                                           Fed. Bar No. ct04602
David H. Thompson*                                        Kenneth R. Slater, Jr.
Peter A. Patterson*                                          Fed. Bar No. ct09451
Attorneys for National Rifle Association          Local Counsel for National Rifle Association
   of America, Inc.                                                of America, Inc.
COOPER & KIRK, PLLC                                   HALLORAN & SAGE LLP
1523 New Hampshire Avenue, N.W.               225 Asylum Street
Washington, D.C. 20036                                 Hartford, Connecticut  06103
(202) 220-9600                                               (860) 522-6103
(202) 220-9601 (Fax)                                      (860) 548-0006 (Fax)
ccooper@cooperkirk.com                               fortner@halloransage.com
                                                                        slater@halloransage.com

*Motion to appear as visiting attorney
forthcoming

## CERTIFICATION

This is to certify that on the 15th day of July 2013, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/_____
Joseph G. Fortner, Jr.

2366081v.1

27