## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUNE SHEW, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | CASE NO. 3:13-cv-00739-AVC |
| | : | |
| v. | : | |
| | : | |
| DANNEL P. MALLOY, *et al.*, | : | |
| | : | |
| Defendants. | : | JULY 12, 2013 |

**AMICI CURIAE BRIEF OF LAW ENFORCEMENT LEGAL DEFENSE FUND, LAW ENFORCEMENT ACTION NETWORK, INTERNATIONAL LAW ENFORCEMENT EDUCATORS AND TRAINERS ASSOCIATION, AND ACTIVE-DUTY AND RETIRED CONNECTICUT PEACE OFFICERS TYSZKA, HALL, EDWARDS, BLEIDNER, MURAD, MCCLAIN, AND BUNCE**

***Counsel for Amici Curiae***

C. D. Michel*
Michel & Associates, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
Tel:  (562) 216-4444
Fax:  (562) 216-4445
cmichel@michellawyers.com
* *Motion for Admission pending*

Rachel M. Baird (ct12131)
Law Office of Rachel M. Baird
8 Church St Ste 3B
Torrington CT 06790-5238
Tel:   (860) 626-9991
Fax:  (860) 626-9992
rbaird@rachelbairdlaw.com

***Of Counsel***

David Martin
Law Offices of David Henderson Martin
1611 North Kent Street, Suite 901
Arlington, VA 22209
(703) 807-1875

## TABLE OF CONTENTS

PAGE(S)

INTEREST OF AMICI CURIAE ..................................................................................1

BACKGROUND AND SUMMARY OF ARGUMENT .............................................2

ARGUMENT .................................................................................................................3

I.   THE CHALLENGED PROVISIONS VIOLATE THE SECOND AMENDMENT.............................3

    A.   The Challenged Laws Require Heightened Scrutiny Because They
        Prohibit Arms That Are Typically Used by Law-Abiding Citizens .......................3

    B.   The Challenged Laws Do Not Assist Law Enforcement in Combating
        Violent Crime, and Serve to Decrease Public Safety ...............................6

II.  THE CHALLENGED PROVISIONS ARE FATALLY VAGUE ....................................................13

    A.   Laws Impinging Upon Fundamental Rights Must Provide the Highest
        Levels of Clarity to Ensure Equitable Enforcement ...............................14

    B.   The Court Should Apply a Heightened Vagueness Standard Because the
        Challenged Provisions Impose Criminal Sanctions and Lack a Scienter
        Requirement .................................................................................17

    C.   The Challenged Provisions Fail to Provide Sufficient Guidance to Law
        Enforcement .................................................................................18

CONCLUSION .............................................................................................................23

i

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

## <u>FEDERAL CASES</u>

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002)..................................................................................4

*Bagget v. Bullitt*,
    377 U.S. 360 (1964)................................................................................15

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2729 (2011)..............................................................................4

*Carey v. Population  Servs. Int'l*,
    431 U.S. 678 (1977)..................................................................................4

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002)..................................................................................8

*Chicago v. Morales*,
    527 U.S. 41 (1999)...........................................................................14, 18

*Clark v. Jeter*,
    486 U.S. 456 (1988)..................................................................................7

*Dist. of Columbia v. Heller*,
    554 U.S. 570 (2008).................................................................4, 5, 15, 17

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ....................................................................5

*GeorgiaCarry.org. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) ................................................................5

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..........................................................................13, 14, 17

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)..................................................................................4

*Harrott v. County of Kings*,
    25 Cal.4th 1138 (2001) .....................................................................21, 22

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

**FEDERAL CASES (CONT.)**

*Hayes v. N.Y. Atty. Grievance Comm. of the Eighth Judicial Dist.*,
    672 F.3d 158 (2d Cir. 2012)................................................................................15

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ..............................................................3, 5, 6

*McDonald v. City of Chicago*,
    130 S. Ct. 3020, 3042 (2010) ..............................................................................15

*Kachalsky v. County of Westchester*,
    701 F.3d 81 (2d Cir. 2012)..................................................................................4, 6

*Kolender v. Lawson*,
    461 U.S. 352 (1983).................................................................................14, 15, 18

*Papachristou v. City of Jacksonville*,
    405 U.S. 156 (1972)............................................................................................23

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992).............................................................................................5

*Peoples Rights Organization, Inc. v. City of Columbus*,
    152 F.3d 522 (6th Cir. 1998) ................................................................18, 20, 21

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)............................................................................................7

*Reno v. Flores*,
    507 U.S. 292 (1993)............................................................................................7

*Richmond Newspapers v. Virginia*,
    448 U.S. 555 (1980)............................................................................................4

*Shaw v. Hunt*,
    517 U.S. 899 (1996)............................................................................................7

*Small v. Bud-K Worldwide, Inc.*,
    895 F. Supp. 2d 438 (E.D.N.Y. 2012) ...............................................................16

**TABLE OF AUTHORITIES (CONT.)**

PAGE(S)

**FEDERAL CASES (CONT.)**

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994)......................................................................................7

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) ......................................................................5, 7

*United States v. Decastro,*
    682 F.3d 160 (2d Cir. 2012)..........................................................................6

*United States v. Marzzarella,*
    614 F.3d 85, 94-96 (3d Cir. 2010)…………………………………………………...5

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011) ........................................................................5

*United States v. Reese,*
    627 F.3d 792 (10th Cir. 2010) ......................................................................5

*United States v. Salerno,*
    481 U.S. 739 (1987)..................................................................................7, 14

*United States v. Strauss,*
    999 F.2d 692 (2d Cir.1993)..........................................................................14

*United States v. Virginia,*
    518 U.S. 515 (1996).....................................................................................7

*VIP of Berlin, LLC v. Town of Berlin,*
    593 F.3d 179 (2d Cir. 2010).........................................................................17

*Vill. of Hoffman Estates v. Flipside,*
    455 U.S. 489 (1982).................................................................14, 15, 16, 17

**STATUTES, RULES & REGULATIONS**

Conn. Const. art. 11, § 1 ....................................................................................6

Conn. Gen. Stat. § 53-202a.....................................................................18, 19, 21

<u>**TABLE OF AUTHORITIES (CONT.)**</u>

**PAGE(S)**

<u>**STATUTES, RULES & REGULATIONS (CONT.)**</u>

Conn. Gen. Stat. § 53-202b...........................................................................................16, 18

Conn. Gen. Stat. § 53-202c...........................................................................................16, 18

Conn. Gen. Stat. § 53-202p.........................................................................................17, 18, 19

Conn. Gen. Stat. § 53-202q...............................................................................................18

New York Penal Law §265.00(23) .....................................................................................20

S.B. 1160, 2013 Reg. Sess. (Conn. 2013)...........................................................................8

H.R. 3355, 103rd Cong. §§ 110101-110106 (1994) ...........................................................11

<u>**OTHER AUTHORITY**</u>

Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth,
   *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets
   and Gun Violence, 1994-2003: Report to the National Institute of Justice, United States
   Department of Justice*, University of Pennsylvania, June 2004, at 65, *available at*
   http://www.ncjrs.gov/pdffiles1/ nij/grants/204431.pdf........................................3, 9, 10, 11

David B. Kopel,
   *Are So-Called "Assault Weapons" A Threat to Police Officers?*, The Law Enforcement
   Trainer (Sept./Oct. 1997), *available at* http://davekopel.org/2A/OpEds
   /Are_Assault_Weapons_a_Threat_to_Police.htm ……………………………………..9

*Gun Policy & Law Enforcement: Where Police Stand on America's Hottest Issue*,
   Policeone.com, http://www.policeone.com/Gun-Legislation-Law-
   Enforcement/articles/6183787-PoliceOnes-Gun-Control-Survey-
   11-key-lessons-from-officers-perspectives (last accessed June 28, 2013) .................11, 12

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

## OTHER AUTHORITY (CONT.)

Marshall K. Robinson, Forensic Scientist, Bridgeport Police Dep't,
  Gun Violence Prevention Working Group Public Hearing Testimony (Jan. 28, 2013),
  *available at* http://www.cga.ct.gov/asaferconnecticut/tmy/0128/
  Bridgeport%20Police%20Department%20-%20Marshall%20K.%
  20Robinson.PDF. ………………………………………………………..…10

Press Release, New York State Troopers PBA (Apr. 15, 2013),
  *available at* http://www.syracuse.com/ news/ index.ssf/2013/04/
  nys_troopers_have_widely_share.html.................................................................……12, 13

PoliceOne.com,
  www.policeone.com/about (last visited June 28, 2013). …………………………………11

Sheriffs' Response to NYSAFE Act,
  http://www.nysheriffs.org/articles/sheriffs%E2%80 %99-response-ny-safe-act
  (last accessed June 28, 2013) ............................................................................12

*Uniform Crime Reports, Murder Victims by Weapon, 2007-2011*,
  Federal Bureau of Investigation, *available at* http://www.fbi.gov/about-us
  /cjis/ucr/crime-in-the.u.s/2011/crime-in- the.u.s.-2011/tables/expanded-
  homicide-data-table- .............................................................................9

*What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*,
  113th Cong. 8, at 15-17 (2013), *available at* http://www.judiciary.senate.gov/pdf/1- 30-
  13KopelTestimony.pdf .........................................................................4, 11, 13

## INTEREST OF AMICI CURIAE

Amici curiae are Law Enforcement Legal Defense Fund (LELDF), Law Enforcement Action Network (LEAN), International Law Enforcement Educators and Trainers Association (ILEETA), and the following active-duty and retired Connecticut peace officers: Retired State Police Lieutenant Colonel Matthew Tyszka , Retired State Police Sergeant Douglas Hall, Esq., Retired State Police Sergeant Darren Edwards, Retired State Police Trooper James Bleidner, Shelton Police Department Officer David Murad, Shelton Police Department Officer Michael McClain, and Waterford Police Department Officer John Bunce (collectively, "Amici").[1]

As law enforcement groups and officers, Amici are well suited to provide insight about the lawful use of the arms at issue in this litigation to assist the Court in considering Plaintiffs' Second Amendment claims. Because law enforcement officers are the front-line responders to violent crimes, Amici are well positioned to shed light on the challenged provisions' practical impact on public safety and the negative impact they will have on the ability of law-abiding citizens to defend themselves effectively.

Amici will also explain, based upon their collective experience, that the challenged laws are unduly vague and fail to provide sufficient guidelines for officers to administer the laws fairly and uniformly. Because Amici support officers who are not only responsible for enforcing the challenged provisions, but are also responsible for keeping the peace, Amici have an acute interest in ensuring that criminal laws have sufficient guidelines, not only for the sake of the public, but also to protect officers and ensure against the diversion of limited resources from crucial law enforcement functions.

---

[1] More detailed descriptions of each amicus party's background  are set forth in the accompanying Motion for Leave to File.

## BACKGROUND AND SUMMARY OF ARGUMENT

Among other things, Connecticut's Act Concerning Gun Violence Prevention and Children's Safety ("the Act") prohibits a gun owner from possessing a magazine capable of holding more than ten rounds of ammunition. The Act also expands Connecticut's definition of "assault weapons" to include semi-automatic firearms capable of accepting a detachable magazine and that have one of a list of enumerated features unrelated to the firearm's power or dangerousness. The Act also defines "assault weapons" to include certain firearms specifically enumerated, "copies or duplicates" with the "capability" of those firearms, and firearms parts that can be "readily assembled" into an "assault weapon." With limited exceptions, the possession, sale, or transfer of such items exposes one to criminal sanctions.

The challenged laws restrict commonly-owned arms that are widely chosen by law-abiding citizens for self-defense within their homes and are thereby protected by the Second Amendment. By imposing a blanket ban on these arms, the challenged laws are unconstitutional per se, or at minimum, must be subject to heightened judicial scrutiny. As Amici are acutely aware, the challenged provisions cannot survive such review because they do not serve to increase the safety of Connecticut residents. Instead, they operate to decrease the ability of law-abiding citizens to effectively protect themselves in their homes, thus jeopardizing the public's safety.

Further, the vagueness of the challenged provisions precludes their fair enforcement. Inevitably, the lack of sufficient guidelines requires officers to rely on their subjective interpretations of the law. This jeopardizes the freedom of law-abiding individuals attempting to comply with the laws. In other words, officers are put in the unenviable position of guessing

whether individuals exercising their Second Amendment rights should be arrested under the new laws. And they are likely to face suits for wrongful arrests and have prosecutions dismissed.

Amici are entrusted with the critical responsibility of ensuring law and order. In very real and direct ways, the challenged laws increase disorder. Law enforcement's work is made more difficult by unclear laws that harm, rather than promote, public safety. The laws appear willfully blind to legitimate safety interests and instead are tailored to negatively impact law-abiding firearm owners.

Ultimately, the challenged provisions demand that law enforcement officers apply a highly technical and deeply controversial set of laws, the enforcement of which will stretch already scarce law enforcement resources and jeopardize public support of law enforcement. Because the laws are unclear, and because they are contrary to the United States Constitution and Supreme Court precedent, Amici respectfully ask that they be enjoined by this Court.

## ARGUMENT

I. THE CHALLENGED PROVISIONS VIOLATE THE SECOND AMENDMENT

### A. The Challenged Laws Require Heightened Scrutiny Because They Prohibit Arms That Are Typically Used by Law-Abiding Citizens

The items prohibited by the challenged laws are "typically possessed by law-abiding citizens for lawful purposes."[2] Due to the popularity of each of the restricted firearms and

---

[2]  *See* Mem. Supp. Pls.' Mot. Prelim. Inj. 10-12, 20. Indeed, one of the firearms targeted by the challenged provisions, the AR-15 rifle, is America's "most popular semi-automatic rifle." (*Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) ("*Heller II* ") (Kavanaugh J., dissenting)). Americans own tens of millions of magazines fitting the description of those banned by the challenged provisions. Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003: Report to the National Institute of Justice, United States Department of Justice*, University of Pennsylvania, June 2004, at 65, *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf (hereinafter, "Koper, et al., *Impacts on Gun Markets and Gun Violence*"). Indeed, such magazines are "factory-standard" on firearms owned by millions of Americans for lawful purposes. *What Should America Do About Gun Violence?: Hearing Before the S. Comm. on*

magazines, and because of their effectiveness for personal defense, these items are also widely

used (and often preferred) by countless civilians, off-duty officers, and retired law enforcement

officers, in their homes. Accordingly, law-abiding citizens, including members of the law

enforcement community, are guaranteed the right to acquire, possess, and use them for lawful

purposes, including self-defense. *Heller*, 554 U.S. 570, 624.[3]

As in *Heller*, the Court need not go any further to rule on the challenged provisions.

Without resort to any means-end level of scrutiny, *Heller* categorically invalidated the D.C.

handgun ban because it prohibited a class of arms overwhelmingly chosen by Americans for

lawful purposes. 554 U.S. at 628-29. Here too, the challenged laws directly prohibit possession

of protected arms, and, in light of *Heller*, they are necessarily unconstitutional. As the Second

Circuit in *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 n.9 (2d Cir. 2012) recognized,

"where a state regulation is entirely inconsistent with the protections afforded by an enumerated

right – as understood through that right's text, history, and tradition – it is an exercise in futility

to apply means-end scrutiny." Because the challenged provisions impose a flat ban on arms that

are, as Amici have observed on the front lines, overwhelmingly used by law-abiding citizens, the

laws are per se invalid.

---

*the Judiciary*, 113th Cong. 8, at 15-17 (2013), *available at* http://www.judiciary.senate.gov/pdf/1-30-13KopelTestimony.pdf (written testimony of David B. Kopel) (hereinafter, "Kopel Testimony").

[3] A ban on the acquisition, sale, transport, or manufacture of protected arms is the functional equivalent of a ban on possession and requires equally exacting review. Fundamental rights protect the purchase of items protected by that right, regardless of whether that corollary appears directly in the text of the right itself. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). It is well settled that individuals have an inherent right to access constitutionally protected items. *See, e.g., Carey v. Population Servs. Int'l*, 431 U.S. 678, 687-89 (1977); *see also Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965); *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002).

To the extent the Court is inclined to apply a means-end approach based (at least in part) on the severity of a given restriction, any test that would apply mere rational basis to laws that impose more than a de minimis or incidental burden on the right to arms directly conflicts with *Heller*. The explicit nature of the right to arms precludes application of rational basis review. *Heller*, 554 U.S. at 628 n.27. Accordingly, the majority of circuits to have decided the issue reason that a law that directly restricts Second Amendment conduct, imposing more than a de minimis burden, necessarily burdens the right and *requires* heightened scrutiny. *See, e.g.*, *GeorgiaCarry.org. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); *Heller II*, 670 F.3d at 1252; *Ezell v. City of Chicago*, 651 F.3d 684, 701, 706 (7th Cir. 2011); *United States v. Masciandaro*, 638 F.3d 458, 469, 471 (4th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 94-96 (3d Cir. 2010). Meaningful judicial review cannot be avoided simply by calling a direct restriction on the right not quite "substantial" enough.[4]

---

[4] Justice Scalia, the author of the majority opinion in *Heller*, has decried the contention that a law that directly regulates a fundamental right is valid unless it imposes an "undue" or "substantial" burden:

> [A] law of general applicability which places only an incidental burden on a fundamental right does not infringe that right, . . . but that principle does not establish the quite different (and quite dangerous) proposition that a law which *directly* regulates a fundamental right will not be found to violate the Constitution unless it imposes an "undue burden." It is that, of course, which is at issue here: Pennsylvania has *consciously and directly* regulated conduct that our cases have held is constitutionally protected. The appropriate analogy, therefore, is that of a state law requiring purchasers of religious books to endure a 24-hour waiting period, or to pay a nominal additional tax of 1¢. The joint opinion cannot possibly be correct in suggesting that we would uphold such legislation on the ground that it does not impose a "substantial obstacle" to the exercise of First Amendment rights.

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 988 (1992) (Scalia, J., dissenting) (citations omitted).

Despite this developing consensus, the Second Circuit applied only rational basis scrutiny in a case challenging restrictions on Second Amendment conduct, holding that "heightened scrutiny is appropriate only as to those regulations that substantially burden" the right. *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012). *Decastro* is unclear as to what constitutes a "substantial burden," but to the extent the analysis excludes from heightened scrutiny all burdens falling somewhere between de minimis and substantial, Amici contend that a "substantial burden" test is incompatible with *Heller* and the Second Amendment. *Compare Decastro*, 682 F.3d at 164 (applying mere rational basis review to all burdens on the Second Amendment until they are deemed "substantial"), *with Heller II*, 670 F.3d at 1255-56 (recognizing that, while a de minimis burden might not warrant heightened scrutiny, *Heller* "clearly does reject any kind of 'rational basis' " test for evaluating laws directly regulating Second Amendment conduct). This Court has the opportunity to square the *Decastro* analysis with the Supreme Court's mandate in *Heller* by applying heightened review to direct restrictions that more than incidentally burden Second Amendment conduct, even if the Court is unconvinced that the burden is "substantial."

As aptly explained in Plaintiffs' moving papers, should the Court nonetheless require more than a direct burden to trigger heightened scrutiny, the challenged provisions must meet strict scrutiny because they do impose a substantial burden on core, protected conduct. Mem. Supp. Pls.' Mot. Prelim. Inj. at 20-24 (citing *Kachalsky v. County of Westchester*, 701 F.3d 81, 88, 93-94, 97 (2d Cir. 2012); *Decastro*, 682 F.3d at 165 n.4, 166-68). Regardless, the challenged laws cannot survive any level of heightened scrutiny because, as Amici explain, they are not sufficiently related to any purported public safety concern.

B.    **The Challenged Laws Do Mot Assist Law Enforcement in Combating Violent Crime, and Serve to Decrease Public Safety**

Law enforcement officers take their duties to protect the citizenry and defend American liberties very seriously. Connecticut law enforcement officers have sworn an oath to uphold the United States Constitution, and thus cannot be expected to enforce unconstitutional laws. Conn. Const. art. 11, § 1. To this end, Amici are compelled to express their concerns over the justification for the challenged provisions' curtailment of constitutional rights, and their observations should be afforded significant weight.

Under heightened scrutiny, whether intermediate or strict, the presumption of validity is reversed, with the challenged law presumed unconstitutional and the burden on the government to justify the law. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("[C]ontent-based speech regulations are presumptively invalid"); *see also Chester*, 628 F.3d at 680 (explaining that "unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law"). To prevail under strict scrutiny, Defendants must establish that the challenged provisions are "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Intermediate scrutiny further requires the government to prove the challenged provisions are "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). As Amici are uniquely positioned to inform the Court, the challenged provisions are unwarranted under either standard.

While the government has a compelling interest in preventing crime, *United States v. Salerno*, 481 U.S. 739, 749 (1987), the Legislature "must have had a strong basis *in evidence* to support that justification." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (emphasis added). Even under intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will *in fact* alleviate these harms in a direct and

material way." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion) (emphasis added); *see also Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented post hoc in response to litigation.")). The government cannot "get away with shoddy data or reasoning"; the "evidence must fairly support [its] rationale . . . ." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002).

Here, the legislation that created the laws at issue, Senate Bill 1160, was introduced in the Connecticut Legislature on April 3, 2013 as an emergency measure. By April 4 – the very next day – it had already passed both houses and was delivered to Governor Malloy for his signature. S.B. 1160, 2013 Reg. Sess. (Conn. 2013). There was no committee hearing and no opportunity for such to consider evidence related to the bill through public hearing. There is no legislative history suggesting the Legislature considered any evidence whatsoever suggesting that limiting the capacity of ammunition feeding devices to ten rounds or prohibiting firearms with the enumerated features *actually* furthers public safety.[5]

The Legislature further failed to consider whether law enforcement officers deem the prohibited items a significant threat, or whether they believe depriving law-abiding people of the prohibited items would promote or harm public safety. Nor was there any discussion regarding whether this significant expansion of firearms regulation would divert resources from crucial law enforcement functions, thereby *decreasing* public safety.

Had the Legislature considered the relevant evidence, it would have found that prohibiting magazine capacity and so-called "assault weapons" is not *substantially* related to

---

[5]  The challenged provisions do not define "assault weapon" based on a firearm's operation (e.g., rate of fire, velocity, etc.), concealability, or, for the most part, any other measure of a firearm's power. Rather, the definition bans firearms based on characteristics that are either cosmetic or are intended to make a firearm more ergonomic to handle.

furthering either public or officer safety. As a former firearms examiner for the Los Angeles

County Sheriff's Department, Dwight Van Horn, once stated:

> [T]he claim that AK-47s or something called an "assault weapon" – which is
> simply a fabricated political and media term meant to vilify firearms that look like
> military arms but actually means whatever someone wants it to mean – is widely
> used by criminals, isn't true and never has been true.[6]

The evidence supports Mr. Horn's assessment. In fact, so-called "assault weapons" were

used in only a small fraction of gun crimes prior to the 1994 Assault Weapon ban: About 2%

according to most studies and no more than 8%.[7] From 1975 through 1992, only about one

percent of law enforcement officers murdered in the United States were killed with what could

be described as an "assault weapon." Kopel, *Threat to Police Officers* (citing March 1997 report

from the Urban Institute, under contract from the U.S. Department of Justice, concluding that

"police officers are rarely murdered with assault weapons"). Those numbers remain essentially

unchanged today: According to the Federal Bureau of Investigation, all types of rifles *combined*

comprised only two percent of *all* weapons used in a civilian or police officer homicide in 2011.

*Uniform Crime Reports, Murder Victims by Weapon, 2007-2011*, Federal Bureau of

Investigation, *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-

the-u.s.-2011/tables/expanded-homicide-data-table-8. Thus, those rifles considered "assault

weapons" under the challenged provisions or that have magazine capacities over ten rounds

account for, at most, two percent of deaths by *any* weapon, but likely only a fraction of that.

Moreover, a report funded by the U.S. Department of Justice explains that the data on shots fired

---

[6] David B. Kopel, *Are So-Called "Assault Weapons" A Threat to Police Officers?*, The Law
Enforcement Trainer (Sept./Oct. 1997), *available at* http://davekopel.org/2A/OpEds
/Are_Assault_Weapons_a_Threat_to_Police.htm (hereinafter, "Kopel, *Threat to Police Officers*").

[7] Koper, et al., *Impacts on Gun Markets and Gun Violence* at 2.

in attacks involving firearms suggest that relatively few such attacks involve more than ten shots fired. Koper, et al., *Impacts on Gun Markets and Gun Violence* at 3.

In Connecticut, the numbers play out similarly. Marshall K. Robinson, forensic scientist for the Bridgeport (Conn.) Police Department, sharply criticized the newly passed "assault weapon" and magazine bans, pointing out the small number of crimes committed by the targeted items. Marshall K. Robinson, Forensic Scientist, Bridgeport Police Dep't, Gun Violence Prevention Working Group Public Hearing Testimony (Jan. 28, 2013), *available at* http://www.cga.ct.gov/asaferconnecticut/tmy/0128/Bridgeport%20Police%20Department%20-%20Marshall%20K.%20Robinson.PDF. Mr. Robinson pointed out that only 1 ½ % of the firearms linked to violent crime in Bridgeport that he has examined since 1996 have been the caliber of the AR-15 or AK-47, the type of firearms targeted by the challenged provisions. *Id.* Regarding magazine capacity, Mr. Robinson referenced his extensive review of homicides and assaults from 2006 - 2012, testifying that "[o]f the 217 such cases, there were 912 bullets and 466 cartridge cases recovered. . . . The largest number cartridge cases recovered in one case was 37 and that involved two guns. The investigations that involved the recovery of eleven or more cartridge cases was 22. Of the 22 cases, 21 involved 2 or more guns." *Id.*

These facts support Amici's observation that such restrictions are generally not a concern of law enforcement officers – except to the extent it prevents them, their loved ones, or those they are sworn to protect from using such items in defense of self, home, and family. For instance, it is unlikely that any officer would intentionally limit himself or herself to magazines loaded with ten rounds in a self-defense situation, whether in the field or at home. It is likewise doubtful that any officer would suggest that a law-abiding person do so. For, while firearm *attacks* generally consist of few shots fired (since the attacker can control the circumstances

under which he or she attacks), *self-defense* shootings often require more rounds, due to the elements of surprise and stress of a sudden criminal attack or the presence of multiple assailants.

Accordingly, prohibitions on certain semi-automatic firearms and magazines capable of holding more than ten rounds do not further any public safety interests, and these restrictions may actually be detrimental to the safety of law-abiding citizens. It is not merely Amici's belief that these restrictions will fail to increase public safety. History has confirmed it.

In 1994, the federal government implemented laws similar to the challenged provisions. H.R. 3355, 103rd Cong. §§ 110101-110106 (1994). They were so ineffective in promoting public safety that they were allowed to expire in 2004. *See* H.R. 3355, 103rd Cong. § 110106. "There was no evidence that lives were saved, no evidence that criminals fired fewer shots during gun fights, no evidence of any good accomplished. Given the evidence from the researchers selected by the Clinton-Reno Department of Justice, it was not surprising that Congress chose not to renew the 1994 ban."[8]

This is generally the prevailing view among law enforcement officers. In March of this year, PoliceOne[9] conducted a comprehensive survey of American law enforcement officers' attitudes on the topic of gun control. *Gun Policy & Law Enforcement: Where Police Stand on America's Hottest Issue*, Policeone.com, http://www.policeone.com/Gun-Legislation-Law-Enforcement/articles/6183787-PoliceOnes-Gun-Control-Survey-11-key-lessons-from-officers-

---

[8] Kopel Testimony at 11 (2013); *see also* Koper, et al., *Impacts on Gun Markets and Gun Violence* at 96.

[9] PoliceOne is an organization whose mission "is to provide officers with information and resources that make them better able to protect their communities and stay safer on the streets. . . . With more than 1.5 million unique visitors [to its website] per month and more than 450,000 registered members, PoliceOne is becoming the leading destination for Law Enforcement professionals." PoliceOne.com, www.policeone.com/about http://www.policeone.com/about(last visited June 28, 2013).

perspectives (last accessed June 28, 2013). More than 15,000 verified law enforcement

professionals took part in the survey. *Id.* "Virtually all respondents (95 percent) say that a federal

ban on the manufacture and sale of ammunition magazines that hold more than ten rounds would

not reduce violent crime." *Id.*  Likewise, 71 percent acknowledged that a federal ban on the

manufacture and sale of some semi-automatic firearms, i.e., "assault weapons" would have no

effect on reducing violent crime. *Id.*

      The New York State Sheriffs' Association criticized a similar "assault weapon" ban and

definition recently adopted in New York, releasing a statement that:

> Classifying firearms as assault weapons because of one arbitrary feature
> effectively deprives people the right to possess firearms which have never before
> been designated as assault weapons. We are convinced that only law abiding gun
> owners will be affected by these new provisions, while criminals will still have
> and use whatever weapons they want.

Sheriffs' Response to NYSAFE Act, http://www.nysheriffs.org/articles/sheriffs%E2%80

%99-response-ny-safe-act (last accessed June 28, 2013). Regarding the New York law's

reduction of ammunition magazine capacity, the New York State Sheriffs's Association

had this to say:

> We believe based on our years of law enforcement experience that this
> will not reduce gun violence. The new law will unfairly limit the ability of
> law-abiding citizens to purchase firearms in New York. It bears repeating
> that *it is our belief that the reduction of magazine capacity will not make
> New Yorkers or our communities safer.*

*Id.* (emphasis added.)

      The Police Benevolent Association of the New York State Troopers, Inc., went so far as

to contend that such laws may in fact *decrease* officer safety, stating that they "believe that

actual enforcement of these new regulations will *significantly increase* the hazards of an already

dangerous job." Press Release, New York State Troopers PBA (Apr. 15, 2013), *available at*

http://www.syracuse.com/ news/ index.ssf/2013/04/ nys_troopers_have_widely_share.html
(emphasis added). This is indeed a valid concern, for demonizing the items being prohibited by
the challenged provisions as useful solely for evil is "a mean-spirited insult to the many police
officers who have chosen these very same guns and magazines as the best tools for the most
noble purpose of all: the defense of innocent life." Kopel Testimony at 3. It causes those officers
to lose esteem among the otherwise supportive law-abiding citizens, for it engenders hostility
and mistrust toward officers among those who own firearms and fear among those who do not.
As a result, the essential resource of community cooperation with law enforcement is
squandered.

    These perspectives were simply unheard by the Legislature in its haste to have the
challenged provisions pushed through the legislative process. For whatever reason, any evidence
suggesting that these laws would serve to threaten public safety rather than promote it was
simply ignored. As such, the challenged provisions cannot survive *any* heightened standard of
review. Further, as shown by Amici, the evidence strongly contradicts the value of the
challenged provisions as public safety measures. As such, the challenged provisions are void
under the Second Amendment and should be enjoined by this Court.

## II.    THE CHALLENGED PROVISIONS ARE FATALLY VAGUE

    Amici strongly object to the State's passage of laws that, like the challenged provisions,
are incapable of fair and uniform enforcement, in violation of essential guarantees of due
process.

    Under the due process clause of the Fourteenth Amendment, a law must fail for
vagueness unless it "give[s] the person of ordinary intelligence a reasonable opportunity to know
what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104,

108 (1972); *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir.1993). Further, the law must provide "explicit standards" for the application of the law to prevent "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. Significantly, the Supreme Court has recognized that the "more important aspect of [the] vagueness doctrine" is its "requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

Further, the rigor with which the vagueness standard is applied must increase if the challenged law limits the exercise of fundamental rights or imposes criminal sanctions. *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982). Because the laws at issue here restrict the fundamental right to keep and bear arms *and* levy criminal penalties, they trigger an elevated standard of vagueness review.[10] Regardless, under any standard, Amici cannot objectively determine which firearms and magazines are prohibited, and precious law enforcement resources will inevitably be wasted on the enforcement and prosecution of violations that will ultimately be dismissed or overturned.

### A.   Laws Impinging Upon Fundamental Rights Must Provide the Highest Levels of Clarity to Ensure Equitable Enforcement

Because law enforcement officers are tasked with enforcing the challenged laws against individuals attempting to exercise their constitutional rights, it is imperative that the laws provide clear standards to protect against arbitrary enforcement. It has long been held that laws

---

[10]   There is some tension as to whether the courts will apply the *Salerno* "void in all applications" test often referenced in general facial challenges, in the specific context of a facial *vagueness* claim. While courts often simply review a law for vagueness under the tests outlined in *Grayned*, in some instances, courts require vagueness in all applications. *Vill. of Hoffman Estates*, 455 U.S. at 494 n.5. In others, courts have found laws unconstitutionally vague even in the face of clearly valid applications or when vagueness was found to "permeate" the challenged law. *Chicago v. Morales*, 527 U.S. 41, 55 (1999); *Kolender*, 461 U.S. at 358 n.8. Regardless of whether the Court applies one of these tests, the challenged laws must provide the heightened level of clarity required of criminal laws that restrict constitutionally protected freedoms.

entrenching upon constitutionally protected freedoms demand the greatest clarity. "[T]he vice of unconstitutional vagueness is further aggravated where . . . the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Bagget v. Bullitt*, 377 U.S. 360, 372 (1964). The Second Circuit has confirmed that regulations limiting the exercise of constitutionally protected rights are subject to an "enhanced vagueness test," requiring more rigorous review than cases not touching upon constitutional rights. *Hayes v. N.Y. Atty. Grievance Comm. of the Eighth Judicial Dist.*, 672 F.3d 158, 168 (2d Cir. 2012) (citing *Vill. of Hoffman Estates*, 455 U.S. at 499).

Application of heightened vagueness review to restrictions on Second Amendment freedoms is consistent with Supreme Court precedent. While vagueness challenges implicating fundamental rights often arise in the First Amendment context, the Supreme Court has instructed that laws restricting constitutional freedoms demand greater clarity – absent any qualification that such freedoms must be enshrined by the First Amendment. *See Vill. of Hoffman Estates*, 455 U.S. at 499; *Kolender*, 461 U.S. at 358-62. Indeed, the Court in *Kolender v. Lawson* applied heightened vagueness review to a law restricting the "constitutional right to freedom of movement" and potentially raising First Amendment concerns. 461 U.S. at 358. But the Court did not limit its application of heightened review according to the law's impact on First Amendment liberties.

The Second Amendment has only recently been confirmed as protecting individual rights – freedoms that are fundamental to our system of ordered liberty, and deserving of protections similar to the First Amendment. *Heller*, 554 U.S. at 595, 634-35; *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3042 (2010). This case thus presents one of the first opportunities, post-*Heller*,

to apply an appropriately rigorous vagueness standard to criminal laws restricting Second Amendment rights.

In 2006, the Second Circuit took note of the potential application of the "sternest application" of vagueness review whenever fundamental rights are at stake, not merely those involving First Amendment conduct. *Farrell v. Burke*, 449 F.3d 470, 495 n.12 (2d Cir. 2006). Ultimately, however, the court declined to resolve the issue because, it found, the petitioner had not shown that the challenged law actually implicated other fundamental rights. *Id*. (citing *Vill. of Hoffman Estates*, 455 U.S. at 499). More recently, the Eastern District of New York considered the application of heightened vagueness review to a weapons possession prohibition the plaintiff argued implicated the Second Amendment. *Small v. Bud-K Worldwide, Inc.*, 895 F. Supp. 2d 438 (E.D.N.Y. 2012). In dismissing the plaintiff's vagueness challenge, the court noted that the statute was not void for vagueness even under a stricter vagueness analysis, implying that such strict review may rightfully be applied in cases implicating Second Amendment freedoms.  *Id*. at 445 & n.7.

 Amici respectfully urge this Court to apply a stricter vagueness analysis in the present case to ensure greater clarity of laws that will inevitably require enforcement, via confiscation, incarceration, or both, against otherwise law-abiding individuals attempting to exercise their fundamental rights. Although the challenged provisions run afoul of Second Amendment protections in their own right, the Second Amendment need not actually be violated to trigger heightened vagueness review. Certainly, such an approach would defeat the purpose of such a standard, as challengers would simply bring suit under the violated right.

Here, sections 53-202b(a)(1) and 53-202c(a) effectively ban the purchase, transportation, and possession of the most popular rifle in the United States. *See supra* Part I.A.; Mem. Supp.

Pls.' Mot. Prelim. Inj. at 10-12, 20. Section 53-202p(c) operates to limit the number of rounds law-abiding citizens may have at their ready for self-defense. The Supreme Court has confirmed that the Second Amendment protects arms typically possessed by law-abiding citizens, and identified that the right of self-defense is "core" protected conduct that is at its zenith in the home. *Heller*, 554 U.S. at 630. At a minimum, laws that criminalize the most common rifle in America today – a rifle that is often selected precisely for its self-defense capabilities – impinge upon that core right. The same is true of laws banning standard-capacity magazines that prohibit law-abiding citizens from using more than ten rounds at a time to defend themselves within the sanctity of their own homes. Moreover, the confusion fomented by the challenged provisions will inevitably lead citizens to "steer far wider of the unlawful zone" of conduct "than if the boundaries of the forbidden areas were clearly marked," *Grayned*, 408 U.S. at 109, thus further inhibiting Second Amendment rights.

In sum, because the challenged provisions restrict constitutionally protected freedoms, the highest levels of clarity are required to guide law enforcement.

**B.     The Court Should Apply a Heightened Vagueness Standard Because the Challenged Provisions Impose Criminal Sanctions and Lack a Scienter Requirement**

Regardless of whether fundamental rights are at issue, a strict vagueness test is warranted. As the Second Circuit has confirmed, the degree of vagueness tolerated in a statute also varies according to the nature of its penalties – laws with criminal penalties are subject to more stringent review than, for instance, economic regulation. *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (internal citation omitted); *see also Vill. of Hoffman Estates*, 455 U.S. at 498-99. In accord with this notion, a scienter requirement may mitigate a law's vagueness. *Vill. of Hoffman Estates*, 455 U.S. at 498-99.

Here, law enforcement officers are asked to enforce laws that impose felony and misdemeanor criminal sanctions. Conn. Gen. Stat. §§ 53-202a(a)(1), 53-202c(a),53-202b(b)-(c), 53-202q(g). Nothing requires one to know that he or she is in possession of a proscribed firearm or magazine to be held criminally liable. Because the laws levy criminal penalties and lack a scienter requirement, the Court should uphold them only if they meet appropriately strict standards of clarity, regardless of any impact on Second Amendment rights.[11]

### C.    The Challenged Provisions Fail to Provide Sufficient Guidance to Law Enforcement

The challenged laws are rife with vague terms that will obstruct uniform and accurate enforcement. Examples of particularly problematic provisions include: Connecticut General Law sections 53-202p(a)(1), (b)-(c) (criminalizing possession of magazines that can be "readily restored or converted" to accept more than ten rounds); sections 53-202a(1)(a)(ii), 53-202c(a) (criminalizing possession of any combination of parts from which an "assault weapon" may be "rapidly assembled"); sections 53-202p(a)(1), (b)-(c) (criminalizing magazines with a capacity of more than ten rounds); and sections 53-202a(1)(B)-(D), 53-202b(a)(1), 53-202c(a) (criminalizing semi-automatic "copies or duplicates" with the "capability" of any firearm explicitly restricted under sections 53-202a(B)-(D), if in production by the provision's effective date).

The vagueness doctrine is particularly concerned that criminal statutes "establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 357-58 (internal quotations omitted). To pass constitutional muster, the challenged provisions cannot "entrust[] lawmaking to the moment-to-moment judgment of the policeman on his beat." *Chicago v. Morales*, 527 U.S. at 60 (quoting *Kolender*, 461 U.S. at 360). The  challenged provisions fail on this score. The

---

[11] In *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 534 (6th Cir. 1998), the Sixth Circuit applied a "relatively stringent review" of an "assault weapons" ban. It did so without reference to the Second Amendment, which was not yet confirmed as an individual right.

challenged provisions lack even minimal guidelines to govern law enforcement, leaving

enforcement of the law to the discretion of individual officers based on their subjective

knowledge and understanding of the law and firearms. Further, because officers generally do not

have specialized knowledge of the firearms, magazine modifications, and features the challenged

provisions attempt to proscribe, uniform enforcement will be impossible.

  Of particular concern is the prohibition of magazines that "can be readily restored or

converted to accept more than ten rounds of ammunition," Conn. Gen. Stat. § 53-202p(a)(1)

(emphasis added), and the ban on "any combination of parts from which an assault

weapon . . . may be *rapidly* assembled . . . ," Conn. Gen. Stat. § 53-202a(1)(A) (emphasis

added).  As described in Plaintiffs' Motion for Preliminary Injunction, the time it takes to modify

a firearm or a magazine varies greatly depending on an individual's knowledge, skill, access to

tools, and the availability of parts. Mem. Supp. Pls.' Mot. Prelim. Inj. at 34. The challenged

provisions raise – and ultimately fail to answer – vital questions. For instance, is a part or

combination of parts capable of being "rapidly assembled" into an assault weapon even if the

owner does not possess the tools necessary to complete the assembly? If not, how quickly must

he be able to access those tools? What determines whether a magazine is "readily" modified to

accept more than ten rounds? Who is doing the modifying? A trained gunsmith would likely find

it easier to "readily" modify a magazine than the average gun owner who only occasionally uses

his firearm. How is the average gun buyer supposed to distinguish between the vast number of

magazines that may or may not be "readily" convertible depending on a number of variables?

Could a magazine be considered "readily" convertible if the owner does not have the required

parts or tools to complete the conversion, but could possibly access them? What if the firearm or

magazine possessor has no knowledge that the item can be modified or how to make the

prohibited modifications? Would that lack of knowledge prevent his or her "rapid" or "ready" conversion of the firearm? Or should law enforcement operate on the ability to convert the item in the abstract?  Because these provisions provide no guidance as to what constitutes "rapidly" or "readily," law enforcement officers are forced to apply the law according to their subjective assessment of a theoretical ability to restore or convert a magazine or firearm.

Amici have seen the inherent problems created for law enforcement officers seeking to enforce a similarly vague provision of New York criminal law. Using the language of former New York Penal Law section 265.00(23), which included as "large capacity ammunition feeding devices" any device that could be "readily restored or converted" to accept more than ten rounds, retailers were regularly investigated, arrested, and/or had their licenses suspended after modifying magazines relying on advice by law enforcement, who later interpreted the statute differently under that section's vague "readily restored or converted" standard. Here too, Amici cannot be certain which factory-issued magazines or modifications are sufficient to keep a magazine from being "*readily* restored or converted" to accept more than ten rounds. *See People Rights Org*., 152 F.3d at 538 (phrase "may be *readily* assembled" in a firearms restriction is "unduly vague") (emphasis added). This opens the door to potentially improper advice by law enforcement on the legality of certain magazines and to inconsistent application of the law. Both of these undermine the legitimacy and public trust in law enforcement.

Further, some firearms have magazines that hold ten rounds if loaded with .357 magnum, but eleven rounds if loaded with .38 special.[12]  Law enforcement personnel are left to guess as to whether criminal liability should be triggered where the capacity of tubular magazines for rifles and shotguns varies with the length of the cartridges used. Mem. Supp. Pls.' Mot. Prelim. Inj. at

---

[12]   One such example is the popular model 1873 lever action rifle, a firearm so common it was a candidate for "the gun that won the west."

36-37 (citing *Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 536 (6th Cir. 1998)). If an officer encounters one of these firearms, is the officer to seize the firearm and arrest the individual because it is capable of holding more than ten rounds of one type of ammunition? What if it is loaded with the ammunition that only holds ten rounds? What if the firearm is unloaded, or if the individual is unaware that it can hold eleven rounds of a different type of ammunition? Inevitably, officers will be forced to decide on a case-by-case basis which firearms trigger confiscation and arrest, according to their own interpretation of the laws, and according to their varying knowledge of firearms and ammunition. As to these types of magazines, the challenged provisions are unconstitutionally vague.

Finally, the Legislature's attempt to sweep in "*copies* or *duplicates*" with the "capability" of the those firearms specified by sections 53-202a(1)(B)-(D) fails to provide adequate guidelines to assist law enforcement in the fair and uniform enforcement of the law. Conn. Gen. Stat. § 53-202a(1)(B)-(D). These provisions purport to ban firearms according to their similarity to firearms that are already prohibited. This is highly problematic for law enforcement officers, who must exercise their subjective judgment as to whether a firearm is "similar enough" to a prohibited firearm to warrant confiscation and arrest.

A California Supreme Court case, although not controlling, is particularly instructive here. In *Harrott v. County of Kings*, 25 Cal.4th 1138, 1143-44, 25 P.3d 649 (2001), the court considered a challenge to a provision of California's "assault weapon" ban, under which certain semi-automatic firearms could be added to the list of banned firearms if they were of the same "series" as models already prohibited under California law. In its opinion, the court quoted a letter from Senator Don Rogers to the Governor requesting the Governor's signature on Senate Bill No. 2444, a bill which required the Attorney General to produce an "Identification Guide"

for firearms that were to be prohibited "assault weapons." *Id*. at 1147 (quoting Letter to

Governor Deukmejian Re: Sen. Bill No. 2444 (1989-1990 Reg. Sess.) Aug. 23, 1990). In that

letter, Sen. Rogers stated:

> *[A] great many law enforcement officers who deal directly with the public are*
> *not experts in specific firearms identification* . . . . [¶] There are numerous makes
> and models of civilian military-looking semi-automatic firearms which are not
> listed by California as "assault weapons" but which are very similar in external
> appearance. This situation sets the stage for honest law-enforcement mistakes
> resulting in unjustified confiscations of non-assault weapon firearms.

*Id.* (emphasis added).

Such mistakes, although innocently made, could easily result in unnecessary, time-

consuming, and costly legal actions, both for law enforcement and for the law-abiding firearms

owners affected. *Id*. Senator Rogers thus saw it as necessary to "assur[e] that law enforcement

officers are assisted in the proper performance of their duties through having at their disposal a

reliable means of accurately identifying each listed 'assault weapon.' " *Id.* Without the guide, it

was too likely that law enforcement officers would interpret and apply the law in an arbitrary and

discriminatory manner because each officer's understanding of what constitutes an "assault

weapon" could too easily differ from the next officer's understanding. The court agreed, stating

that "[n]ot only would ordinary citizens find it difficult, without the benefit of the Identification

Guide, to determine whether a semiautomatic firearm should be considered an assault weapon,

ordinary law enforcement officers in the field would have similar difficulty." *Id.*

As the *Harrott* court observed that law enforcement could not be expected to be experts

in the identification of "assault weapons" that are a "series" of an explicitly prohibited firearm,

neither can law enforcement officers be expected to be experts in the identification of "assault

weapons" that are a "copy or duplicate" with the "capability" of an explicitly prohibited firearm.

Faced with a host of vague terms and confusing definitions and lacking further guidance as to challenged provisions' meaning, officers are left to rely on their subjective judgment and individual understanding of firearms and ammunition in determining which items the law is meant to prohibit. This will inevitably spawn the "erratic arrests and convictions" that due process is meant to prevent. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

Even if portions of the challenged provisions provided some standards, these statutes can, and should, provide greater clarity. Law enforcement officers are assigned the daunting task of enforcing the laws, pursuant to their own interpretations, against individuals attempting to exercise their fundamental rights to keep and bear arms, with the very real possibility that their interpretations will result in the arrest and incarceration of otherwise law-abiding citizens. Law enforcement should not be left to divert limited resources from crucial public safety functions attempting to enforce these provisions, only to have cases dismissed and convictions overturned.

## CONCLUSION

The challenged provisions criminalize the possession of protected arms – absent any nexus to a reduction in violence or criminal activity – in derogation of fundamental Second Amendment rights. Further, the laws fail to provide sufficient clarity to promote equitable enforcement, in violation of due process guarantees.  For these reasons, Amici respectfully request this Court issue an injunction enjoining enforcement of the challenged provisions.

/s/ C.D. Michel_____

C. D. Michel*
Michel & Associates, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
Tel:  (562) 216-4444
Fax: (562) 216-4445
cmichel@michellawyers.com
*Motion for Admission pending*

/s/ Rachel M. Baird_____

Rachel M. Baird (ct12131)
Law Office of Rachel M. Baird
8 Church St Ste 3B
Torrington, CT 06790
Tel:  (860) 626-9991
Fax:  (860) 626-9992
rbaird@rachelbairdlaw.com

## CERTIFICATION OF SERVICE

I HEREBY CERTIFY THAT on July 15, 2013, a copy of the foregoing Amici Curiae

Brief was filed electronically. Notice of this filing will be sent by email to all parties by

operation of the Court's electronic filing system.  Parties may access this filing through the

Court's system.

/s/ Rachel M. Baird_____
Rachel M. Baird
Commissioner of the Superior Court