# UNITED STATES DISTRICT COURT
for the
District of Connecticut

**June Shew, et al**

_____

           **Plaintiff**            )

                              )

**v.**                          )        **Case No.**      **3:13-cv-00739-AVC**

                              )

**Dannel P. Malloy, et al**     )

_____ )    **OCTOBER 18, 2013**

           **Defendant**

**BRIEF OF AMICI CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE,
THE MAJOR CITIES CHIEFS ASSOCIATION, THE INTERNATIONAL
BROTHERHOOD OF POLICE OFFICERS, AND THE NATIONAL
ORGANIZATION OF BLACK LAW ENFORCEMENT EXCUTIVES IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
<u>AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

**STATEMENT OF INTEREST**

The Brady Center to Prevent Gun Violence and other amici listed below are filing an amicus curiae brief in support of Defendants, principally to address the current legal standard for Second Amendment protection of restrictions on the possession for firearms and the standard of review of such restrictions.   The Brady Center has a substantial interest in ensuring that the Second Amendment is not interpreted to jeopardize the public's interest in protecting families and communities through strong government action to prevent gun violence.  Through its Legal Action Project, the Brady Center has filed numerous amicus curiae briefs in cases involving firearms regulations, including *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), *District of Columbia v. Heller*, 554 U.S. 570 (2008), *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), and *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc).

Amici the Major Cities Chiefs Association (MCCA) is comprised of police executives heading the sixty-six largest police departments in the United States which protect approximately forty percent of America's population.  The International Brotherhood of Police Officers (IBPO) is one of the largest police unions in the country, representing more than 25,000 members. While the IBPO fully supports and defends the Second Amendment right to keep and bear arms, it strongly supports states' authority to enforce reasonable and constitutional gun laws, which will protect the public and law enforcement officers. The National Organization of Black Law Enforcement Executives (NOBLE) is an organization with 2,500 members, including federal, state and local law enforcement CEOs, command-level officials, and criminal justice educators who are committed to improving the quality of law enforcement service through training, professional competence and personal example.  The MCCA, IBPO and NOBLE share the

2

interests of the individual amici in seeing reasonable gun control measures upheld and enforced for the public good.

## SUMMARY OF THE ARGUMENT

Assault weapons enable and facilitate violent crime and mass murder.  Mass slaughters terrorize society at large, undermine the public's sense of safety and security, and burden the community with latent fear and uncertainty.  Amici MCCA, IBPO, and NOBLE work to protect the public from these military-style weapons, and are exposed to their special dangers.  The State of Connecticut appropriately addressed the dangers posed by assault weapons by enacting an Act Concerning Gun Violence Prevention and Children's Safety, Public Act 13-3, effective on April 4, 2013, and amended by Public Act 13-220, effective June 18, 2013 (the "Act").

Plaintiffs and the NRA, as amici, insist that the Second Amendment protects the rights of the general public to own assault weapons.  They essentially argue that the constitutionality of the Act is completely dependent upon whether assault weapons are in common use for lawful purposes.  And under their analysis, since gun manufacturers have successfully encouraged and persuaded Americans in recent years to purchase millions of assault weapons, those weapons should not be subject to regulation.  However, the prior successful marketing of assault weapons that dramatically increase the risk of a mass shooting does not immunize those weapons from regulation.

After the expiration of the federal assault weapons ban in 2004, State and local governments have sought to fill the void.  The process has moved slowly, as legislatures have grappled with the difficult policy and legal issues involved.  The gun market, however, has been much more nimble and has widely encouraged the sale of assault weapons.  Immediately after the expiration of the federal assault weapons ban, and before the Connecticut legislature acted,

sales of assault weapons sharply increased.  Now, Plaintiffs argue, it is too late.  The legislature did not act quickly enough, they say, and now that the market is glutted with assault weapons, the sheer popularity of the weapons entitles the guns to Second Amendment protection. Furthermore, Plaintiffs argue, such protection is so absolute that the legislature has no discretion to restrict the most dangerous assault weapons despite the overwhelming public policy interest in doing so.

Plaintiffs misconstrue the Second Amendment.  It does not protect dangerous and unusual weapons such as those restricted by the Act.  Nor does it protect secondary characteristics of guns that do not detract from the basic functionality of the weapon for purposes of self-defense.  It protects only weapons that are in common use for *lawful purposes*, and even then, legislatures have the authority to regulate such weapons to protect the public interest. Under this standard, the Act is clearly permissible and consistent with the Constitution.

## ARGUMENT

## I.      Principles Established by Heller and McDonald

The Supreme Court defined the scope of protection under the Second Amendment in *Heller* and McDonald.[1]  Most notably and, contrary to the arguments proposed by the Plaintiffs and other amici, the Supreme Court never provided in those decisions that firearm regulations are subject to the strong presumption against constitutionality (that accompanies a strict scrutiny review).  Instead, the Supreme Court provided clear guidance in reviewing the constitutionality of gun control laws by defining the scope and limitation of the rights under the Second Amendment.

---

[1] States have long implemented wide-ranging restrictions on procuring, possessing, or using firearms not linked to any core purpose since the beginning of the Republic.  *See* Cornell & DeDino, *A Well Regulated Right, The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487, 502-505.

First, the Supreme Court made it very clear that the scope of Second Amendment is not absolute, but rather limited in a sense that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" in scope and does not amount to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller,* 554 U.S. 570 at 626.  The Supreme Court repeated such assurances in *McDonald* by stating that the incorporation by the Fourteenth Amendment "does not imperil every law regulating firearms." *McDonald,* 130 S. Ct. at 3047.  "[T]h[e] guarantee [under the Bill of Rights] limits (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values" (parenthesis added) and "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment."  *Id*. at 3046.

In furtherance to this limited nature of the protection, the Court in both cases proclaimed that an individual right to keep and bear arms for self-defense is subject to certain regulation by the legislature.  The Supreme Court in *Heller* acknowledged that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence."  *Heller,* 554 U.S. at 636.  The Court was extremely cautious about the risks of its decision choking the legislature's efforts to design the gun control regime.  For this reason, the Supreme Court set forth in its own decision a non-exclusive and illustrative list of a number of gun control regulations that the Court found to be "presumptively lawful."  *Id.* at 626-27.  In *McDonald,* the Court again explicitly reaffirmed that "reasonable firearms regulations will continue under the Second Amendment."  *McDonald*, 130 S. Ct. at 3046.

Second, even assuming that the rights under the Second Amendment are fundamental, that does not necessarily call for strict scrutiny.  On the contrary, *Heller* suggests that the Court rejected strict scrutiny, as Justice Scalia determined that certain laws are "presumptively lawful,"

without any proof that they satisfied a strict scrutiny analysis.  Nonetheless, Plaintiffs assert that the Act must be subject to a "higher standard than intermediate scrutiny" because it "violates the fundamental right at issue because it bans mere possession of firearms and magazines in one's own home."  The Act does not violate any fundamental Second Amendment right, however.  Moreover, it is well-settled law that regulations affecting "fundamental rights" are not always subject to strict scrutiny review.  For example, the Supreme Court has expressly rejected the argument that any "burden upon the right to vote," which is clearly a fundamental right as discussed in *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886), "must be subject to strict scrutiny." *Burdick v. Takushi,* 504 U.S. 428, 432 (1992).

Third, the historical tradition of this nation justifies prohibition on carrying of "dangerous and unusual weapons."  *Heller,* 554 U.S. at 571.  The Supreme Court denied the protection of the Second Amendment for such "sophisticated arms that are highly unusual in society at large."  First, government may prohibit the possession of arms that terrify the population without violating the Second Amendment.  The Supreme Court cited, for example, Blackstone, which states that "[t]he offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land . . . ."  4 Blackstone 148 (1769).  The Supreme Court also cited *English v. State*, 35 Tex. 473 (1871), which held that the Second Amendment did not protect certain types of weapons that are used for criminal purposes.  Among the "wicked devices of modern craft" prohibited by the statute at issue in that case were pistols.  According to *English*:

> To refer the deadly devices and instruments called in the statute 'deadly weapons,' to the proper or necessary arms of a 'well-regulated militia,' is simply ridiculous.  No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders,

assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.

Fourth, intermediate scrutiny was by no means precluded by the decisions in Heller and McDonald. Under the general proposition that the Second Amendment protection is not absolute, the Supreme Court in *Heller* has suggested a 2-prong test that was appropriately recognized by lower courts. The Supreme Court in *Heller* first examined the core rights granted under Second Amendment and concluded that it protects "the right of law-abiding, responsible citizen to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. After concluding that the regulated weapons were within the scope of Second Amendment, the Court reviewed whether the restriction at issue substantially limits the Second Amendment rights.[2] Among other things, the Court emphasized that the D.C. gun laws plainly resulted in prohibition of the entire class of handguns, which amounts to total destruction of self-defense rights under the Second Amendment. In *Heller*, the Court did not need to go further to examine the applicable level of scrutiny and, thus, neither mandated nor even articulated a specific level of scrutiny.[3] *Id.* at 628-29. However, the Court in *Heller* repeatedly identified the primary reason of its holding is the severity of the ban that amounted to a "destruction of the right," "prohibition of entire class of 'arms,'" or rendering the arms "wholly useless for the purpose of defense." *Heller, Id.*

---

[2] *See United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010) (*Heller* "suggests a two-pronged approach to Second Amendment challenges. First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. . . . If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid").

[3] After *Heller,* in 2010, the Court in *McDonald* addressed a Second Amendment challenge and, likewise, did not articulate a particular standard of review to evaluate Second Amendment challenges to gun regulations. *See also* Lawrence Rosenthal & Joyce Lee Malcolm, *McDonald v. Chicago: Which Standard of Scrutiny Should Apply to Gun Control Laws?* 105 Nw. U. L. Rev. 437, 438-39 (2011).

Pursuant to this general guidance, several courts including the Second Circuit identified the appropriate level of scrutiny by examining the substantiality of the burden actually imposed on the core Second Amendment rights.  In *United States v. Decastro*),[4] the Second Circuit set forth a threshold under which courts must determine, in the first instance, whether a challenged regulation substantially burdens the rights under the Second Amendment and, only *after* discerning that the challenged regulation imposes a substantial burden will a court apply heightened level of scrutiny.  682 F.3d 160, 166-67 (2d Cir. 2012.  The Second Circuit even went further to include that "statutes that do not impose a substantial burden on the Second Amendment would call for a less restrictive standard such as rational basis."  *See id.* at 167, n. 6. Although the Second Circuit in *Decastro* did not explicitly apply rational basis review, the Second Circuit ultimately found that the law at issue did not place a substantive burden on the right to possess a gun for self-defense because the law only prohibits the transportation into one's state of residence of firearms acquired outside the state to stop circumvention of state laws regulating gun possession.  682 F.3d at 168, n.5; *see Heller,* 554 U.S. 709.  Among the reasons given in its decision, the Second Circuit explained that, under the *Heller* decision, the "time, place and manner restrictions may not significantly impair the right to possess a firearm for self-defense, and may impose no appreciable burden on Second Amendment rights."  682 F.3d at 165 In *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93 (2nd Cir. 2012) cert. denied, 133 S Ct. 1806 (2013), the Second Circuit recognized that even if a substantial burden is imposed on the Second Amendment then "some form of heightened scrutiny [is] appropriate" and in *Kachalsky*

---

[4] Given *Heller*'s emphasis on the weight of the burden imposed by the D.C. gun laws, it should not be read to mandate that any marginal, incremental or even appreciable restraint on the right to keep and bear arms be subject to heightened scrutiny.  Rather, heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes).

the appropriate heightened scrutiny was intermediate scrutiny where the court is required to determine whether a law is "substantially related to the achievement of an important governmental interest." *Id*.

Plaintiffs and amici tried to distinguish *Kachalsky* from the case at hand arguing that *Kachalsky* is not a flat ban, but a license scheme, and it concerns not the home, but the public arena.  However, the distinction oversimplifies the holdings of *Heller* and *McDonald*, because the scope of the Second Amendment cannot be solely judged by whether a gun control is a flat ban involving home or not.  As discussed above, the constitutionality of gun laws invites a multi-layered review of the totality of relevant facts to determine whether the laws effectively and substantially deprive law-abiding citizens of the right to self-defense under the Second Amendment.  Indeed, even the Seventh Circuit's decision in *Moore v. Madigan,* 702 F.3d 933 (7th Cir. 2012) that struck down Chicago's flat ban of carrying weapons outside home noted that it agreed with *Kachalsky* that the New York law allowing only individuals having a bona fide reason to possess handguns to introduce them into the public sphere is reasonable.  *Id*. at 940.  In sum, the determinative question is the degree of severity which can be judged by the substantiality of the effect that the questioned laws would likely have on the Second Amendment rights.

The Seventh Circuit in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) not only reaffirmed the 2-pronged approach implied by *Heller* and *McDonald*, but further opined that if the challenged law regulates an activity falling outside the scope of the Second Amendment as it was understood at the relevant historical moment, then the analysis can stop there and "the regulated activity is categorically unprotected."  *Id*. at 703.  However, if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected, then there

must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.  The Seventh Circuit reasoned that "the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."  So, under this approach, a court must first extract any "categorically unprotected" activities from the boundary of its review before it moves to the second inquiry of government justification. *Id*.

## II.     Assault Weapons Are Categorically Unprotected.

The Supreme Court in *Heller* found that "dangerous and unusual weapons" are not protected by the Second Amendment,[5] a holding it supported with reference to a series of older treatises and state court decisions.  *Heller*, 554 U.S. at 627.  Such dangerousness and unusualness of a weapon may be determined by certain aspects of the weapon, for example, whether it enables the carrier to conceal such weapon and magnify the damage to a level that terrifies the public.  The Third Circuit in *Marzzarella* also considered such criteria in identifying a dangerous and unusual weapon.  While a short-barreled shotgun is dangerous and unusual in that its concealability fosters its use in illicit activity, it is also dangerous and unusual because of its heightened capability to cause damage. *Marzzarella*, 614 F.3d at 95.

According to such standards, the weapons regulated by the Act are clearly dangerous and unusual, which makes them categorically fall outside the scope of Second Amendment protection.  As discussed below, assault weapons clearly have the ability to terrify the population, and are disproportionately used in crime.

---

[5] As explained in *Marzzarella*, "By equating the list of presumptively lawful regulations with restrictions on dangerous and unusual weapons, we believe the Court intended to treat them equivalently as exceptions to the Second Amendment guarantee."  614 F.3d at 91.

Research supports the point that assault weapons are particularly dangerous.  Academic research has found that the average number of people killed or wounded in mass shootings doubled when assault weapons or semiautomatic guns combined with high capacity magazines were used in the shooting (Koper cited in Webster and Vernick, 2013, p. 167).  Other analyses have found a similar pattern.  For mass shootings from January 2009 and January 2013, shootings with assault weapons or high capacity magazines resulted in more than double the number of people shot and more than 50 percent more killed (Mayors Against Illegal Guns, 2013).  Likewise, an analysis of a database of mass shootings from 1984 to 2012 found positive correlations between rounds fired per minute and the number of people hit and killed (Ashton, Kevin, 2013).  Reducing access to assault weapons and to high capacity ammunition magazines reduces criminals' ability to spray-fire a continuous stream of hundreds of bullets into crowds.

The NRA contests this point (amicus brief at 10) and argues that, "to the extent the additional attributes that, when combined with a detachable magazine, push a firearm over the line from acceptable to contraband make a difference in the functionality of the firearm at all, they tend to *improve* the firearm's ability and safety for self-defense and other lawful purposes." That claim is unsubstantiated.  On the contrary, according to former Baltimore County Police Department Colonel Leonard J. Supenski, "The typical self-defense scenario in a home does not require more ammunition than is available in a standard 6-shoot revolver or 6-10 round semiautomatic pistol."  *See* Assault Weapons:  "Mass Produced Mayhem."  According to the NRA's own data, out of 482 incidences, the average and median number of shots fired by a

11

defender was two.  *See* Claude Werner, Director of Firearms Training, LLC, analysis of *The NRA Armed Citizen – A Five Year Analysis*.[6]

It is simple fact that semiautomatic guns with particular features such as pistol grips, thumbhole stock, telescoping and folding stock are designed to increase the portability, concealability and magnitude of damage.  Such features make it easier to transport the weapons to public spaces and use to maximize the number of effective hits, which also means that it has a grievous potential to much more likely inflict greater calamity and jeopardize the operation of law enforcement, particularly in case of mass shootings.

## III.  The Weapons Regulated by the Act Are Not Commonly Used for Lawful Purposes At the Time.

Even assuming that the weapons regulated are not categorically excluded from the scope of Second Amendment, under the first prong of the *Heller* test, a court must determine whether the weapons that are the subject of regulation fall within the scope of Second Amendment protection.  *Heller* stands for the proposition that a weapon is only protected if it is (A) commonly used (B) "at the time" for (C) lawful purposes such as self-defense in the home.  The regulated weapons must meet each of these criteria in order to qualify for protection.  554 U.S. at 627.

### A.  The Weapons Possessing the Regulated Characteristics Are Not Commonly Used.

In *Heller*, the Supreme Court held that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ."  *Id.* at 625

---

[6] In practice, "nearly all shootings including criminal ones, use many fewer rounds" than ten, and "until recently police officers carried revolvers which tended to hold only six rounds."  Eugene Volokh, *Implementing the Right to Keep and Bear Arms,* at 1489.  *See also* Gary Kleck, *Point Blank, Guns & Violence in America* (paperback ed., 2005) at p. 79 (explaining that only a tiny fraction of gun homicides involve more than 10 shots fired).

The Court noted that historically "the sorts of weapons protected were those 'in common use at the time.'"  *Id*. at 627  According to *Heller*, possession in the home of all handguns could not be totally banned because they are "*overwhelmingly chosen* by American society" for self-defense (emphasis added).  *Id*. at 628  According to the Court, "the American people have considered the handgun to be *the quintessential self-defense weapon*," and "[w]hatever the reason, handguns are *the most popular weapon chosen by Americans* for self-defense in the home . . . ." (emphasis added).  *Id*. at 629  No other weapon has been shown to be as popular for self-defense in the home, and the Court did not explain whether any lower level of "use" could be deemed "common."  *Id*. at 627

However, under any reasonable interpretation, the assault weapons regulated by the Act are not in common use.  First, the assault weapons that Plaintiffs focus upon – semiautomatic rifles and shotguns that possess the characteristics identified by the Act – are not the "quintessential self-defense weapon" or "the most popular weapon chosen by Americans for self-defense in the home" because there is no evidence that the level of use of weapons regulated by the Act remotely approaches the level of handgun use.  *Id*. at 627  Plaintiffs do not even attempt to argue otherwise.

Second, no evidence supports that the weapons regulated by the Act are commonly used for lawful self-defense *in Connecticut*.  Plaintiffs present national production and sales figures, none of which provide an indication of how prevalent the weapons at issue are in Connecticut, much less for self-defense in the home.  Third, even if we assume semiautomatic weapons are in common use, the Act does not prohibit all such weapons.  Plaintiffs do not complain that the Act prohibits a particular class of weapons (such as semiautomatic rifles) – it clearly does not – but that the Act prohibits certain secondary characteristics (such as a hand grip) that are incorporated

into certain of those weapons.  Plaintiffs cite no legal basis for asserting that the Second

Amendment protects secondary characteristics that do not undermine the basic functionality of

the weapon, in this case, the ability of the weapon to load and fire bullets semi-automatically for

purposes of self-defense.  Nevertheless, if one were to accept the theory that secondary

characteristics are constitutionally protected, the relevant constitutional inquiry in such case

would not be whether semiautomatic weapons as a class are in common use but rather whether

semiautomatic weapons *with the particular characteristics at issue* are commonly used for home

self-defense.  There is no evidence that they are.

### B.    The Weapons Possessing the Regulated Characteristics Are Not in Common Use at the Relevant Time.

According to *Heller*, "the sorts of weapons protected were those 'in common use at the

time' . . . ."  The Court did not elaborate on what it meant by "at the time."  The phrase

originated in *Miller*, where the Court stated:

> The signification attributed to the term Militia appears from the debates in the
> Convention, the history and legislation of Colonies and States, and the writings of
> approved commentators.  These show plainly enough that the Militia comprised
> all males physically capable of acting in concert for the common defense."  A
> body of citizens enrolled for military discipline."  And further, that ordinarily,
> when called for service these men were expected to appear bearing arms supplied
> by themselves and of the kind *in common use at the time*.

From this statement, it might be understood that the relevant time for assessing whether a

weapon is in common use is the time when the Constitution was drafted.  *Heller* held that this

was not the appropriate reference point, *Heller*, 128 S.Ct. at 2791, but it did not provide any

indication of what the relevant "time" should be.

It would be unreasonable to look only to the day on which the statute was enacted as the

relevant reference point.  Suppose, for example, that a new, unregulated and highly lethal

weapon were developed.  When it is first offered for sale, the weapon would not be protected

14

because it would not be in common use.  However, if sales of the weapon grew explosively over

the next year, then the weapon would, within that short period, become constitutionally

protected, even though a ban would have been permissible had the legislature acted just a few

months earlier.  Such an approach makes little sense.  If "common use at the time" is a relevant

criterion, then the reference period must at least include a reasonable period of time for the

legislature to assess and respond to changes in the marketplace.

Even if semiautomatic rifles have existed for a recognizable period of time, they were not

in common use for self-defense throughout that period.  In fact, the Sheriffs' brief demonstrates

that large sales of AR-15s are a relatively recent phenomenon.  Between 1986 and 2004, on

average fewer than 100,000 AR-15s were sold annually.[7]  The weapons clearly were not in

common use at that time, in part because their use was prohibited by the federal weapons ban.

Purchases spiked after the expiration of the weapons ban in 2004, peaking in 2009 at well over

500,000 units sold.  It cannot be that, in 2004, a ban on AR-15s was constitutional but not five

years later.

Plaintiff's analysis becomes more absurd particularly with respect to regulations

covering, not the basic weapon (*e.g.*, semiautomatic rifles), but particular characteristics of that

weapon, such as particular grips, that are even more likely than entirely new classes of weapons

to grow quickly in popularity.  If a major gun manufacturer devised a particularly appealing hand

grip, which it then incorporated into all of its otherwise standard rifles, hundreds of thousands of

guns with that particular hand grip could be manufactured and sold then within a very short

---

[7] *See*  Zawitz, U.S. Dep't of Justice, Bureau of Justice Statistics, *Guns Used in Crime* 6 (1995)
(assault weapons constituted about 1% of guns in circulation prior to federal assault weapons
ban); Koper, *An Updated Assessment of the Federal Assault Weapons Ban* 10 (Report to
National Institute of Justice, U.S. Dep't of Justice 2004) ("Around 1990, there were an estimated
1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock)[.]").

period of time.  Under Plaintiff's argument, Second Amendment protection would then adhere not just to the category of gun (semiautomatic rifles) but to guns with that particular *hand grip*.

If "common use at the time" is the criterion to be applied, then "the time" must at least be understood to cover a historically representative period of time during which the weapons exhibiting the particular characteristics were available and widely used for lawful purposes of self-defense.  Again, no evidence supports that the secondary characteristics regulated by the Act have been in common use for such a historically-representative period of time, which may warrant the protection of the Second Amendment.

### C.      The Characteristics Prohibited by the Act Are Not Related to Self-Defense in the Home.

In order to bring the regulated weapons within the scope of Second Amendment protection, such common use must have been for a lawful purpose, and not for illegitimate purposes such as violent crime or the threat of violent crime.  The primary "lawful purpose" identified by the Supreme Court is self-defense within the home.  According to *Heller*, self-defense "was the *central component* of the right itself."[8]  As stated in *Kachalsky*, "[w]hat we know from these decisions is that Second Amendment guarantees are at their zenith within the home."

Therefore, a critical question in determining whether the Act oversteps Constitutional bounds is whether the regulation impinges on the ability of the weapons to serve their basic function of self-defense in the home or for any other lawful purpose.  Indeed, the functionality of the weapon was at the heart of the *Heller* decision particularly when examining the constitutionality of D.C. gun law that required that handguns be disabled in the home.

---

[8] *See also*, *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) (the Supreme Court reiterated its "central holding in *Heller*" that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home").

According to the Court, that requirement "makes it impossible for citizens to use [the firearm] for the core lawful purpose of self-defense, and is hence unconstitutional."[9]  The functionality is not the technical difference as Plaintiffs argue, but rather the general availability and utility of the weapon.

In short, if the regulated characteristics meaningfully affect the functionality of the weapon for lawful purposes such as self-defense, then it is more likely that the regulation at issue violates the Second Amendment.  However, if regulating the underlying characteristics of the weapon does not undermine its utility for self-defense, then the regulation falls outside the scope of the Second Amendment.  As stated in *Marzzarella,* 614 F.3d at 94:

> *Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality.  *Id.* at 2818 (citing handguns' ease in storage, access, and use in case of confrontation).  But unmarked firearms are functionally no different from marked firearms.  The mere fact that some firearms possess a nonfunctional characteristic should not create a categorically protected class of firearms on the basis of that characteristic.

The Act's restrictions do not impact a semiautomatic weapon's utility for self-defense.  As noted, the Act does not prohibit all semiautomatic weapons, but only those that possess the enumerated characteristics.  The prohibited and permitted weapons serve equally well for purposes of self-defense in the home.  Indeed, the NRA admits (amicus brief at 9) that "the firearms banned by the Act are *not* fundamentally different from some of the semiautomatic firearms that it permits."  For example, according to the NRA (amicus brief at 9), "[a] detachable magazine does nothing to distinguish a semiautomatic firearm from other familiar, commonly-

---

[9] *See also Decastro* ("Throughout, *Heller* identifies the constitutional infirmity in the District of Columbia laws in terms of the burden on the ability of D.C. residents to possess firearms for self-defense.  The Court emphasized . . . that the mandate to disable all firearms 'makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional.'"); and *Nordyke v. King,* 563 F.3d 439, 458  (9th Cir. 2009) ("*Heller* tells us that the Second Amendment's guarantee revolves around armed self-defense.  If laws make such self-defense impossible in the most crucial place – the home – by rendering firearms useless, then they violate the Constitution").

possessed firearms." As a logical conclusion, the Act does not eviscerate the Second Amendment protection given that it does not inhibit possession and use of any such functionally-identical firearms that are proven to effectively serve the lawful purposes.

Although the basis is not entirely clear, NRA appears to contend that the Second Amendment protects the gun features regulated by the Act because they improve the usefulness and accuracy of shooting. If the technical accuracy and user-friendliness of a gun should be the criteria for constitutional protection, it would practically invalidate any governmental efforts to restrict the type of guns that can be distributed to the civilians and would prevent legislation that banned machine-guns or other military-type weapons that are lethally accurate and highly efficient.

In line with the above reasoning, the D.C. Circuit in *Heller II* upheld prohibition of assault weapons and large-capacity magazines, which are strikingly similar to those at issue here. The D.C. Circuit admitted that it is difficult to draw meaningful distinction between the semiautomatics, namely AR-15, and the M-16, *Heller II,* 670 F.3d at 1263, citing that the Supreme Court once described AR-15 as "the civilian version of the military's M-16 rifle." *Staples v. United States,* 511 U.S. 600, 603 (1994).

Also, the D.C. Circuit correctly pointed out that prohibition of semiautomatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves, notably, because the prohibition left a person "free to possess any otherwise lawful firearm." 670 F.3d at 1262 As this demonstrates, the point of review over a gun regulation must be on its effect on the ability of citizens to defend themselves, and not certain types and classes of firearms.

**IV.    Even Assuming the Act Implicates the Second Amendment, The Requirements of the Act Satisfy Intermediate Scrutiny Review.**

As explained above, the weapons regulated by the Act do not fall within the scope of Second Amendment protection.  However, even if they do, the restrictions in the Act should be subject to intermediate scrutiny, a standard that the Act clearly satisfies.

First, after *Heller*, lower court decisions have almost uniformly analyzed challenges such as those under review here pursuant to the intermediate scrutiny.  The Second, Third, Fourth, Fifth and Tenth Circuits have applied intermediate scrutiny in the context of Second Amendment.[10]  Indeed, the standard used most often by state courts in analogous situations is intermediate scrutiny within a "reasonable regulation" framework – meaning that the applicable standard is whether the Connecticut legislature is reasonable in enacting prophylactic measures directed at saving lives or reducing serious crime.  670 F.3d at 1256  *See, e.g., Lewis v. United States,* 445 U.S. 55, 66-67 (1980).

Second, the level of scrutiny depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.  628 F.3d at 682.  After duly acknowledging the Heller's focus on "core" Second Amendment conduct and the Court's frequent references to First Amendment doctrine, the Fourth Circuit in *Chester* elected to apply strict scrutiny only for severe burdens on the armed self-defense while endorsing an easy

---

[10] *See United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (applying intermediate scrutiny to a ban on firearm possession by domestic violence misdemeanants); *Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny to a law criminalizing possession of guns with obliterating serial numbers); *Peterson v. Martinez,* 707 F.3d 1197, 1205 (10th Cir. 2013) (Slip. Op., separate concurrence of Judge Lucero) (explaining that, for Colorado's ban on carrying concealed weapons in public, if Second Amendment protection were available, the appropriate constitutional test is intermediate scrutiny); *see also NRA v. ATF,* 700 F.3d, 185 (5th Cir. 2012) (assuming that the challenged federal laws (prohibiting persons under 18 from possessing handguns) burdened conduct in the scope of the Second Amendment, finding that such laws "trigger nothing more than 'intermediate' scrutiny.").

justification of the laws that do not implicate the central self-defense concern of the Second

Amendment under intermediate scrutiny.  *Id.*  Given the varying degrees of burden on Second

Amendment rights and diverse spectrum of governmental regulations, "one-size-fits-all standard

of review" is purely impossible. *Id.*

    The relevant scrutiny applicable to the Act is intermediate scrutiny.  First, the Act does

not infringe the "core" rights guaranteed by Second Amendment.  *Id.*  Plaintiffs fail to show that

the Act imposes any meaningful burden on their rights to possess firearms in the home for self-

defense.  Under the Act, it is clear that individuals who are not otherwise disqualified by

operation of law can maintain a wide variety of handguns, rifles, or shotguns to protect

themselves in their homes.  Second, the Act does not restrict, but regulate the possession of

firearms.  Under the Act, there is no ban on firearms that have been typically used to facilitate

self-defense; only certain identification of dangerous features, which simply regulates the

manner of possession. Again, the Third Circuit has ruled that prohibition that left a person free to

possess any otherwise lawful arms "is more accurately characterized as a regulation of the

manner in which persons may lawfully exercise their Second Amendment rights."  *Marzzarella*,

614 F.3d at 97.  Third, regulation of gun ownership is not a modern invention – it is a practice

that was accepted by the founders.  It is well-settled that firearms have always been subject to

police-power regulation in the states.  Fourth, because of the important government interest at

stake[11] and the slight burden they impose on any Second Amendment right, the Act may be more

easily justified than other types of gun regulations.  As explained above, the firearms

Connecticut seeks to ban are not the quintessential self-defense weapons.  Rather, these firearms

---

[11] Because the State's interest in regulating  deadly assault weapons in this arena is abundantly
clear and extremely important, it could be fairly be argued that an less stringent standard than
intermediate scrutiny could be utilized.

are dangerous and unusual outliers. [12]  They are not the type of firearms that are typically used

for self-defense in the home.[13]  In fact, a semiautomatic weapon with, for example, a large

magazine may be more dangerous (and therefore less suited for self-defense) given that the

ability to fire a burst of bullets in a short period of time increases the risk of accidental shootings

of innocent others in the household, passerby and bystanders.  *Heller II* 670 F.3d at 1264.

To pass muster under intermediate scrutiny, the government must show that the

requirements of the legislation are "substantially related to an important governmental

objective."  *Clark v. Jeter,* 486 U.S. 456, 461 (1988).  As discussed below, that standard has

been met.

First, the legislative object of the Act is extremely important and even compelling given

that the stake here literally is one of life or death.  Under these circumstances, the state interests

and objectives (to protect its citizenry from maiming and death) are at their strongest.  Such

strong government objectives are evidenced by the legislative materials.  The Connecticut

legislature passed the Act to protect its citizens in the aftermath of a horrendous shooting attack

involving an assault weapon and the legislation regulates the type of assault weapon used in that

---

[12] It is important to note that Congress has historically prohibited private possession of
particularly dangerous types of firearms.  For example, possession of machine guns is
categorically prohibited (*see* 18 U.S.C. 922(o), and a similar restriction as to "semi-automatic
assault weapons" was in effect until 2004 pursuant to a pre-existing sunset provision.  *See* 18
U.S.C. 922(v)(1).  Congress has also restricted possession of firearms by various categories of
individuals deemed unfit to possess such weapons (18 U.S.C. 922(g)(1)) and prohibited
possession of firearms at specific locations (18 U.S.C. 930 (2000 Supp. V 2005).  Further,
federal law also regulates the manufacturing, sale and importation of firearms.  *See* 18 U.S.C.
923 (2000 Supp. V 2005); 18 U.S.C. 922(a).

[13] *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime:  The Prevalence and Nature of
Self-Defense With a Gun,* 86 J. Crim. L. & Criminology 150, 185 (1995) (revolvers and semi-
automatic pistols are together used almost 80% of the time in incidents of self-defense); *see also*
Department of Treasury, *Studying the Sporting Suitability of Modified Semi-Automatic Assault
Rifles* 38 (1998) (finding semi-automatic assault rifles are "not generally recognized as
particularly suitable or readily adaptable to sporting purposes).

shooting.  In applying intermediate standard of review, such important regulatory interests are typically sufficient to justify reasonable restrictions.  *Cf. Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Second, given the clear data demonstrating that assault-weapons are much more likely than other firearms to be used in acts of violence and in mass shootings, Connecticut's well-balanced legislative action to define the specific features of assault-weapons is substantially related to and eminently serves the important government purpose of protecting the lives of its citizens.  Indeed, the subset of guns that Connecticut is focusing on is one which is "preferred by criminals over law-abiding citizens eight to one."  *See Assault Weapons "Mass Produced Mayhem"* at 10, Brady Center to Prevent Gun Violence (October 2008).  Regardless of whether only a small percentage of firearms are "assault weapons," (perhaps only 1-2% of all firearms qualify as "assault weapons") these types of firearms continue to be responsible for a disproportionately higher number of mass shootings.[14]

Plaintiffs suggest that there is no nexus between the Act's restrictions and either a reduction in violent crime or an improvement in public safety.  That suggestion is contrary to the empirical evidence which were extensively referenced in *Heller II* decision.  *See Heller II*, 670 F.3d at 1262-1264.  Simple statistics illustrate the gravity of the problem.  Guns in America kill

---

[14] From the mass shootings in Aurora, through Newtown, and to date, 42 guns with high capacity magazines were used across 31 mass shooting cases.  Twenty assault weapons were used across 14 mass shooting cases, and 33 cases involving assault weapons, or high capacity magazines, or both.  In 2012 alone where were 7 mass shootings and a record number of casualties stemming from gunfire (140 annual mass shooting casualties).  Furthermore, not one (out of 62) mass shootings in the U.S. in the past 30 years, has been stopped by a civilian with a gun. http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein

more than 30,000 people annually and injure 70,000 more.[15]  In 2007, firearms were used in

more than 385,000 serious crimes including approximately 12,000 murders, 191,000 robberies,

and 181,000 aggravated assaults.[16]

Plaintiffs argue that the use of highly-sophisticated guns by such criminals enables them

to be equipped with equivalent arms with the same level of accuracy and capacity.  However,

*Heller* or *McDonald* made no suggestion that the Second Amendment constitutionally protects

the state-of-art characteristics of firearms or highly-destructive weapons capable of killing vast

number of people, merely because some sophisticated criminals might have access to such

weapons.  That argument ultimately leads to an absurd conclusion that any gun control is futile

(and even constitutionally invalid), because criminals will likely ignore such laws anyway.

Throughout the United States, similar types of bans have been upheld. *See e.g., Arnold v.*

*Cleveland,* 616 N.E. 2d 163, 173 (Ohio 1993); *compare McDonald,* 130 S. Ct. at 3047 (noting

the "paucity of precedent sustaining bans comparable to" the Chicago handgun ban invalidated

in that case); *cf Navegar, Inc. v. United States,* 192 F.3d 1050, 1053 (D.C. Cir. 1999) (upholding

federal assault weapons ban against challenges not involving the Second Amendment).

Most notably, *Heller II* has upheld the strikingly-similar D.C. laws under intermediate

scrutiny based on the evidence demonstrating that the D.C. laws are likely to promote the

Government's interest in crime control in the densely populated urban area.  Plaintiffs wrongly

argue that *Heller II* decision adopted interest-balancing approach which was condemned by

Supreme Court in *Heller*.  However, *Heller II* is strictly in line with the Supreme Court's

---

[15] *See* Center for Disease Control National Center for Injury Prevention and Control, Web-based
Injury Statistics Query and Reporting System ("WISQARS"), available at
http://www.cdc.gov/injury/wisqars/index.html (last visited on June 17, 2013).

[16] Bureau of Justice Statistics, *Crimes committed with firearms,* 1973-2007, available at
http://bjs.ojp.usdoj.gov/content/glance/tables/guncrimetab.cfm.

guidance in *Heller* as it embodies the line of reasoning of *Heller* through utilizing the 2-pronged

test.  Plaintiffs raised no compelling argument that *Heller II* ignored *Heller* and merely criticized

the general citations of *Turner* occasionally made in majority panel opinion in *Heller II*.

Plaintiffs accuse the DC Circuit in *Heller II* of allowing the government to pick and choose arms

for lawful purposes.  However, that was exactly what has been explicitly reserved by Supreme

Court in *Heller*, which explicitly validated a ban on unusual and dangerous weapons.

## V.      The Ban on Magazines Capable of Holding More Than 10 Rounds Does Not Implicate the Second Amendment.

Based on similar reasons as the case of assault weapons, a 10 round or fewer magazine

limit is constitutional.  First of all, it does not fall under the scope of the Second Amendment

protection.  A 10-round magazine limit is simply not a burden on gun ownership or the ability to

possess guns for self-defense of the home. [17]  This limitation does not and cannot disarm any

Americans.  Moreover, if Plaintiffs are correct in asserting that criminals rarely fire any rounds at

all but, instead, typically only brandish guns to threaten victims, there is no meaningful

difference between allowing 10 bullet magazines or requiring that only 10 bullets be loaded at

any particular confrontations where typically no shots will actually be fired.  Also, the

reasonableness of determining that a 10-round loading limit was the correct line to draw is

supported by the NRA's own data which shows that the average number of shots fired by an

armed citizen in self-defense is two bullets.

Even assuming that the limit on magazine capacity implicates the Second Amendment,

the appropriate level of scrutiny is intermediate scrutiny as such limit does not impose serious

burden on the armed self-defense by law-abiding citizens.

---

[17] *See* http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein; *see also* http://www.motherjones.com/special-reports/2012/12/guns-in-america-mass-shootings

The fact that many Americans own such large-capacity magazines makes no difference in defining the scope of the Second Amendment. Supreme Court provided that "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Heller,* 554 U.S. at 627-28. Analogously, modern-day developments in gun power and market dynamics should have no legal impact on expanding or limiting the scope of Second Amendment.

## CONCLUSION

Under the principles established by *Heller* and *McDonald*, a ban on assault weapons and its requirement of a 10-round or fewer loading limit do not implicate Second Amendment rights and, even assuming that they do, they are constitutionally justified under intermediate scrutiny as they impose no severe burden on the core self-defense rights under Second Amendment and substantially serves the important government purpose to protect the lives of its citizens from dangerous and unusual weapons that were dominantly used for gun violence and mass shootings.

For the reasons set forth above, this Court should deny Plaintiffs' motion for summary judgment and grant the Defendants' cross motion for summary judgment.

**Of counsel:**

Jonathan E. Lowy
Brady Center to Prevent Gun
  Violence
Legal Action Project
1225 Eye Street, NW, #1100
Washington, DC  20005
(202) 289-7319
jlowy@bradymail.org


Gregory G. Little
White & Case, LLP
1155 Avenue of the Americas
New York, NY  10036
(212) 819-8200
gregory.little@whitecase.com

**Respectfully submitted,**

**AMICI CURIAE THE MAJOR CITIES
CHIEFS ASSOCIATION, THE
INTERNATIONAL BROTHERHOOD OF
POLICE OFFICERS, THE NATIONAL
ORGANIZATION OF BLACK LAW
ENFORCEMENT EXECUTIVES and THE
BRADY CENTER TO PREVENT GUN
VIOLENCE**

**By:**    **/s/ Alinor C. Sterling_____**
        **Alinor C. Sterling (ct17207)**
        **Joshua D. Koskoff (ct15619)**
        **Koskoff Koskoff & Bieder**
        **350 Fairfield Avenue**
        **Bridgeport, CT  06604**
        **Tel.:**  **(203) 336-4421**
        **Fax:**  **(203) 368-3244**
        **asterling@koskoff.com**
        **jkoskoff@koskoff.com**

## **CERTIFICATION OF SERVICE**

I hereby certify that on October 18, 2013, a copy of the foregoing was filed electronically and served by mail on parties unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to parties unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


**   /s/ Alinor C. Sterling                                        **
**Alinor C. Sterling**